IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA
COLUMBIA DIVISION

| | | |
|---|---|---|
| Shauna Ashmon<br>and Genecia Drayton, | ) | C/A No.: 3:23-cv-05228-SAL-PJG |
| | ) | |
| Plaintiffs, | ) | |
| | ) | **MOTION FOR SUMMARY JUDGMENT** |
| v. | ) | **ON BEHALF OF DEFENDANTS** |
| | ) | |
| Cpl. Zalenski, M.D. Tyler Wolfe, Gen. Robert | ) | |
| Harris, Deputy Christopher Blackmon, and | ) | |
| Richland County Sheriff's Department, | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

## STATEMENT OF FACTS

By way of background, the FLOCK safety system[1] utilizes advanced traffic sensors such as license plate recognition (LPR) cameras to capture and digitalize images from license plates. *See* Ex. A, pp. 27-29. These cameras assist in preventing and investigating criminal activity by automatically detecting, capturing, and recording license plate information. *Id*. A FLOCK alert is disseminated in two formats. *See* Ex. A, p. 29. Via cell phone messaging and another on the deputies' mobile data terminal in their patrol cars to verify or check this information. *See* Ex. C, p. 44. The cell phone information provides the location of the camera, which direction the vehicle is traveling, and the plate number. *Id*. The text message contains a link. *Id*. Pressing that link opens a web browser which contains any pictures captured by the LPR camera. *Id.*

The following facts are taken in in a light most favorable to Plaintiffs: On July 16, 2023, Richland County Sheriff's Department ("RCSD") Deputies Mariusz Zalewski and Tyler Wolfe

---

[1] The FLOCK system is instituted in various locations in Richland County and is not a function performed by the RCSD. *See* Ex. A, pp. 81-82.

were on routine patrol in the area of Summit Parkway in Richland County, South Carolina when the FLOCK system alerted them to a stolen plate specifically containing "VED953." *See* Ex. A, pp. 27, 58. The nature of the call out was that of a stolen plate. *Id*. Zalewski was able to access both the text and web browser as described above. He was able to make out a picture of the make and model of the vehicle (*i.e.*, Toyota Camry) and the letters and numbers on the tag. *See* Ex. C, p. 16. The plate had a white background with a mixture of colors with black lettering. *Id*. Beyond this, the perimeter of the plate in which the state is referenced was blurred and not readable. *Id.,* pp. 44-45. Zalewski then referred to NCIC system which confirmed that the plate was stolen. Id., p. 17.

Zalewski then called out this information on the radio, indicating the information regarding the make, model, and color of the vehicle; plate information; and that the plate was stolen. *Id*., p. 22. RCSD Region deputies, including Wolfe, were actively looking for that stolen plate at the time. *See*, Ex. B. Zalewski was traveling on Summit Parkway towards Clemson Road when he observed the vehicle matching the description. *See* Ex. C, p. 22. Zalewski called Wolfe advising that he located the subject vehicle they were looking for and confirmed it. *See*, Ex. B. This would entail initiating a felony traffic stop with Wolfe and others responding in a back-up capacity. *Id*. Wolfe separately performed a records check on license plate VED953 which was returning as stolen. *Id*. Wolfe then arrived at the subject location having similarly received a positive notification pertaining to this tag as stolen. *Id*.

Both Zalewski and Wolfe performed a felony stop, with Wolfe as the contact officer, and Zalewski as cover officer. *See*, Ex. B. Both deputies withdrew their sidearms and kept them in a "low ready" position. *Id*. Neither deputy pointed their firearm at the occupants. *See* Ex. A, p. 85; *see also* Ex. B, pp. 46-47.

Wolfe gave loud clear verbal commands to the occupants, who are the Plaintiffs, for their hands to be placed outside of the vehicle. *See*, Ex. B. Wolfe then then advised the driver

Ashmon to remove the keys from the ignition and place them on the ground. *Id*. At this point, both occupants began to exit the vehicle stating that there was a misunderstanding. *Id*. Wolfe immediately holstered his sidearm and approached Drayton, who was attempting to lay on the ground outside the passenger side of the vehicle. *Id*. Wolfe instructed Drayton to stand up[2] and place her hands behind her back, to which she complied with hesitation. *Id*. Wolfe then placed Drayton in the rear of his patrol vehicle and confirmed that the air conditioning was activated.[3] *Id*. After Drayton was secure in the marked patrol vehicle, Wolfe then explained why the felony stop occurred and what potential crime they were investigating. *Id*.

_____

At the time Wolfe was first interacting with the passenger Drayton, Zalewski was approaching the driver's side and giving commands for Ashmon to exit the car. *See* Ex. C, p. 25. Zalewski then approached her and placed her investigative detention. *Id*., p. 27. Specifically, Zalewski handcuffed Ashmon and explained that the reason for the stop was that the plate was stolen and he needed to investigate. *Id*. Wolfe then approached and asked Ashmon about her identification card and she indicated that it was in a purse on the floorboard. *See*, Ex. B. Wolfe retrieved and handed Ashmon's driver's license to Zalewski. *Id*.

During Zalewski's investigation, he noted that the tag on the Camry was an Alaska license plate. *See* Ex. C, p. 29. Zalewski returned to his vehicle and conducted an inquiry with this more particularized information, including the VIN associated with the Camry. *Id*., pp. 29-30. The vehicle and tag came back as clear. Zalewski then returned to where Ashmon

_____

[2] Wolfe described his actions during this time: "I prevented [Drayton] laying on the ground due to the ambient temperature and did not want any burns or injuries to occur from her laying on the hot pavement." *Id*.

[3] Again, per Wolfe, "I made the decision to place [Drayton] in the vehicle for her safety from the roadway as well as preventing any excessive heat related injuries due to the temperature outside." *Id*.

was standing. *Id.*, p. 31. He apologized to Ashmon. *Id.* By this time, Deputy Blackmon had arrived and uncuffed Ashmon releasing her from detention. *See* Ex. D, p. 31. Also, Wolfe then immediately walked to his patrol vehicle and removed Drayton from his patrol vehicle and removed her from handcuffs. *See*, Ex. B. He then explained how deputies were led to believe that the tag on the vehicle could possibly been stolen; explained that the Alaska tag that was displayed was not stolen; and that the tag displayed on the stolen SC tag used the same format of three letters then three numbers (with all 6 matching those appearing on the vehicle Plaintiffs were occupying). *Id.* Wolfe then apologized and left the scene with other deputies. *Id.*

INSTANT CIVIL ACTION

In the above-captioned civil action, Plaintiffs name the Defendants Zalewski, Wolfe, Harris, and Blackmon in their individual capacities and the RCSD pursuant to 42 U.S.C. § 1983, alleging that their Fourth and Fourteenth Amendment rights were violated as well as state law causes of action for negligence; false arrest and imprisonment; and assault and battery. *See generally* Dkt 1.

The Defendants assert that they acted appropriately and reasonably at all relevant times and categorically deny that they violated Plaintiffs' constitutional rights. Consequently, the Defendants now move for summary judgment pursuant to Rule 56, FRCP, based upon the following grounds:

**I.    PLAINTIFFS HAVE FAILED TO STATE CAUSES OF ACTION AGAINST THE DEFENDANTS FOR FOURTH AMENDMENT DEPRIVATIONS UNDER 42 U.S.C. §1983**

**II.   THE DEFENDANTS BLACKMON AND HARRIS CANNOT BE HELD LIABLE UNDER 42 U.S.C. §1983 BASED UPON INDIVIDUAL LIABILITY CONSIDERATIONS**

**III.  PLAINTIFFS' ALLEGATIONS THAT THEY WERE DEPRIVED OF THEIR FOURTEENTH OR FIFTEENTH AMENDMENT RIGHTS ARE UNSUPPORTED IN THE PLEADINGS OR THE RECORD AND THEREFORE FAIL TO STATE A CLAIM**

**IV.    THE DEFENDANT RCSD IS NOT AMENABLE TO SUIT**

**V.     THE DEFENDANT SHERIFF IS THE ALTER EGO OF THE STATE OF SOUTH CAROLINA AND, AS SUCH, IS NOT A "PERSON" AMENABLE TO SUIT UNDER 42 U.S.C. § 1983**

**VI.    THE DEFENDANT SHERIFF IS ENTITLED TO ELEVENTH AMENDMENT IMMUNITY**

**VII.   THE DEFENDANT DEPUTIES ARE ENTITLED TO QUALIFIED IMMUNITY FROM ALL LIABILITY**

**VIII.  PLAINTIFFS' STATE LAW CLAIMS ARE WITHOUT MERIT AND MUST BE DISMISSED**

**IX.    ABSOLUTE IMMUNITY UNDER THE SOUTH CAROLINA TORT CLAIMS ACT**

## DISCUSSION

**I.     PLAINTIFFS HAVE FAILED TO STATE CAUSES OF ACTION AGAINST THE DEFENDANTS FOR FOURTH AMENDMENT DEPRIVATIONS UNDER 42 U.S.C. §1983**

### A.    The traffic stop was lawfully justified

Plaintiffs allege that the Defendants violated their Fourth Amendment rights during the relevant events. The constitutionality of a traffic stop is assessed under the two-prong standard in *Terry v. Ohio*, 392 U.S. 1 (1968). First, the articulated basis for the traffic stop must be legitimate. *See United States v. Rusher*, 966 F.2d 868, 875 (4th Cir. 1992). Second, the officers' actions during the traffic stop must be "reasonably related in scope" to the basis for the seizure. *Id.*

A traffic stop constitutes a seizure under the Fourth Amendment and must be justified by reasonable suspicion of criminal activity or some other exception to the generally applicable warrant requirement. *United States v. Feliciana*, 974 F.3d 519, 522 (4th Cir. 2020). "[A] police officer can, consistent with the Fourth Amendment, conduct a brief, investigative stop (i.e., a *Terry* stop) predicated on reasonable, articulable suspicion that criminal activity may be afoot." *Milla v. Brown*, 109 F.4th 222 (4th Cir. 2024) (internal

quotations and citations omitted). An officer with reasonable suspicion has "a particularized and objective basis for suspecting the particular person stopped of criminal activity." *Kansas v. Glover*, 589 U.S. 376, 380 (2020) (citing *United States v. Cortez*, 449 U.S. 411, 417-18 (1981)). Reasonable suspicion is a "commonsense, nontechnical" standard that relies on the judgment of experienced law enforcement officers, "not legal technicians." *Ornelas v. United States*, 517 U.S. 690, 695 (1996) (citation and internal quotation marks omitted). To support a finding of reasonable suspicion, the detaining officer must "either articulate why a particular behavior is suspicious or logically demonstrate, given the surrounding circumstances, that the behavior is likely to be indicative of some more sinister activity than may appear at first glance." *United States v. Foster*, 634 F.3d 243, 248 (4th Cir. 2011). Accordingly, "an officer's articulated facts must in their totality serve to eliminate a substantial portion of innocent travelers before reasonable suspicion will exist." *United States v. McCoy*, 513 F.3d 405, 413 (4th Cir. 2008). Courts look to the totality of the circumstances in determining whether an officer had reasonable suspicion of criminal activity. *United States v. Arvizu*, 534 U.S. 266, 273 (2002); *see also Ornelas,* at 695 ("The principal components of a determination of reasonable suspicion ... will be the events which occurred leading up to the stop or search, and then the decision ***whether these historical facts***, viewed from the standpoint of an objectively reasonable police officer, amount to reasonable suspicion.") (emphasis added)

Based on the totality of the circumstances, the information known to Zalewski and Wolfe was that the Toyota vehicle operated by Ashmon displayed the same 6 letters and numbers as a plate that was listed as stolen. The FLOCK system alerted deputies to a certain make and model of a vehicle depicting readable characters on the license plate, which came back stolen. This was confirmed via three indicators available to the deputies in their vehicles: the FLOCK text, the FLOCK website, and the National Crime Information Center (NCIC). Within a short time frame, Zalewski observed the vehicle that was captured by the FLOCK

camera possessing the same information listed in the FLOCK communications. Specifically, a white Toyota Camry with a plate containing a white background with a combination of colors with black characters bearing the characters VED953. The car displayed a stolen license tag, and the stop occurred within the RCSD jurisdiction. Hence, ***based on the historical facts knownⁿ*** to Zalewski at the time of the stop, Zalewski had a particularized and objective basis to believe that the driver of the Toyota Camry was, at a minimum, violating the criminal statute entitled, "*Use of license plate on vehicle other than vehicle for which plate was issued." See* § 56-3-1360 ("No person shall drive or operate any motor vehicle … on a highway displaying thereon a vehicle license plate which was issued for any other vehicle [ ]").

The traffic stop was additionally predicated on reasonable, articulable suspicion that the Toyota Camry may actually have been stolen. In his deposition, Tyler logically demonstrated, given the surrounding circumstances, that the presence of what appeared to be a stolen tag was likely indicative of some more sinister activity than may appear at first glance. *See e.g. Foster* at 248.

Q: When you said [Z] had determined it was gonna be a felony stop, in what context did he say that to you?

A: That was the indication when you ask or advise other units you're going to wait for more units before you light up a car and activate blue lights for a traffic stop.

Q: And what would make this a felony stop?

A: The stolen plate being displayed on the car.

Q: That's a felony?

A: No. The fact that a stolen plate on a car means it doesn't belong on that car because it's been stolen. The likelihood of the car it's displayed on being stolen is high, which is a felony. Possession of a stolen vehicle.

Q: So the stealing of the plate is not a felony. It's the stolen car that would be a felony?

7

A:      The possession of it.

*See* Ex. A, pp. 41-42.

The statute in which Wolfe was referring is *Receiving, possessing, concealing, selling, or disposing of stolen vehicle*. *See* S.C. Code Ann. § 16-21-80 ("A person not entitled to the possession of a vehicle who receives, possesses, conceals, sells, or disposes of it, knowing it to be stolen or converted under circumstances constituting a crime, is guilty of a [ ] (2) felony and, upon conviction, must be fined in the discretion of the court or imprisoned not more than five years, or both, if the value of the vehicle is more than two thousand dollars but less than ten thousand dollars.")

Upon receiving information indicating the tag on the vehicle Plaintiff was driving was reported stolen, Zalewski and Wolfe had sufficient reasonable, articulable, and particularized suspicion that Plaintiff was engaged in criminal activity to initiate an investigatory stop. Moreover, Defendant Wolfe's training and experience dictated that individuals often use stolen tags on vehicles to hide other, more significant crimes. *Illinois v. Wardlow*, 528 U.S. 119, 125. ("Our determination of reasonable suspicion must give due weight to commonsense judgments and inferences about human behavior made by officers in light of their experience and training."); *see also United States v. Perkins*, 363 F.3d 317, 321 (4th Cir. 2004)); *see also United States v. Lender*, 985 F.2d 151, 154 (4th Cir. 1993) ("Reasonable suspicion is a commonsensical proposition. Courts are not remiss in crediting the practical experience of officers who observe on a daily basis what transpires on the street.").

### B.      Ordering Plaintiffs out the car was lawfully justified

In their Complaint, Plaintiffs allege that "Defendant Zalenski aggressively ordered Plaintiff Ashman to throw her keys out of the car and to hold both of her hands out of the driver's side window. [ ] Defendant Zalenski then ordered Plaintiffs out of the car." *See* Dkt 1,

¶¶ 14, 15. The Defendants would show that directing Plaintiffs to exit the car was both justified and lawful.

The Supreme Court and the Fourth Circuit Court of Appeals have long held that ensuring officers' personal safety is of critical importance in the conduct of traffic stops.[4] It is well established that officers performing a lawful stop are "authorized to take such steps as [are] reasonably necessary to protect their personal safety" thereafter. *United States v. Hensley,* 469 U.S. 221, 235 (1985); *United States v. Soriano-Jarquin*, 492 F.3d 495, 500 (4th Cir. 2007). For example, the Court noted in *Maryland v. Wilson,* 519 U.S. 408 (1997), that "a police officer may as a matter of course order the driver of a lawfully stopped car to exit his vehicle." *Id.* at 410 (citing *Pennsylvania v. Mimms,* 434 U.S. 106, (1977) (per curiam)). This analysis equally applies to Drayton, the passenger. This safety interest attaches to officers' interactions with passengers as well as with drivers, because passengers may likewise present to officers who interrupt their journey a risk of personal harm. Because the **"**danger to an officer from a traffic stop is likely to be greater when there are passengers in addition to the driver in the stopped car," *Wilson,* 519 U.S. at 414, the Court held that they too could be ordered by the officer to exit a vehicle, *Id.* at 410, 412. If an officer may "as a matter of course" and in the interest of personal safety order a passenger physically to exit the vehicle, he may surely take the minimally intrusive step of requesting passenger identification.

---

[4] *Michigan v. Long,* 463 U.S. 1032, 1047 (1983) (recognizing that "investigative detentions involving suspects in vehicles are especially fraught with danger to police officers."); *United States v. Braxton*, 456 F. App'x 242, 246 (4th Cir. 2011) (noting that the cases "are legion" that hold that suspicion of a stolen vehicle carries with it the suspicion that weapons may be present); *see also Pennsylvania v. Mimms,* 434 U.S. 106, 110 (1977) ("[W]e have specifically recognized the inordinate risk confronting an officer as he approaches a person seated in an automobile. According to one study, approximately 30% of police shootings occurred when a police officer approached a suspect seated in an automobile … Indeed, it appears that a significant percentage of murders of police officers occurs when the officers are making traffic stops.") (internal quotation marks and citations omitted).

**C.    The length of the encounter was brief and lawful**

During a stop of a vehicle justified by a reasonable suspicion of criminal activity, law enforcement officers "may briefly detain and investigate such a vehicle and its occupants." *United States v. Singh,* 363 F.3d 347, 355 (4th Cir.2004). Likewise, in this case, if the Defendant deputies had the reasonable suspicion to justify stopping Plaintiffs, they could also briefly detain them, and the vehicle in which they had been sitting, for further investigation. In fact, any felony stop procedures used for officer safety purposes would not convert a *Terry* stop into an arrest. *United States v. Holmes,* 376 F.3d 270, 276 n. 2 (4th Cir.2004); *see also United States v. Elston*, 479 F.3d 314, 320 (4th Cir. 2007) ("Importantly, the techniques that the officers used to effect [the suspect's] detention were consistent with an investigatory stop under *Terry.* Our decisions have recognized that drawing weapons, handcuffing a suspect, placing a suspect in a patrol car for questioning, or using or threatening to use force does not necessarily elevate a lawful stop into a custodial arrest.")

Moreover, as Plaintiffs were placed in investigatory detention, the deputies' subsequent actions were reasonably related to the scope of the stop. As the Supreme Court held in *Rodriguez v. United States*, 575 U.S. 348, 354 (2015):

> A seizure for a traffic violation justifies a police investigation of that violation. A relatively brief encounter, a routine traffic stop is more analogous to a so-called '*Terry* stop' ... than to a formal arrest.  Like a *Terry* stop, the tolerable duration of police inquiries in the traffic-stop context is determined by the seizure's "mission" -- to address the traffic violation that warranted the stop. Because addressing the infraction is the purpose of the stop, it may last no longer than is necessary to effectuate that purpose. Authority for the seizure thus ends when tasks tied to the traffic infraction are -- or reasonably should have been -- completed.

(alteration and internal quotation marks omitted); s*ee also United States v. Howell*, 71 F.4th 195, 202 (4th Cir. 2023), *cert. denied,* 144 S. Ct. 1039 (2024) ("In assessing whether a detention is too long in duration to be justified as an investigative stop," it is "appropriate to

examine whether the police diligently pursued a means of investigation that was likely to confirm or dispel their suspicions quickly." (quoting *United States v. Sharpe*, 470 U.S. 675, 686 (1985)) Finally, despite the intrusive nature of a detention accompanied or effectuated by handcuffing "the use of handcuffs serves to minimize the risk of harm to officers, the arrestee, and bystanders." *E.W. by & through T.W. v. Dolgos*, 884 F.3d 172, 193 (4th Cir. 2018).

According to Zalewski and Wolfe's body worn camera ("BWC") videos, the stop and investigative detention of Plaintiffs lasted roughly five minutes in its entirety, *to wit*:

- 15:59:34 [Zalewski video]    Zalewski's traffic stop of Plaintiffs
- 15:59:41 [Wolfe video]    Wolfe directs Plaintiffs to show their hands
- 16:00:19 [Zalewski video]    Ashmon placed in handcuffs
- 16:00:23 [Wolfe video]    Drayton placed in handcuffs
- 16:02:03 [Wolfe video]    Wolfe retrieves Ashmon's purse
- 16:02:35 [Wolfe video]    Wolfe hands Ashmon driver's license to Zalewski
- 16:04:11 [Zalewski video]    Zalewski verifies that car and tag are not stolen
- 16:04:34 [Zalewski video]    Blackmon uncuffs Ashmon
- 16:04:48 [Wolfe video]    Wolfe uncuffs Drayton

*See* Exs. G, H.

These time intervals tell the actual story. The deputies responded to a high-risk traffic stop promptly and efficiently, having placed both Plaintiffs in investigative detention in less than one minute after the stop. Zalewski and Wolfe's subsequent actions were reasonably related to the scope of the stop. *United States v. Palmer*, 820 F.3d 640, 648-49 (4th Cir. 2016) ("Pursuant [to *Terry*], we first assess whether the articulated bases for the traffic stop were legitimate. Second, we examine whether the actions of the authorities during the traffic stop were reasonably related in scope to the bases for the seizure.") (alterations omitted) Specifically, roughly 96 seconds elapsed during which time Zalewski (1) retrieved Ashmon's

license; (2) performed an investigation; (3) communicated with his supervisor;[5] and then (4) made the determination that Ashmon was clear. In total, Ashmon and Drayton were handcuffed for approximately 4 minutes, 15 seconds, and 4 minutes, 25 seconds, respectively. These deputies clearly used "the least intrusive means reasonably available to verify or dispel [their] suspicion in a short period of time." *Palmer,* at 649.

## II. THE DEFENDANTS BLACKMON AND HARRIS CANNOT BE HELD LIABLE UNDER 42 U.S.C. §1983 BASED UPON INDIVIDUAL LIABILITY CONSIDERATIONS

While it is not delineated in the Complaint, Plaintiffs are alleging federal constitutional claims against Defendants Blackmon and Harris based on constitutional injuries allegedly sustained at the relevant times.

It is well settled that the personal involvement of a defendant is a strict prerequisite for the imposition of monetary liability under §1983. In order for an individual to be liable under § 1983, it must be "affirmatively shown that the official charged acted personally in the deprivation of the plaintiff's rights … Consequently, (the defendant) must have had personal knowledge of and involvement in the alleged deprivation of appellant's rights in order to be liable." *Wright v. Collins*, 766 F.2d 841, 850 (4th Cir. 1985); *see also Procuneir v. Navarette*, 434 U.S. 555, 556 (1978); s*ee also Vinnedge v. Gibbs*, 550 F.2d 926, 928 (4th Cir. 1977) (finding that in order for an individual to be liable under § 1983, it must be affirmatively shown that the "official charged acted personally in the deprivation of the plaintiff's rights"); *Bennett v. Georgetown Cty. Det.*, C/A No. 2:10-0762, 2010 WL 5866595, at *4 (D.S.C. Nov. 4, 2010), *report and recommendation adopted*, 2011 WL 723131 (D.S.C. Feb. 23, 2011) (dismissing the plaintiff's claims where plaintiff failed to establish "any personal involvement in a tort of constitutional magnitude on the part of any defendant").

---

[5] *See* Ex. B; *see also* Ex. C, pp. 36-37.

In this matter, the record is conspicuously devoid of evidence that either Blackmon's or Harris' conduct rose to a constitutional dimension.

That as to the Defendant Blackmon, his participation included the following: He arrived at the scene during the encounter and Zalewski, his supervisor, asked him to place Ashmon in Blackmon's car since his car had dive gear in it. *See* Ex. D, p. 23. Blackmon then placed Ashmon in his car and activated his in-car camera. *Id.* He then was in a standby mode in case he could assist with the investigation. *Id*. At some point, Zalewski ascertained that Ashmon's information checked out whereupon he released Ashmon from her handcuffs. *Id*., pp. 28, 31. He then fully explained to Plaintiffs the reasons for the officers' actions. *Id*., pp. 31-32.

That as to Harris, he was summoned to the scene in a back-up capacity. *See* Ex. E, p. 17. Plaintiffs were already in detention at the time of his arrival while the other deputies were investigating. *Id*. Plaintiffs do not allege, nor is there evidence that Harris had any direct participation in the stop, detention, investigation, or any decision-making.

In a § 1983 action, "liability is personal, based upon each defendant's own constitutional violations." *Trulock v. Freeh*, 275 F.3d 391, 402 (4th Cir. 2001). Put differently, a colorable claim of a deprivation of a constitutional right is not sufficient for a § 1983 claim against a defendant because the plaintiff also must establish that such a person personally participated in the deprivation. *See e.g. Haggwood v. Magill, et. al*., C/A No. 5:15-3271, 2016 WL 4149986, at *4 (D.S.C. August 3, 2016). Here, Plaintiffs cannot prove that these Defendants violated their constitutional rights.

III.    **PLAINTIFFS' ALLEGATIONS THAT THEY WERE DEPRIVED OF THEIR FOURTEENTH OR FIFTEENTH AMENDMENT RIGHTS ARE UNSUPPORTED IN THE PLEADINGS OR THE RECORD AND THEREFORE FAIL TO STATE A CLAIM**

   A.    <u>**Generally**</u>

The Complaint makes cursory mentions of Fourteenth and Fifteenth Amendment deprivations. *See* Dkt 1, ¶¶ 1, 2, 29. However, Plaintiffs' Complaint and her assertions contain

no facts remotely implicating these federal constitutional rights, and as such, the Court must dismiss this allegation.

The Defendants recognize that the Court is required to provide Plaintiffs, as the non-moving parties, the benefits of factual issue inquiries and examinations of the entire record, including the pleadings. However, the Court is not obligated to create causes of action where they do not exist or where they have not been alleged. *See Beaudett v. City of Hampton*, 775 F.2d 1274, 1278 (4th Cir. 1985). It is incumbent upon a plaintiff to put sufficient facts into controversy to state a claim. *House v. Aiken County National Bank*, 956 F.Supp. 1284, 1290 (D.S.C. 1996). Moreover, the Fourth Circuit has held that conclusory allegations, without more, are insufficient to preclude the granting of the summary judgment motion. *See Smith v. American National Red Cross*, 980 F.2d 727 (4th Cir. 1992).

There exists no implication and the record fails to establish any evidence sufficient to support allegations of violations of Plaintiffs' Fourteenth or Fifteenth Amendment rights -- even had there been a proper assertion of such a claim.[6] As such, Plaintiffs' passing references to a violation of this constitutional right must be dismissed as these allegations are strictly conclusory in nature.

## IV.    THE DEFENDANT RCSD IS NOT AMENABLE TO SUIT

It is clear under the laws of the State of South Carolina, including the State Constitution, that the Sheriff of Richland County is the proper legal entity subject and amenable to suit. *See Cone v. Nettles*, 308 S.C. 109, 417 S.E.2d 523 (1992). Under the laws of the State of South Carolina, there is no entity known as the Richland County Sheriff's

---

[6]  The Supreme Court has repeatedly held that in examining claims pursuant to 42 U.S.C. § 1983, the Court must look to the specific conduct and specific provision of the Constitution allegedly violated. *Graham v. Connor*, 490 U.S. 386, 387, (1989) ("courts must identify the specific constitutional right allegedly infringed by the challenged application of force and then judge the claim by reference to the specific constitutional standard which governs that right").

Department. For this reason and strictly from a procedural perspective, the proper entity to be sued would be the Defendant Richland County Sheriff in his official capacity.

## V. THE DEFENDANT SHERIFF IS THE ALTER EGO OF THE STATE OF SOUTH CAROLINA AND, AS SUCH, IS NOT A "PERSON" AMENABLE TO SUIT UNDER 42 U.S.C. § 1983

Sheriff Lott is the duly elected sheriff for Richland County. It is well settled that a sheriff and his deputies in South Carolina are not county officers, but rather are state officers. *Cone v. Nettles*, 308 S.C. 109, 417 S.E.2d 523 (1992); *see also Gulledge v. Smart*, 691 F. Supp. 947 (D.S.C. 1988), *aff'd*, 878 F.2d 379 (4th Cir. 1989).

In *Cone*, *supra*, the South Carolina Supreme Court held that sheriffs and sheriff deputies are state officials and, therefore, are not amenable to suit for monetary damages in their official capacities. The *Cone* Court relied upon South Carolina constitutional provisions which demonstrate that a sheriff is controlled by the state. For instance, the state constitution establishes the office of sheriff and the terms of office. *S.C. Const.* art V, §24. The state constitution not only creates the office of sheriff but also delegates to the General Assembly the power to prescribe his duties and compensation and to set the age and qualifications for a candidate for sheriff. *S.C. Const.* art V, §24. Moreover, the Governor has the authority to remove a sheriff for misconduct and to fill the vacancy. Based on these factors, the *Cone* Court found that a sheriff in South Carolina, as a constitutional officer, is a state official.

These same factors persuaded the Federal District Court to conclude that a sheriff is a state officer. *See Gulledge v. Smart*, 691 F. Supp. 947 (D.S.C. 1988), *aff'd*, 878 F.2d 379 (4th Cir. 1989). The Federal District Court further held that "the sheriff and the county are distinct and separate entities in South Carolina." *Patel v. McIntyre*, 667 F. Supp. 1131, 1146 n. 26 (D.S.C. 1987), *aff'd*, 848 F.2d 185 (4th Cir. 1988); *see also Heath v. Aiken County*, 295 S.C. 416, 368 S.E.2d 904 (1988).

In *Will v. Michigan Department of State Police*, 109 S.Ct. 2304 (1989), the United States Supreme Court held that a state is not a "person" under Section 1983. Therefore, a party may not seek monetary damages against a state or a state agency pursuant to 42 U.S.C. § 1983. The Defendant Sheriff was acting as a state official and was, accordingly, an alter ego of the State. As such, the Defendant Sheriff in his official capacity is not a "person" subject to suit for monetary damages.

## VI. THE DEFENDANT SHERIFF IS ENTITLED TO ELEVENTH AMENDMENT IMMUNITY

The only proper party under state law for the state claims is Leon Lott, in his official capacity as the Sheriff of Richland County. *See* S.C. Code Ann. § 15-78-70(a), (c). However, the Sheriff of Richland County is an arm of the state. *See e.g. Gulledge v. Smart*, 691 F. Supp. 947, 954-55 (D.S.C. 1988) (sheriffs and their deputies are arms of the state in South Carolina); *Allen v. Fid. & Deposit Co. of Maryland*, 515 F. Supp. 1185 (D.S.C. 1981) (same). Because the Sheriff is an arm of the state, he enjoys sovereign immunity pursuant to the Eleventh Amendment. *See Pennhurst State School & Hosp. v. Halderman*, 465 U.S. 89, 100 (1984) ("It is clear, of course, that in the absence of consent a suit in which the State or one of its agencies or departments is named as the defendant is proscribed by the Eleventh Amendment."). South Carolina, and arms thereof, has not waived its Eleventh Amendment sovereign immunity or otherwise consented to suit in federal court. *See* S.C. Code Ann. § 15-78-20(e) ("Nothing in [the Tort Claims Act] is construed as a waiver of the state's or political subdivision's immunity from suit in federal court under the Eleventh Amendment to the Constitution of the United States …"). Since the only proper defendant for the state law claims is entitled to sovereign immunity under the Eleventh Amendment, all state law claims must be dismissed.

**VII. THE DEFENDANT DEPUTIES ARE ENTITLED TO QUALIFIED IMMUNITY FROM ALL LIABILITY**

**A.** **Overview**

The doctrine of qualified immunity "'balances two important interests – the need to hold public officials accountable when they exercise power irresponsibly and the need to shield officials from harassment, distraction, and liability when they perform their duties reasonably.'" *Wilson v. Prince George's Cty.*, 893 F.3d 213, 219 (4th Cir. 2018) (quoting *Pearson v. Callahan*, 555 U.S. 223, 231, (2009)); *see also Betton v. Belue*, 942 F.3d 184, 190 (4th Cir. 2019); *Smith v. Ray*, 781 F.3d 95, 100 (4th Cir. 2015). Put another way, "[q]ualified immunity shields government officials who commit constitutional violations but who, in light of clearly established law, could reasonably believe that their actions were lawful." *Hunter v. Town of Mocksville, N.C.*, 789 F.3d 389, 401 (4th Cir. 2015) (internal quotations omitted); *see also Humbert v. Mayor and City Council of Baltimore City*, 866 F.3d 546, 555 (4th Cir. Cir. 2017), *cert. denied*, 138 S. Ct. 2602 (2018); *Osborne v. Georgiades*, 679 F. App'x 234, 237 (4th Cir. Cir. 2017); *Scinto v. Stansberry*, 841 F.3d 219, 235 (4th Cir. Cir. 2016). In *Owens*, 767 F.3d at 395, the Fourth Circuit reiterated: "Qualified immunity protects government officials from liability for 'civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" (Quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818, (1982)).

As the Fourth Circuit recently held in *Rambert v. City of Greenville*, 107 F.4th 388, 397-98 (4th Cir. 2024):

> The protection applies regardless of whether the government official's error is a mistake of law, a mistake of fact or a mistake based on mixed questions of law and fact. It gives government officials breathing room to make reasonable but mistaken judgments, and protects all but the plainly incompetent or those who knowingly violate the law.

(internal citations omitted)

**B.**     **Plaintiffs have not shown that their federal constitutional rights were violated**

In the Fourth Circuit, plaintiffs bear the burden of proof to show that a constitutional violation occurred, while "defendants bear the burden of showing that the violation was not clearly established, and they are therefore entitled to qualified immunity." *Mays v. Sprinkle*, 992 F.3d 295, 302 n.5 (4th Cir. 2021).

Plaintiffs allege in their Complaint that the Defendant deputies violated their federal constitutional rights by stopping and detaining them without legal justification. The Defendants submit based upon the foregoing grounds, that the evidence taken in a light most favorable to Plaintiffs, expressly fails to demonstrate any violation of such rights. *Supra*. Furthermore, a seizure pursuant to articulable, reasonable suspicion, even if it is the product of a mistake of fact, does not give rise to a constitutional violation.

Because the facts do not support Plaintiffs' allegations of any constitutional injury, the qualified immunity analysis need not proceed further. The Defendants are entitled to judgment as a matter of law.

**C.**     **The unconstitutionality of the individual Defendants' conduct was not clearly established such that a reasonable police officer in their position would have known that his conduct was unlawful**

If an officer is shown to have violated the rights of a plaintiff, courts must then "evaluate whether the right at issue was 'clearly established' at the time of the officer's conduct. [ ] Accordingly, even when the facts in the record establish that the officer's conduct violated a plaintiff's constitutional rights, the officer still is entitled to immunity from suit 'if a reasonable person in the [officer's] position could have failed to appreciate that his conduct would violate those rights.'" *Wilson*, 893 F.3d at 219 (quoting *Torchinsky v. Siwinski*, 942 F.2d 257, 261 (4th Cir. 1991)) (other citation omitted); *see also Williams v. Strickland*, 917 F.3d 763, 768

(4th Cir. 2019); *Greene v. Feaster*, 733 F. App'x 80, 82 (4th Cir. 2018) (per curiam) ("Even when a prison official [is shown to have violated a constitutional right of a plaintiff], qualified immunity will shield him from liability as long as his 'conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'") (quoting *Goines*, 822 F.3d 159, 170).

The second inquiry "turns on the 'objective legal reasonableness' of the action, assessed in light of the legal rules that were 'clearly established' at the time it was taken." *Messerschmidt v. Millender*, 565 U.S. 535, 546 (2012) (citing *Anderson v. Creighton*, 483 U.S. 635, 639 (1987)). If the law at the time of the alleged violation was not "clearly established," the official will be entitled to qualified immunity because "an official could not reasonably be expected to anticipate subsequent legal developments, nor could he fairly be said to 'know' that the law forbade conduct not previously identified as unlawful." *Harlow*, 457 U.S. at 818. On the other hand, "[i]f the law was clearly established, the immunity defense ordinarily should fail, since a reasonably competent public official should know the law governing his conduct." Id. at 818-19.

An objectively reasonable police officer in these deputies' position would not know that their conduct was unlawful in these circumstances. Beyond this, a key inquiry for purposes of qualified immunity is whether arguable reasonable suspicion existed from these deputies' perspective. While appellate courts have routinely held that to be afforded qualified immunity, an officer need not have reasonable suspicion, but only arguable reasonable suspicion. *See Chestnut v. Wallace*, 947 F.3d 1085, 1093-94 (8th Cir. 2020) ("If we determine that an officer lacked reasonable suspicion, he may nonetheless be entitled to qualified immunity if he had arguable reasonable suspicion -- that is, if a reasonable officer in the same position could have believed he had reasonable suspicion.") (Emphasis added) (Internal quotation marks omitted); *see also De La Rosa v. White*, 852 F.3d 740, 745–46 (8th Cir. 2017); cert. denied.,

138 S.Ct. 737 (2018) ("Trooper White is entitled to qualified immunity if a reasonable officer could have believed that he had a reasonable suspicion; in other words, if he had arguable reasonable suspicion."); *see also Jackson v. Sauls*, 206 F.3d 1156, 1166 (11th Cir. 2000). ("When an officer asserts qualified immunity, the issue is not whether reasonable suspicion existed in fact, but whether the officer had 'arguable' reasonable suspicion to support an investigatory stop.") *see also Leon v. Summit Cty.*, 755 F. App'x 790, 794-95 (10th Cir. 2018)("Plaintiff's allegations need to show that Graham lacked even arguable reasonable suspicion. The Complaint fails that test.") (Emphasis in original); *see also McColley v. Cty. of Rensselaer*, 740 F.3d 817, 850–51 (2nd Cir. 2014) ("Even if the [ ] affidavit did not thus demonstrate reasonable suspicion [ ], Riley would still be entitled to qualified immunity as long as the affidavit established arguable reasonable suspicion."); *see also Eldredge v. Town of Falmouth, MA*, 662 F.3d 100, 106 (1st Cir. 2011) ("The relevant inquiry for qualified immunity purposes is not whether reasonable suspicion to conduct the stop in fact existed, but whether a reasonable officer could have believed that it did. Put another way, qualified immunity exists "so long as the presence of [reasonable suspicion] is at least arguable.") (Internal quotation marks omitted)[7]

---

[7]  These rulings are in line with Fourth Circuit precedent regarding arguable probable cause.  To receive qualified immunity, an officer need not have actual probable cause, but only arguable probable cause.  In the context of probable cause to arrest, actual probable cause is a more stringent standard than the objective reasonableness entitling a defendant to qualified immunity. *See Torchinsky v. Siwinski*, 942 F.2d 257, 261 (4th Cir. 1991); *see also Hunter v. Bryant*, 502 U.S. 224, 227 (1991) ("Even law enforcement officials who reasonably but mistakenly conclude that probable cause is present are entitled to immunity.") (internal quotation marks and citation omitted); *see also Smith v. Reddy*, 101 F.3d 351 (4th Cir. 1996) (in qualified immunity context, "[t]he reasonableness of [defendant's] conduct does not turn on whether probable cause was, in fact, present"); *see also Gomez v. Atkins*, 296 F.3d 253, 261-62 (4th Cir. 2002) ("In our assessment of whether Atkins is entitled to qualified immunity, however, the question is not whether there actually was probable cause for the murder warrant against [Gomez], but whether an objective law officer could reasonably have believed probable cause to exist.")

In terms of arguable reasonable suspicion, the focus here is not if there was indeed an objective justification for the stop. In a qualified immunity context, the proper test is whether an officer in Zalewski or Wolfe's position ***could have believed*** that reasonable suspicion existed. That Zalewski and Wolfe decided to conduct a brief traffic stop in light of their personal observations, the unconstitutionality of their conduct was not clearly established. Quite simply, based on the historical facts, an objectively reasonable police officer in their position could have believed that reasonable suspicion existed by initiating a felony traffic stop and place Plaintiffs in investigative detention.

Here, Zalewski and Wolfe did not transgress any bright line. *See Maciariello v. Sumner*, 973 F.2d 295, 298 (4th Cir. 1992) ("[O]fficials are not liable for bad guesses in gray areas, they are liable for transgressing bright lines.") As a result, the 'unconstitutionality' of his conduct was not clearly established such that a reasonable police officer in his position would have known that his conduct was unlawful.

## VIII. PLAINTIFFS' STATE LAW CLAIMS ARE WITHOUT MERIT AND MUST BE DISMISSED

Each of Plaintiffs' state law claims (false arrest, negligence, and assault and battery) fails because Plaintiffs cannot prove the requisite elements of those claims.

### A. False Arrest and False Imprisonment

A claim for false arrest or imprisonment is defined as "depriving a person of his liberty without lawful justification." *Law v. S.C. Dep't of Corr.*, 368 S.C. 424, 435, 629 S.E.2d 642, 651 (2006). In order to prevail on this cause of action, Plaintiffs have the burden of proving that: (1) Defendant restrained him, (2) the restraint was intentional, and (3) the restraint was unlawful. *Id.* "The fundamental issue in determining the lawfulness of an arrest is whether there was probable cause to make the arrest." *Id*.

Thus, the false arrest claim requires Plaintiffs to plead and prove the absence of articulable, reasonable suspicion. As set forth in section I. above, these deputies had adequate legal justification to stop and conduct a brief investigative detention of Plaintiffs. Therefore, Plaintiffs cannot prevail on a state law claim for false imprisonment.

**B.** **Negligence**

Plaintiffs also assert claims for negligence. Obviously, in order to prevail on a negligence claim, Plaintiffs must prove: "(1) a duty of care owed by the defendant to the plaintiff; (2) a breach of that duty by a negligent act or omission; and (3) damage proximately resulting from the breach." *Chakrabarti v. City of Orangeburg*, 403 S.C. 308, 314, 743 S.E.2d 109, 112 (Ct. App. 2013). The court must determine whether the law recognizes a particular duty, because if there is no duty, a negligence claim fails. *Id.*

The South Carolina Supreme Court addressed the legal duty that law enforcement officers owe when investigating potential crimes in *Wyatt v. Fowler*, 326 S.C. 97, 484 S.E.2d 590 (1997). In *Wyatt*, the supreme court held that "the police owe a duty to the public at large and not to any individual." *Id.* at 101, 484 S.E.2d at 592. "More specifically, the state does not owe its citizens a duty of care to proceed without error when it brings legal action against them." *Id.* Under the holding of *Wyatt*, it is clear that our state does not recognize a cause of action for negligent arrest or negligent investigation of a crime. Therefore, Defendants are entitled to summary judgment on Plaintiffs' negligence claims.

**C.** **Assault and Battery**

Not only do Plaintiffs lack any factual support for a claim of assault or battery, such a claim would fail as a matter of law because the Defendant deputies acted with lawful justification (*i.e.*, with reasonable suspicion) as discussed above. It is clear that assault and battery both require wrongful or unlawful conduct. *See Herring v. Lawrence Warehouse Co.*, 222 S.C. 226, 241 72 S.E.2d 453, 458 (1952) ("Where, however, the basis of an action is

assault and battery, the intention with which the injury was done is immaterial so far as the maintenance of the action is concerned, ***provided the act causing the injury was wrongful***, for if the act was wrongful, the intent must necessarily have been wrongful.) (emphasis added, internal alterations omitted); *Gathers v. Harris Teeter Supermarket, Inc.*, 282 S.C. 220, 230, 317 S.E.2d 748, 754 (Ct. App. 1984) ("A battery is the actual infliction of any ***unlawful, unauthorized*** violence on the person of another, irrespective of its degree."). Because the deputies were justified in stopping and detaining Plaintiffs, any incidental contact they may have had with Plaintiffs cannot form the basis for liability.

## IX.    ABSOLUTE IMMUNITY UNDER THE SOUTH CAROLINA TORT CLAIMS ACT

Plaintiffs' Complaint centers around the manner in which the investigation leading to their brief seizure was conducted. However, under the immunity afforded by the South Carolina Tort Claims Act, Defendants are not liable for losses resulting from the methods they employ in providing police protection. S.C. Code Ann. § 15-78-60(6). Moreover, the decision whether or not to seize or question a person constitutes a discretionary function, and therefore Defendants also enjoy immunity pursuant to § 15-78-60(5). Lastly, any allegations that Defendants failed to follow proper procedures during the seizure are foreclosed by the immunity provided by § 15-78-60(4). Because the Tort Claims Act provides the Defendant Sheriff with immunities applicable to each of Plaintiffs' state law claims, he is entitled to summary judgment on all claims.

## CONCLUSION

For the numerous reasons set forth above, the Defendants respectfully request that this Court enter an order granting summary judgment in their favor as to all claims.

[Signature block on following page]

Respectfully submitted,

*/s/ Robert D. Garfield*
Robert D. Garfield, Fed. ID 7799
Steven R. Spreeuwers, Fed. ID 11766
CROWE LAFAVE GARFIELD & BAGLEY, LLC
2019 Park Street
Columbia, South Carolina 29201
803.999.1225
robert@crowelafave.com
steve@crowelafave.com

*Counsel for Defendants*

Columbia, South Carolina
October 21, 2024