IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA
COLUMBIA DIVISION

Shauna Ashmon and Genecia Drayton,    )    C/A No.: 3:23-cv-05228-SAL-PJG
    )
    Plaintiffs,    )
    )
v.    )
    )
Cpl. Zalenski, M.D.; Tyler Wolfe;    )
Gen. Robert Harris; Deputy Christopher    )
Blackmon; and Richland County    )
Sheriff's Department,    )
    )
    Defendants.    )
_____)

# EXHIBIT A
## Deposition of Tyler Wolfe

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA
COLUMBIA DIVISION

- - -

Shauna Ashmon and Genecia Drayton,

       Plaintiffs,

                                  C.A. NO.:
      vs.                        3:23-cv-05228-SAL-PJG

Cpl. Zalenski, MD; Tyler Wolfe;
Gen. Robert Harris; Deputy
Christopher Blackmon; and
Richland County Sheriff's
Department,

       Defendants.

_____

VIDEOTAPED DEPOSITION OF MASTER DEPUTY WOLFE
_____

DATE TAKEN:    Tuesday, September 10, 2024

TIME BEGAN:    2:06 p.m.

TIME ENDED:    3:58 p.m.

LOCATION:      Crowe LaFave Garfield & Bagley, LLC
                  2019 Park Street
                  Columbia, South Carolina 29201

REPORTED BY:  Lisa Garson, Court Reporter
                  EVERYWORD, INC.
                  P.O. Box 1459
                  Columbia, South Carolina 29202
                  803-212-0012

APPEARANCES:


        THE SHEALEY LAW FIRM, LLC
        BY:  ELIZABETH DALZELL, ESQUIRE
        1507 Richland Street
        Columbia, South Carolina 29201
        803.929.0008
        liz@shealeylaw.com
        Representing the Plaintiffs


        CROWE LaFAVE GARFIELD & BAGLEY, LLC
        BY:  ROBERT D. GARFIELD, ESQUIRE
             STEVEN R. SPREEUWERS, ESQUIRE
        2019 Park Street
        Columbia, South Carolina 29201
        803.999.1225
        robert@crowelafave.com
        steve@crowelafave.com
        Representing the Defendants



ALSO ATTENDING:

        ALYSSA McMAHON
        PAMELA CRABTREE, VIDEOGRAPHER

1                        I N D E X

2

3                                              PAGE

4    EXAMINATION

5          By Ms. Dalzell                         5

6          By Mr. Spreeuwers                      78

7    Certificate of Reporter                      91

8

9                     E X H I B I T S

10   WOLFE EXHIBIT    DESCRIPTION                PAGE

11   1     Richland County Sheriff's Department   25
           Complaint Form/Officer Statement
12         Bates ASHMON-A-001 - 005

13   4     Photograph                             67

14   (Reporter's note:  Exhibits 2 and 3 not entered)

15

16

17

18

19

20

21

22

23

24

25

1                          - - -

2                    P R O C E E D I N G S

3                          - - -

4          THE VIDEOGRAPHER:  This is the beginning

5     of Media One.  Today is September 10, 2024.

6     We are on the record at 2:06 p.m.

7          My name is Pamela Crabtree, Notary and

8     Legal Videographer with Virtual Media,

9     Columbia, South Carolina.  Lisa Garson is

10    Notary and Court Reporter with EveryWord Court

11    Reporting, in Chapin, South Carolina.  We are

12    engaged by counsel to the plaintiffs to take

13    this video deposition of Master Deputy Tyler

14    Wolfe, with the deposition being held at Crowe

15    LaFave, LLC, 2019 Park Street, Columbia, South

16    Carolina, 29201.  Case number

17    3:23-cv-05228-SAL-PJG.

18         Will counsel please introduce yourselves

19    for the record, after which the court reporter

20    will swear in the witness.

21         MS. DALZELL:  Liz Dalzell here for the

22    plaintiffs, Shauna Ashmon and Genecia Drayton.

23         MR. SPREEUWERS:  Steve Spreeuwers on

24    behalf of the defendants.

25         MR. GARFIELD:  Robert Garfield on behalf

1    of the defendants.

2         THE COURT REPORTER:  Sir, raise your

3    right hand for me, please.

4         Do you swear to tell the truth, the whole

5    truth, and nothing but the truth so help you

6    God?

7         THE WITNESS:  I do.

8                        - - -

9                   EXAMINATION

10                       - - -

11   BY MS. DALZELL:

12        Q    Good afternoon, Master Deputy Wolfe.  My

13   name is Liz Dalzell.  I represent Shauna Ashmon and

14   Genecia Drayton in an action that they filed

15   against you and a couple other officers with the

16   Richland County Sheriff's Department regarding a

17   traffic stop in and detainment that occurred back

18   in July of 2023.  As I'm sure you know, we filed a

19   lawsuit regarding that detainment, and we're here

20   today to ask you some questions about what you

21   remember about that day and the events leading up

22   to, and including, the detainment and the stop.

23   Okay?

24        A    Okay.

25        Q    Have you ever given a deposition before?

1    A    I have not.

2    Q    Okay.  So there are just a few basic

3    ground rules.  A court reporter is taking down

4    everything that you say and it will be transcribed

5    into a written transcript, so the best you can do

6    to answer affirmatively with a yes or a no, instead

7    of a shake of the head or a nod of the head, that

8    kind of thing, we'll have a much more clear record

9    that way.

10         Also, if you don't understand any of the

11   questions I'm asking, you have every right to ask

12   me to rephrase it.  I don't want you guessing or

13   trying to interpret what I'm saying.  Sometimes I

14   do get a little ahead of myself, so feel free to

15   ask me to rephrase and ask the question in a

16   different way if you don't understand what I'm

17   asking.

18        A    Got it.

19        Q    Okay.  If you need a break at any time,

20   we are not gonna hold you here, make you

21   uncomfortable, so if you need another drink or you

22   need to go to the restroom, you just say the word

23   and we'll go off the record and take a break.

24        A    I appreciate it.

25        Q    Okay.  We shouldn't be here too long so

1    hopefully that's not necessary, but if it is you

2    just say the word.  Okay?

3        A    Okay.

4        Q    Can you please state your full name for

5    the record.

6        A    Tyler John Wolfe.

7        Q    Okay.  And where are you currently

8    employed?

9        A    Richland County Sheriff's Department.

10       Q    How long have you been employed there?

11       A    Almost six years.

12       Q    Okay.  And what position did you start

13   out at within the sheriff's department?

14       A    Originally, my position was a Deputy

15   Sheriff 3 at the courthouse.

16       Q    Okay.  And did you work somewhere before

17   joining the Richland County Sheriff's Department?

18       A    I did.

19       Q    Where did you work before that?

20       A    I can't remember if it was the -- a

21   gutter job or if it was a utilities company, but

22   one of those shortly there before.

23       Q    Okay.  So you were not in law enforcement

24   until you joined the Richland County Sheriff's

25   Office; is that right?

1        A      Correct.

2        Q      And when did you do the law enforcement
3    academy?

4        A      I attended the Criminal Justice Academy
5    on Broad River Road twice.

6        Q      Okay.  When was the first time?

7        A      The first time was for my Class 3,
8    shortly after my hire date in 2018.

9        Q      Okay.  So you were hired first, and then
10   you attend the academy once you get the offer of
11   employment, correct?

12       A      Can you -- I don't understand.

13       Q      How does that process work?  Do you have
14   to have an offer from a law enforcement agency
15   before attending the academy?

16       A      So I was hired as a full-time employee,
17   receiving paychecks from Richland County Sheriff's
18   Department, and then I was sent to the academy by
19   Richland.

20       Q      Okay.  Do you do any work as a law
21   enforcement officer before attending the academy?

22       A      I don't fully understand the question as
23   far as work.

24       Q      When you were first hired by the
25   sheriff's department, what were your job duties

1    before you attended the Criminal Justice Academy?

2        A    Courthouse security.

3        Q    Okay.  So you can do that kind of work

4    without attending the academy.

5        A    I believe that law has changed -- don't

6    quote me on it -- but I don't think that is allowed

7    anymore but at the time it was.

8        Q    I see.  Approximately, how long did you

9    work in security at the courthouse?

10       A    A year, year-and-a-half, I would say.

11       Q    Okay.  And then what did you do after

12   that?

13       A    I was promoted to a road deputy and went

14   to the academy for my Class 1 Certification.

15       Q    Okay.  And so what year did you attend

16   the academy?

17       A    I don't recall the exact year; 2020,

18   2021, somewhere around there.

19       Q    Okay.

20       A    During the COVID era.

21       Q    Okay.  All right.  And did COVID change

22   your training, at all?

23       A    No.

24       Q    Okay.  Tell me about the training that

25   takes place at the academy.

1     A     I mean, we're there for -- I was there
2  for eight-weeks.
3     Q     You live on site at Broad River?
4     A     Monday through -- well, Sunday night
5  through Friday.
6     Q     Okay.  And do you attend class?
7     A     Yes.
8     Q     What else do you do while you're at the
9  academy?
10    A     Physical training; driving; shooting
11 scenarios.  It's a multitude of things.
12    Q     Okay.  And you said you attended that
13 first time for about eight-weeks.
14    A     The first time for Class 3?
15    Q     I think you said it was Class 1
16 Certification the first time.
17    A     No, ma'am.
18    Q     Okay.  I'm sorry.  I misunderstood.
19          So what was the -- what were you getting
20 certified for the first time you went to the
21 academy?
22    A     For clarification, in 2018 when I went?
23    Q     I thought the first time you went to the
24 academy was in 2020.
25    A     No, ma'am.  That was the second time.

1    Q    Okay.  Let's back up.  Tell me about the

2  first time you went to the academy.

3    A    That was for Class 3.

4    Q    Okay.  What does Class 3 mean?

5    A    It was a different classification for law

6  enforcement.

7    Q    Okay.  And what kind of training did you

8  do the first time that you attended the academy

9  back in 2018?

10    A    Two-weeks' of legals.

11    Q    Okay.  When you say legals, what does

12  that mean?

13    A    It's classes on the law that pertains to

14  the certification that we were there to be

15  certified in.

16    Q    Okay.  And what is -- what kind of law

17  enforcement are you engaging in when you're a Class

18  3 officer?

19    A    Judicial security.

20    Q    Okay.  So that's what you attended before

21  you started working at the courthouse.

22    A    Yes and no.

23    Q    Okay.  Clarify that.

24    A    I worked at the courthouse.  I'd been a

25  full-time employee at Richland County Sheriff's

 1   Department.  I did not receive my certification to

 2   be on my own from the academy until after I

 3   attended.

 4        Q    Okay.  When you say, be on your own, what

 5   do you mean by that?

 6        A    That means I have to have a trainer, a

 7   supervisor, somebody else that has that

 8   certification.

 9        Q    I see.  So until you attended the

10   academy, you were working alongside somebody else

11   at the courthouse.

12        A    Quite a few of us.

13        Q    Okay.  And then to get this Class 3

14   Certification, that was two-weeks of legals you

15   said.

16        A    Correct.

17        Q    And is that just classroom instruction?

18        A    To the best of my knowledge, that I

19   remember, yes.

20        Q    Are you out in the field, at all, during

21   that two-weeks of training?

22        A    No, ma'am.

23        Q    Okay.  Did you live on site during that

24   training?

25        A    No, ma'am.

1    Q    Okay.  So you just came to class during

2  the day and then went home at night.

3    A    Correct.

4    Q    And you then continued to work as a

5  security officer at the courthouse after you

6  completed that training?

7    A    As a Class 3 Certified Deputy with the

8  Richland County Sheriff's Department at the

9  courthouse.  Yes, ma'am.

10    Q    Okay.  And how long did you work as a

11  Class 3 Deputy?

12    A    Roughly, a year, year-and-a-half.

13    Q    Okay.  And then what did you do next

14  after that?

15    A    I was promoted to a Class 1 Deputy and

16  sent to the academy for my Class 1 Certification.

17    Q    Okay.  Did you seek out the promotion, or

18  were you just given the promotion by the sheriff's

19  department?

20    A    I sent a letter of interest in memo to

21  the sheriff at some point during my Class 3 time,

22  and that's when he decided that he would promote

23  me.

24    Q    Okay.  And what is the difference between

25  a Class 3 and a Class 1 officer?

1      A     I have -- currently, I have no clue.

2      Q     Okay.

3      A     Those certifications and classifications

4   have changed.

5      Q     Okay.  Back at the time when you were

6   becoming a Class 1 officer, what was your

7   understanding of the difference between the two?

8      A     My understanding was Class 3 was judicial

9   security and a limited scope of arrests for county

10  property, judicial property that the county owns;

11  versus a Class 1 that is a fully certified law

12  enforcement officer in the State of South Carolina.

13     Q     Okay.  Does that Class 1 ranking come

14  with a pay increase?

15     A     It did.

16     Q     Okay.  And just so I'm clear, I think you

17  said this already, but the academy to obtain that

18  certification is eight-weeks long, correct?

19     A     The Class 1?

20     Q     Correct.

21     A     Correct.

22     Q     Okay.  And so you were guessing that you

23  went sometime during 2020 or 2021.

24     A     Correct.

25     Q     Was that all done in person?

1    A    Yes.

2    Q    Okay.

3    A    The eight weeks, yes.

4    Q    Okay.  And you said that you went during

5    the week and you stayed Sunday night through

6    Friday.

7    A    Correct.

8    Q    What did you do during that training?

9    Tell me about the things you learned and the skills

10   that you developed.

11   A    A few weeks of it is legals training;

12   criminal law; we do scenarios, different scenarios,

13   domestic scenarios; there's some active shooter

14   training; there's some driver training; firearms

15   training; defensive tactics training.

16   Q    And is there any training regarding

17   traffic stops?

18   A    There is.

19   Q    Okay.  Tell me about that training.  What

20   did you do as part of that training?

21   A    Positioning on traffic stops; how to

22   safely conduct what they classified at the time as

23   a routine traffic stop, those sorts of things; the

24   difference between different traffic stops.

25   Q    Okay.  And when you say positioning on

1    traffic stops, what does that mean?

2         A    Like where your car would be; where you

3    would be talking; just every different positional

4    element.

5         Q    Okay.  And do you do any simulations when

6    you are learning about traffic stops?

7         A    I can't remember if we did simulations or

8    not.

9         Q    Did any of that kind of training happen

10   out on the road where you would practice, for

11   example, a stop, or something similar in a

12   real-life setting like that?

13        A    I don't understand the question.

14        Q    Did any of your training take place out

15   on the road?

16        A    The training at?

17        Q    While you were at the academy.

18        A    No.

19        Q    Okay.  So it's all contained within the

20   facility at Broad River?

21        A    Correct.

22        Q    Okay.  And so it's safe to say you

23   obtained your Class 1 Certification after the eight

24   weeks, correct?

25        A    I did.

1    Q    Okay.  And how did your job duties change
2  at that point?
3    A    I was assigned to a region within the
4  Richland County Sheriff's Department.
5    Q    And what region was that?
6    A    Region four.
7    Q    Okay.  What area does that include?
8    A    Mostly the Broad River Road area.
9    Q    Okay.  And when you're assigned to a
10  particular region, what are your job duties with
11  regard to that region?
12    A    As a patrol deputy, my primary
13  responsibilities are calls for service, property
14  checks.
15    Q    What is a property check?
16    A    So when people go on vacation, they're
17  not home, they call the sheriff's department and
18  say, hey, I want somebody to ride by my house, make
19  sure nobody broke in.
20    Q    Okay.  Do you patrol that region when
21  you're assigned to the region?
22    A    Correct.
23    Q    And so patrolling means you're kind of
24  driving around looking for anything that might
25  require your services; is that fair to say?

1      Or what does a patrol mean?

2      A      Patrol would mean in my designated area I

3  go around and look for any criminal violation that

4  I can enforce as a deputy sheriff, and to be seen

5  with presence in neighborhoods.  It's not always

6  about taking people to at jail.

7      Q      Okay.  How long were you assigned region

8  four?

9      A      I don't know the exact timeframe, off the

10 top of my head.

11     Q      Okay.  At some point did you get assigned

12 to a different region?

13     A      Correct.

14     Q      Why was that?

15     A      A promotion.

16     Q      Okay.  And so what was your next region

17 after region four?

18     A      Region seven.

19     Q      And what area does that encompass?

20     A      The northeast area of Columbia,

21 Sandhills/Summit area.

22     Q      Okay.  And so is that the region where

23 this traffic stop occurred?

24     A      I believe the traffic stop in question

25 is.  That occurred in region seven, yeah.

1    Q    Okay.  How long had you been assigned to

2  region seven in July of '23.

3    A    I can't give you an exact answer because

4  I just don't remember.  I don't know.

5    Q    Do you think it was more than six months?

6    A    I don't think I can give you an exact --

7  I don't want to pin it down to an exact time, more

8  or less on anything, because I just don't remember

9  exactly when I was moved there.

10    Q    Fair enough.  Okay.

11        MR. SPREEUWERS:  Can you speak up,

12    please?

13        THE WITNESS:  I sure can.

14  BY MS. DALZELL:

15    Q    Have you been assigned to any other

16  regions, other than region four and region seven?

17    A    I have.

18    Q    Okay.  What regions are those?

19    A    Region three.

20    Q    Okay.  Where is that?

21    A    Monticello Road, slightly northwest --

22  region three is slightly north, northwest of

23  downtown Columbia.

24    Q    And is that where you're currently

25  assigned?

1    A    Correct.

2    Q    Okay.  How long have you been there?

3    A    I don't know the exact timeframe.  Less

4  than a year.

5    Q    Okay.  Any other regions other than the

6  three you've told me about?

7    A    No.

8    Q    Okay.  Have you ever worked with a

9  partner in any of those regions?

10    A    I don't understand the partner portion.

11    Q    And pardon me for my lack of knowledge of

12  the way the law enforcement system works, but it's

13  my understanding that sometimes law enforcement

14  officers work with a partner.

15    A    I mean, sometimes, I would say.

16    Q    Okay.  But you're not assigned somebody

17  who you are constantly with on a day-to-day?

18    A    Correct.

19    Q    Okay.  Have you ever been assigned a

20  partner?

21    A    Assigned a partner, no.

22    Q    Okay.  Have you ever worked with a

23  partner?

24    A    Yes.

25    Q    Tell me about those people.  Who have you

1    worked with as a partner?

2        A    We have reserve deputies that volunteer,

3    they ride with us.  We don't pick and choose when

4    they come and how they serve, so they've been in my

5    car; and deputies that their car is in maintenance

6    for a day, they have to ride.

7        Q    Okay.  Were you riding with anybody on

8    the day of this incident?

9        A    I do not believe so.

10       Q    Okay.  Have you ever been disciplined

11   during your employment with the Richland County

12   Sheriff's Office?

13       A    No.

14       Q    Have you ever been accused of using

15   excessive force?

16       A    No.

17       Q    Have you ever been written up for

18   anything?

19       A    No.

20       Q    Has anybody ever filed a complaint

21   against you, like a citizen or someone you had an

22   encounter with as part of your job as a law

23   enforcement officer?

24       A    I don't know, off the top of my head.

25       Q    Is there a possibility that someone's

1   made a complaint about you?

2       A    I mean there's a possibility of that, I

3   guess, but I haven't -- to my knowledge I don't

4   remember being told that anybody has filed a

5   complaint.

6       Q    And is the procedure that if a complaint

7   is filed would the sheriff's department talk to you

8   about it?

9       A    I don't know the procedures of our

10  Professional Standards Division.

11      Q    Okay.  Are you taught anything about that

12  when you're hired by the Richland County Sheriff's

13  Office?

14      A    I wouldn't say, taught.  I mean, we speak

15  with them.  They explain their job, but I don't

16  know their internal procedures of how they handle

17  things.

18      Q    Okay.  Have you ever known of anybody

19  being informed of a complaint made by someone?

20      A    I have.

21      Q    Okay.  And tell me about that.  How did

22  you know about that?

23      A    I was informed by my chain of command

24  because I happened to be their supervisor.

25      Q    Okay.  So the person above you told you

1    about a complaint made by one of your subordinates

2    -- made against one of your subordinates?

3        A    To disseminate to them.

4        Q    Okay.  And so you then informed the

5    subordinate about the complaint.

6        A    Correct.

7        Q    Okay.  But your supervisors have never

8    informed you of a complaint made against you?

9        A    I'm trying to think.

10       Q    And take your time.  We're not in a rush.

11       A    I don't recall off the top of my head,

12   but I don't want to exclude it and be wrong.

13       Q    Okay.  Have you ever been suspended for

14   anything?

15       A    No.

16       Q    Okay.  Were you made aware of the

17   complaint filed by Shauna Ashmon regarding this

18   incident?

19       A    Yes.

20       Q    How were you made aware of that?

21       A    My chain of command.

22       Q    And who is that?  Who told you about it?

23       A    I don't remember if it was my corporal or

24   my sergeant at the time.

25       Q    And tell me about what you recall about

1 that conversation.

2     A   There wasn't much to it.  It was, go see,

3 at the time, internal affairs.

4     Q   Okay.  And that was told to you in

5 person?

6     A   Correct.

7     Q   Okay.  And did you go see internal

8 affairs?

9     A   At the designated time, yes.

10     Q   Okay.  What happened during that process

11 with internal affairs?

12     A   I was -- I don't remember the exact

13 conversation.  I talked to one of the individuals

14 down there and they asked me to write a statement

15 on my recollection of the event.

16     Q   Okay.  And so did you write a statement?

17     A   Yes.

18     Q   All right.  And did you do that there at

19 that office that day?

20     A   I don't know if it was that day or if I

21 came back.

22     Q   Okay.  Were you at internal affairs more

23 than one time with regard to this incident?

24     A   Yes.

25     Q   Okay.  Tell me about that.  What do you

1  remember about each of the times you went to

2  internal affairs?

3       A    I believe one of them was a conversation

4  and one of them was the statement.

5       Q    Okay.  So you came back to write it.

6       A    Correct.

7            (Wolfe Exhibit 1, Richland County

8            Sheriff's Department Complaint Form and

9            Professional Development, Officer Statement,

10           Bates ASHMON-A-001 - 005, marked for

11           identification.)

12  BY MS. DALZELL:

13       Q    Okay.  All right.  You've been handed

14  what's been marked as Exhibit 1.

15            Have you ever seen -- I'm gonna give you

16  a minute to flip through it.

17            You don't have to read it all now.  We're

18  definitely gonna come back to it.  Have you seen

19  this document before?

20       A    Which portion of it?

21       Q    The part that you just read through, the

22  first few pages, the complaint.

23       A    I've not seen that.

24       Q    Okay.  Have you seen the document right

25  behind that complaint, the statement that you made

1    at the internal affairs office?

2        A    Yes.  I've seen that.

3        Q    Okay.  Great.  Did you type it out while

4    you were there, or did you write it out?

5        A    I don't recall, but I believe I typed it.

6        Q    What would you type that on?

7        A    One of the computers.

8        Q    So they have computers in the office

9    there?

10       A    Yes.

11       Q    Okay.  And you would have the ability to

12   type out a statement on one of those computers?

13       A    If I remember correctly.

14       Q    Okay.  Have you ever written out a

15   statement, as opposed to typing one out?

16       A    Yes.

17       Q    Okay.  So there's a chance you could have

18   written this and then somebody typed it, or do you

19   think you typed it?

20       A    I believe I typed it, but I can't say

21   100-percent for sure.

22       Q    Okay.  And this is the statement that you

23   gave, correct?

24       A    Correct.

25       Q    Okay.  When was the last time you

1  reviewed this statement?

2        A     Last week sometime.

3        Q     And was that in preparation for this

4  deposition?

5        A     Yes.

6        Q     Okay.  All right.  Let's turn to the day

7  of this encounter.  We're talking about the

8  afternoon of July 16, 2023.  Why were you in, or

9  around, the Summit neighborhood that day?

10       A     We were alerted to a stolen license plate

11  in the area.

12       Q     Okay.  When you say, we were alerted, how

13  were you alerted about a stolen license place?

14       A     LPR cameras which are license plate

15  readers, they're on cameras.  We got the

16  notification that one of those had indicated that

17  there was a possible stolen plate.

18       Q     Okay.  And so pardon my ignorance here.

19  I'm just gonna have to walk through this slowly so

20  I understand.  Where are those cameras located?

21       A     I don't know the locations of all of

22  those cameras.

23       Q     Or what's an example of where an LPR

24  camera could be located?

25       A     Generally, they're places at points of

1    high traffic.

2         Q    Like in a traffic light or something like

3    that?

4         A    Intersections.  I don't know exactly how

5    or why they pinpoint where cameras are located and

6    placed.

7         Q    Okay.  That's not your job.

8         A    Correct.

9         Q    But these cameras take pictures of

10   license plates?

11        A    Yes.

12        Q    Okay.  And then what happens when those

13   cameras take pictures of license plates?

14        A    I don't know exactly what happens with

15   the photos.

16        Q    Okay.

17        A    Like, I don't know.  I don't have access

18   to that sort of stuff, nobody's -- I don't work for

19   that company.

20        Q    Okay.  But you somehow get an alert that

21   what?  This day you got an alert that there's a

22   stolen license plate?

23        A    A stolen license plate.

24        Q    How would one know that the license plate

25   is stolen?

1    A    Through a records check of NCIC.

2    Q    Okay.  So this camera takes a picture and

3  it's sent somewhere, and then somebody is running

4  it through a records check?

5    A    Are you asking me if somebody manually

6  runs it?

7    Q    Yeah.

8    A    I have no clue.

9    Q    Okay.  All right.  I understand.  Somehow

10  a records check is done.

11    A    Correct.

12    Q    And how are you then alerted that a

13  stolen license plate has been spotted in that

14  neighborhood?

15    A    It's an automatic notification through

16  the system.

17    Q    Through what system?

18    A    The FLOCK system.

19    Q    All right.  What is the FLOCK system?

20    A    It's the license plate reader cameras I

21  just described.

22    Q    Okay.  And how do you receive that

23  message?  Is it a piece of machinery in your car?

24    A    It comes through either by text or email.

25    Q    Okay.  And when you say, by text, do you

1    have a state-issued cell phone dedicated to your
2    work?
3        A    No.
4        Q    It's to your personal phone?
5        A    No, ma'am.
6        Q    Okay.  Where does the text go?
7        A    My county-issued phone.
8        Q    Okay.  Who keeps records regarding your
9    county-issued phone?
10       A    No clue.
11       Q    Okay.  Do you ever see those records for
12   any reason?
13       A    No.
14       Q    Do you ever use the phone outside of your
15   duties for the county?
16       A    No.
17       Q    Where does the phone stay when you're not
18   using it?
19       A    With me.
20       Q    Okay.  So you have it 24/7?
21       A    For the most part because I am a
22   supervisor.
23       Q    Okay.  So nothing personal happens on
24   that phone.  These are just texts and messages
25   you're getting that are work related, correct?

1      A     Yes.

2      Q     And then where would you get an email

3 while you're out on a patrol?

4      A     To my computer in the car.

5      Q     Okay.  And the computer, is it attached

6 to your dashboard?

7      A     It is bolted into the car.

8      Q     Okay.  And do you have a dedicated -- a

9 county dedicated email address that you're getting

10 messages sent to?

11      A     Yes.

12      Q     What is that email address?

13      A     Twolfe@rcsd.net.

14      Q     What is the phone number for your

15 county-issued phone?

16      A     803-917-5418.

17      Q     Okay.  And do you recall what kind of

18 message you received on July 16, 2023, alerting you

19 of a stolen plate?

20      A     No.

21      Q     Was it a text message or an email?

22      A     Text.

23      Q     It was a text.  So you remember that?

24      A     I have the emails turned off.

25      Q     Why is that?

1        A     We get enough emails as is.

2        Q     So you don't want to be looking at emails

3    in your car.

4        A     So I don't miss a different important

5    email.  It's an easier way to keep the

6    notifications separate.

7        Q     Okay.  And so who is that text message

8    coming from?

9        A     I have no clue.

10        Q     Like, is it coming from a phone number?

11        A     I have a contact.  I would assume it's a

12    phone number.  I don't know who's on the other side

13    of it.

14        Q     Okay.

15        A     I don't know if it's automated.

16        Q     And do you have a copy of that text

17    message?

18        A     I don't have a copy.  It is on my

19    county-issued phone.

20        Q     Still on the phone.

21             MS. DALZELL:  I'll ask for a copy of

22        that.

23    BY MS. DALZELL:

24        Q     Do you recall what the text message said?

25        A     If I remember correctly the notifications

1    provide date/time categories for the notification

2    and a location.

3        Q     Okay.  And what was this category of text

4    message that you got?

5        A     The response from an NCIC records check.

6        Q     Okay.  And what did it tell you?  What

7    did the text message tell you?

8        A     Stolen plate.

9        Q     Was it a stolen plate or stolen car?

10       A     Stolen plate.

11       Q     Okay.  Tell me about the difference.

12   What's the difference between a stolen plate and a

13   stolen car?

14       A     A stolen plate is a license plate, and a

15   stolen car would be the entire car.

16       Q     And so you were alerted of a stolen plate

17   only.

18       A     Correct.

19       Q     Okay.  Prior to receiving this text

20   message about this stolen plate, had you received

21   other text messages about this stolen plate?

22       A     I don't -- I don't know.

23       Q     Do you recall ever receiving notice about

24   this particular plate on other occasions?

25       A     No.

1    Q    Okay.  Do you recall ever receiving
2    emails about this plate?
3    A    No.
4    Q    Okay.  So you get this text message that
5    this stolen plate is in that neighborhood, is that
6    how it goes?  Or how are you alerted to its
7    location?
8    A    It gives a location in the text message.
9    Q    And what was the location that it gave
10   you?
11   A    I don't recall the exact location.
12   Q    Okay.  And then what do you do after you
13   receive that text message?
14   A    Circulate the area.
15   Q    What do you mean by that?
16   A    Drive around and see if I can find it.
17   Q    Okay.  And is that what you were doing
18   before this traffic stop?
19   A    Yes.
20   Q    Okay.  So you were actively looking for
21   that particular stolen plate at the time?
22   A    Yes.
23   Q    Okay.  How long had you been looking for
24   that stolen plate before this traffic stop, would
25   you say?

1       A     I don't know.

2       Q     No idea?

3       A     I couldn't tell you.

4       Q     What time did you start your shift that

5    day?

6       A     Day shift, roughly 5 o'clock in the

7    morning.

8       Q     Okay.  And do you recall, roughly, when

9    you got to that part of the neighborhood?

10      A     No.

11      Q     Where else had you been that day?

12      A     I don't recall every place and every

13   street I went that day.

14      Q     Do you recall anywhere else you had been

15   that day?

16      A     Off the top of my head, no.

17      Q     Okay.  Would there be record of that?

18      A     I have no clue what we keep records of.

19      Q     Okay.  All right.  So you receive a text

20   regarding this stolen plate.  You're patrolling --

21   or tell me if I'm not using the right

22   terminology -- you're driving around looking for

23   it.

24      A     Okay.

25      Q     And then what happens?

1    A     I was on the phone with my corporal at

2   the time.

3    Q     And who is that?

4    A     Corporal Zalenski.

5    Q     When you say your corporal, what that

6   does that mean in terms of ranking and the

7   relationship between the two of you?

8    A     He's my immediate supervisor.

9    Q     Okay.  And when you say you were on your

10  phone, so you were on your county-issued cell

11  phone?

12   A     Correct.

13   Q     Why where were you on the phone with him?

14   A     He was on speak phone with me.  We were

15  discussing the notification we had just received.

16   Q     And what were you -- do you recall what

17  you were talking about?

18   A     Where each other had been.

19   Q     Okay.  And then you're talking to him on

20  the phone and then what happened?

21   A     He -- to the best of my knowledge, he

22  advised me that he found the vehicle.

23   Q     Okay.  Do you recall what he said?

24   A     I don't recall exactly what he said,

25  verbatim.

1    Q    What do you remember about the

2  conversation?

3    A    That he found the vehicle.  I remember

4  asking him if it was the vehicle and asked him

5  essentially to confirm that this is the tag in

6  question we're looking for; he advised, yes, and I

7  asked him where he was at.

8    Q    Okay.  And then what happened?

9    A    I proceeded to drive that direction.

10    Q    Okay.  And then what happened?

11    A    And he advised he was going to wait until

12  another unit got close to him before he activated

13  his blue lights.

14    Q    Okay.  And where was he in relation to

15  the vehicle at the time he called you?

16    A    I have no clue.

17    Q    Okay.  All you know is that he had

18  spotted the vehicle.

19    A    Yes.

20    Q    And how did you know where to go?

21    A    He told me on the phone.

22    Q    What kind of information was he giving

23  you at that point?

24    A    Direction of travel and the nearest

25  intersection.

1    Q    Okay.  So you headed towards that

2  direction.

3    A    Correct.

4    Q    Okay.  And you come up to the -- what

5  alerted you to the fact that you were at the

6  vehicle or at the scene?

7    A    He had blue lights on.

8    Q    Okay.  So what did you do next?

9    A    Pulled slightly to the front and right of

10  the vehicle.

11    Q    Why did you do that?

12    A    To prevent the vehicle from possibly

13  fleeing.

14    Q    And did you talk to him about you doing

15  that before you did that?

16    A    Probably seconds before.

17    Q    Okay.  Were you on the phone with him the

18  whole time?

19    A    No.

20    Q    All right.  When did you end your phone

21  conversation with him?

22    A    I don't recall.

23    Q    Okay.  Would he be the one telling you to

24  position your vehicle that way?

25    A    No.

1    Q    Okay.  That was your decision?

2    A    Yes.

3    Q    Okay.  What made you decide to block that

4    car in like that?

5    A    The heavy traffic in the area and stolen

6    plate.  Law enforcement's general thought process

7    is, if there's a stolen plate, there's a stolen

8    car; and instead of endangering the general public

9    around it, if I can force them to bail on foot, or

10   prevent the car from fleeing, and resolve it

11   peacefully, that was my goal.

12   Q    Okay.  And so you pull the car --

13   describe how you pull it again.  I don't want to

14   put words in your mouth.

15   A    To the right and slightly in front of it.

16   Q    To the right and slightly in front of the

17   vehicle.

18   A    Correct.

19   Q    So you're blocking it from going

20   anywhere.

21   A    I don't think my car was fully in front

22   of theirs.

23   Q    Okay.  And then what happened?

24   A    We had already discussed that it would be

25   a felony traffic stop.

1    Q    Who had discussed that?

2    A    Me and my corporal.

3    Q    When did you discuss that?

4    A    Over the radio.

5    Q    The phone or the radio?

6    A    I believe it was over the radio.

7    Q    Okay.  What's the difference, so I

8  understand?  Because you were on the phone with him

9  for a while, correct?

10    A    Correct.

11    Q    And then you switched to a radio?

12    A    Law enforcement-issued radio.

13    Q    Okay.  When did that switch occur?

14    A    I don't recall the exact time.

15    Q    But was it during time you were driving

16  towards the scene?

17    A    I don't remember if it was right before

18  or right after.

19    Q    Right after you got there?

20    A    Like right before or right after our

21  conversation.

22    Q    I'm trying to figure out when this

23  conversation occurred.

24    A    Prior to me getting to the traffic stop,

25  while we were still looking.  It's when we were on

1  the phone.

2      Q    Okay.  Okay.  So you're on the phone.  Is

3  he directing you to do anything at this point?

4      A    On the phone?

5      Q    Uh-huh.

6      A    No.

7      Q    Okay.  And then you hang up the phone and

8  then you switched to the radio?

9      A    We hung up the phone because he found the

10 vehicle.

11     Q    Okay.

12     A    I don't remember where within that

13 conversation of whether he found it 5, 10, 15

14 minutes prior to that, or however long.

15          At some point he told me he found the

16 vehicle, and we hung up the phone.

17     Q    Okay.  And then at some point you're

18 talking over the radio, correct?

19     A    Correct.

20     Q    And is he directing you at that point

21 when he's talking to you over the radio?

22     A    No.

23     Q    Okay.  When you said he had determined it

24 was gonna be a felony stop, in what context did he

25 say that to you?

1    A    That was the indication when you ask or

2  advise other units you're going to wait for more

3  units before you light up a car and activate blue

4  lights for a traffic stop.

5    Q    Okay.  And what would make this a felony

6  stop?

7    A    The stolen plate being displayed on the

8  car.

9    Q    Okay.  That's a felony?

10    A    No.  The fact that a stolen plate on a

11  car means it doesn't belong on that car because

12  it's been stolen.  The likelihood of the car it's

13  displayed on being stolen is high, which is a

14  felony.

15    Q    Okay.

16    A    Possession of a stolen vehicle.

17    Q    Okay.  So the stealing of the plate is

18  not a felony.  It's the stolen car that would be a

19  felony?

20    A    The possession of it.

21    Q    Okay.  So he was the one who determined

22  that this should be a felony stop?

23    A    I don't recall.

24    Q    Didn't you just say that he told you this

25  was gonna be a felony stop?

1    A    Part of our conversation -- so I don't

2  understand why we're stuck here, to be completely

3  honest, on the questions.

4    Q    What do you mean by that?

5    A    I don't understand the specific question

6  line.  I feel like we're going back and forth.

7    Q    I'm trying to understand the process --

8    A    I'm trying to help you understand from my

9  point of view.

10    Q    I understand and it's like I'm trying to

11  decide -- or figure out who the decision maker is,

12  why this was a felony stop.  This is a big deal,

13  right?  These women were stopped and detained and

14  it was a mistake.

15    A    They were stopped and they were detained.

16  Correct.

17    Q    At gunpoint, right?  So I have to get to

18  the why and how, and how something like this would

19  happen.

20    A    Yeah.

21    Q    And forever change these women's lives.

22  Okay?  So bear with me.  I don't understand the

23  inner workings of law enforcement.  Okay?

24    A    Correct.

25    Q    What I'm trying to get at is, who

1  determines that it's a felony stop?

2       A     Anybody can determine that.

3       Q     Okay.  In this case who determined it?

4       A     I don't recall exactly, but I believe

5  Corporal Zalenski.

6       Q     Okay.  And is a felony stop different

7  from any other stop?

8       A     Yes.

9       Q     What makes it different?

10      A     The likelihood that the individuals in

11 the stop, in the vehicle that we were stopping,

12 could cause harm, flee, all of the dangers that law

13 enforcement faces during traffic stops.

14      Q     And so what do you all do differently in

15 a felony stop, as opposed to like a regular stop?

16      A     We don't approach he vehicle immediately

17 is the biggest difference.

18      Q     What do you do instead?

19      A     We wait at our cars with firearms drawn

20 and call the individuals out of the car towards us.

21      Q     So like in a routine traffic stop you

22 wouldn't do that?

23      A     Correct.

24      Q     And so what else do you do differently?

25 You wait at your car; you draw your firearm; what

1  else would you do differently at a felony stop as

2  opposed to a regular stop?

3      A    Call the occupants out of the vehicle.

4      Q    Okay.  And when you say call them out of

5  the vehicle, walk me through that.  What does that

6  mean?

7      A    We give call outs, specially identifying

8  individuals in the car to exit the vehicle and walk

9  backwards towards us.

10     Q    Okay.  Did you do that in this case?

11     A    I did not.

12     Q    Why that?

13     A    There was a miscommunication between me

14  and the passengers and occupants.

15     Q    What was the miscommunication?

16     A    I intended for them to remove the keys

17  and place the keys on the ground.  It was evident

18  by their actions that they thought I meant them get

19  on the ground.

20     Q    Okay.  And so why didn't you have them

21  walk backwards to you?

22     A    I could see their hands.

23     Q    Okay.  So you didn't feel threatened?

24     A    There was no more threat in my eyes.

25     Q    Okay.  And is it at your discretion to

1    change the nature of the way you conduct that stop

2    when you assess a threat like that?

3         A    Yes.

4         Q    Okay.  And so you said that in a felony

5    stop one thing you do differently is stay at your

6    car; you draw your weapon; you tell them to exit

7    their car; walk backwards if you feel like that's

8    necessary.

9              What else is different about a felony

10   stop as opposed to a regular stop?

11        A    I don't recall any other major

12   differences, off the top of my head.

13        Q    Okay.  Is there a certain amount of

14   required back-up in a felony stop?

15        A    No.

16        Q    And so when your corporal called you, was

17   he calling for back-up?

18        A    Yes.

19        Q    Okay.  Did he call anybody else for

20   back-up?

21        A    I don't know.

22        Q    Okay.  So we know other officers appeared

23   at the scene.  Do you know how, or why, they got

24   there?

25        A    I do not.

1    Q    Okay.  So going back to when you arrive

2  at the scene, you pull your car to block their car

3  in, and then what do you do?

4    A    I exited my vehicle; withdrew my issued

5  firearm from its holster; kept it at a low ready

6  and gave verbal commands to the occupants inside.

7    Q    When you say, kept it at a low ready,

8  what do you mean by that?

9    A    The muzzle not pointing towards anybody;

10  pointing it in a downward direction in front of me.

11    Q    So it's your testimony you were not

12  pointing the gun at Ms. Ashmon and Ms. Drayton?

13    A    Yes, ma'am.

14    Q    And it's your testimony that you were

15  holding it down?

16    A    Yes, ma'am.

17    Q    Okay.  And that would be -- holding it

18  down is part of the protocol?

19    A    No ma'am.

20    Q    What's part of the protocol?

21    A    To point at the occupants.

22    Q    Okay.  But you did not point it at the

23  occupants?

24    A    Correct.

25    Q    Why not?

1      A      I didn't feel the need to.

2      Q      Why?

3      A      I could see their hands already.

4      Q      Okay.  Did you point the gun at them at

5  any time?

6      A      No, ma'am.

7      Q      You didn't point the gun at them as you

8  were exiting your vehicle?

9      A      No, ma'am.

10     Q      Okay.  And so how long did it take before

11  you assess that there was not a threat to your

12  safety?

13     A      I don't know the time length on it.

14     Q      Okay.  All right.  So it's your testimony

15  that you're holding your weapon down, meaning the

16  barrel of the gun is facing the ground?

17     A      It's pointing towards the ground.

18     Q      Pointed towards the ground.  And then you

19  exit your vehicle?

20     A      I was already exited at that point.

21     Q      Okay.  And then what happens?

22     A      I gave verbal commands to the occupants.

23     Q      Okay.  And did they comply?

24     A      Yes.  Through the miscommunication, but

25  yes.

1    Q    Okay.  And that's going back to the fact

2    that you wanted the keys thrown on the ground and

3    they thought they should go on the ground?

4    A    Correct.

5    Q    Okay.  Then what happened?

6    A    After I realized that there was a

7    miscommunication between my verbal commands, they

8    were complying, hands empty, no threat, I proceeded

9    to detain the front seat passenger in handcuffs.

10    Q    Okay.  And did she comply or resist in

11    any way?

12        MR. SPREEUWERS:  Object to the form.

13    BY MS. DALZELL:

14    Q    Did she resist being arrested in any way?

15        MR. SPREEUWERS:  Object to the form.

16        You can answer.

17        THE WITNESS:  No.

18    BY MS. DALZELL:

19    Q    Okay.  Was she cooperative?

20    A    Yes.

21    Q    And what happened after you put the

22    handcuffs on her?

23    A    I started to explain the situation, why

24    she was being -- why the vehicle she was in was

25    stopped; that I was gonna have her sit in the

1    backseat of my patrol car; and then started to

2    briefly explain the miscommunication; I didn't want

3    them laying on hot pavement, so I sat her in my

4    patrol car.

5        Q    Okay.  Did you turn on the air

6    conditioning?

7        A    I did.

8        Q    Okay.  And then what did you do?

9        A    I returned to her to continue to explain,

10   as far as I knew at that point.

11       Q    Okay.  And once she's detained and in

12   your car, what did you do?

13       A    I returned to Corporal Zalenski and the

14   driver.

15       Q    Okay.  And what happened then?

16       A    He was attempting to identify the driver,

17   to my knowledge, and I retrieved a driver's license

18   from the driver's purse in the backseat.

19       Q    Did he ask you to do that?

20       A    I don't recall.  I don't remember.

21       Q    Okay.  But you remember finding her ID?

22       A    Yes.

23       Q    Okay.  And then what did you do?

24       A    Handed him her ID.

25       Q    All right.  And what did he do with the

1  ID at that point?

2      A    I have no clue.

3      Q    Okay.  What did you do after you handed

4  him the ID?

5      A    I believe I stood by with the driver.

6      Q    Did you talk to her at all?

7      A    I don't recall.

8      Q    And when you say you stood by with the

9  driver --

10     A    Stood near her because we are standing in

11 traffic, and to make sure she doesn't flee, doesn't

12 get hit.

13     Q    Okay.  So she's still standing outside of

14 the vehicle at this point?

15     A    I believe so.

16     Q    Okay.  And your corporal has the ID and

17 goes and does something with it?

18     A    Correct.

19     Q    Okay.  And then what happens?

20     A    Another deputy arrives on scene, and I

21 believe I ask if he has room in his backseat so she

22 can sit down and get out of the heat.

23     Q    Okay.  And what deputy was that; do you

24 recall?

25     A    I don't.

1    Q    Okay.

2    A    Honestly.

3    Q    Did you know him --

4    A    Yes.

5    Q    -- at the time.

6    A    Yes.

7    Q    And you just don't remember who it was?

8    A    Correct.

9    Q    Okay.  And did that happen?  Was she put

10   in the back of his vehicle?

11   A    I don't know if she was put in the back

12   of his vehicle.  I know she was placed in the back

13   of a vehicle.

14   Q    Okay.

15   A    A patrol vehicle.

16   Q    Okay.  And what are you doing during this

17   time?

18   A    During the point -- I don't understand

19   the full question of the time period you're asking.

20   Q    Yeah.  I'm trying to get a sense of where

21   you are when she's being placed in the vehicle.

22   Are you doing anything?  Are you just waiting at

23   this point?  Do you recall any other actions that

24   you took while she was being put in the other

25   vehicle?

```
 1        A     I think at this point I had walked over
 2   to my corporal's like driver door area.
 3        Q     Okay.  Was he inside his car at the time?
 4        A     I believe so.
 5        Q     What was he doing inside the car?
 6        A     I have no clue.
 7        Q     Why did you walk over to the door?
 8        A     It was his stop; he was primary
 9   investigation; to see if he needed anything else.
10        Q     Okay.  And did he need anything else?
11        A     I don't think that conversation ever
12   happened.
13        Q     Okay.  What happened?
14        A     My sergeant arrived on the scene.
15        Q     Okay.  Who was your sergeant?
16        A     Sergeant Womsley.
17        Q     Okay.  How do you spell Womsley?
18        A     I have no clue.  I can take my best guess
19   at it, though.
20        Q     No problem.  That's all right.  Is he
21   your corporal's supervisor?
22        A     Yes.
23        Q     So he's the head of the whole -- would it
24   be called a squad, or what would you call it?  Who
25   is he supervisor of?
```

1    A    Two different shifts.

2    Q    Okay.  Your shift?

3    A    Correct.

4    Q    And then what's the other shift?

5    A    The sister shift, if you will.  Whatever

6  shift is relieving us.

7    Q    Okay.  All right.  And it's just two

8  shift in a day?

9    A    Yes, ma'am.

10    Q    So 12-hour shifts?

11    A    Yes, ma'am.

12    Q    Okay.  And is Sergeant Womsley

13  supervising just this region?  Or does he supervise

14  more than the region that you were in at this time?

15    A    He was assigned to region seven, to those

16  two shifts.

17    Q    Okay.  And that's it; he doesn't have

18  more than one region?

19    A    Correct.

20    Q    Okay.  Do you have any idea why he ended

21  up on the scene?

22    A    I have no clue.

23    Q    Okay.  And so you said that you went over

24  to your corporal's car, kind of waiting to see if

25  he needed anything, is that when Sergeant Womsley

1    appeared?

2        A    I went over to his car to see if he

3    needed assistance, not just to wait.

4        Q    Okay.  And at what point did Sergeant

5    Womsley appear?

6        A    About that same time when I got there.

7        Q    Okay.  Did you talk to Sergeant Womsley

8    at all?

9        A    Briefly, I believe.

10       Q    Do you recall what you all said to each

11   other?

12       A    I believe he asked why they were in

13   handcuffs, or something to that effect.

14       Q    Okay.  Was he asking you that question?

15       A    I don't recall who he was asking.

16       Q    Okay.  What else did he say?

17       A    I have no clue.

18       Q    Did you respond to him?

19       A    I believe so.

20       Q    What did you say?

21       A    I don't remember my exact words.

22       Q    Okay.

23       A    It wasn't an in-depth conversation.

24       Q    Okay.  Did he direct you all to do

25   anything at that point?

1      A      I don't -- I don't recall.

2      Q      Okay.  Did your corporal direct you to do

3  anything at that point?

4      A      No.

5      Q      So what happened next?  You're kind of

6  near his car; what happens next?

7      A      I walked back to -- I don't know if I

8  walked back towards my car or if I walked towards

9  where the driver was placed and spoke to one of

10 them.  I don't remember exactly which one, I

11 believe it was the driver.

12     Q      Okay.  And what did you say to her?

13     A      I believe we had a brief conversation

14 about a registration for the vehicle, or something

15 like that.

16     Q      Okay.  And so that's the first time

17 you're asking her for registration?

18     A      It's the first contact I had with her --

19 conversation with the driver at all, I believe.

20     Q      Okay.  And were you able to find the

21 registration in her car?

22     A      I don't believe I ever looked.

23     Q      What happened before you did that?

24     A      We were taking handcuffs off of them and

25 releasing them.

1    Q    Why is that?

2    A    The tag wasn't the tag we were looking

3 for.

4    Q    Okay.  How did you find that out?

5    A    The records check through the NCIC system

6 of the tag that was displayed.

7    Q    What do you mean by that?  So what --

8 because didn't the record check tell you it was

9 this tag to begin with?

10    A    The system, the notification told me it

11 was that tag.

12    Q    Okay.  And then what records were checked

13 to tell you that it was not the tag?

14    A    NCIC.

15    Q    Okay.  So when you actually ran this

16 actual plate through the system?

17    A    I never ran the plate.

18    Q    Or somebody did I guess.

19    A    Correct.

20    Q    And that's what alerted you all to the

21 fact that this was the wrong plate?

22    A    Yes.

23    Q    Okay.

24         MR. SPREEUWERS:  Liz, whenever you get to

25    a good stopping point, do you mind if we can

1    take a break?

2         MS. DALZELL:  Not at all.  Now is good.

3         THE VIDEOGRAPHER:  Please stand by.  This

4    marks the end of Media One.  We're off the

5    record at 3:06 p.m.

6              (Off the record.)

7         THE VIDEOGRAPHER:  This is the beginning

8    of Media Two of the deposition of Master

9    Deputy Tyler Wolfe.

10        We are back on the record at 3:14 p.m.

11   BY MS. DALZELL:

12   Q    Okay.  Master Deputy Wolfe, I'm gonna

13   turn back to your statement and just make sure I'm

14   clear on a couple things, if that's okay.

15   A    Okay.

16   Q    At top of your statement it says that the

17   FLOCK system alerted to a stolen plate out of --

18   and then it says VED953, which I assume is the

19   license plate number, correct?

20   A    Yes.

21   Q    But the system did not specify the state

22   of origin.  What does that mean:  The system did

23   not specify the state of origin?

24   A    There was no state attached to the

25   license plate notification.

1    Q    Okay.  So the notification you're

2  receiving is just giving you the letters and

3  numbers?

4    A    It did not provide me a state.

5    Q    Did it provide you a picture?

6    A    Yes.

7    Q    Okay.  And so from there you say, I

8  believed it to be a South Carolina collegiate style

9  plate due to the white background with red letters,

10  and possibly a SC Gamecock plate.

11       First of all, do you have a copy of that

12  picture that you received that day?

13    A    I do not.

14    Q    Have you ever seen it after this

15  incident?

16    A    Have I seen what?

17    Q    Have you seen the picture that you

18  received that day since July 16?

19    A    No.

20       MS. DALZELL:  Do you all have a copy of

21    that?  There's no record of that?

22       MR. GARFIELD:  No.

23  BY MS. DALZELL:

24    Q    But you describe a plate that you believe

25  to be a South Carolina plate, correct?

1        A      Yes.

2        Q      What specifically do you recall about the

3  picture you received, or the picture of the plate

4  you received?

5        A      That initially it was a white background

6  with some sort of red lettering that matches some

7  collegiate style, more privatized South Carolina

8  plates.

9        Q      And what makes you say collegiate style.

10  Like what does that mean to you?

11        A      It doesn't follow the norm -- at the time

12  what would be a normal South Carolina issued plate.

13        Q      Okay.  Like almost like a vanity plate or

14  something?

15        A      Essentially.

16        Q      Okay.  If you then go down a little

17  further and it says, "I just received the NCIC

18  notification of the tag I performed a records check

19  on, VED953, was returning as stolen, but I did not

20  have time to investigate the NCIC entry fully due

21  to Corporal Zalenski asking for additional units

22  before initiating felony stop."

23             Walk me through that.  What did you mean

24  when you're saying that?  So you received this

25  notification of the stolen plate -- is that what

1  you were saying when you said you received the NCIC

2  notification?

3      A    So an NCIC notification, when you perform

4  a records check it's not immediate.  It takes time.

5  It's technology.  So at some point I ran the tag

6  but I never got to physically look at the

7  notification that I received back from NCIC.

8      Q    I see.  So you're saying you ran Shauna

9  Ashmon's tag when you got to the scene?

10     A    No, ma'am.

11     Q    Okay.  What are you saying?

12     A    That I ran the plate that I was given,

13 the VED953, through NCIC myself, but I did not get

14 the return, that response back from the system

15 indicating until I was already en route because he

16 had requested additional units.

17     Q    I see.  So after you received the picture

18 through FLOCK, you ran that tag --

19     A    Yes.

20     Q    -- through NCIC, but you did not have

21 time to get the results of that.

22     A    Correct.

23     Q    And what would, in theory, the NCIC

24 results have told you?  What were you looking for

25 by running that plate?

1    A    That that plate was listed as stolen.

2    Q    I see.  Okay.  And other than the letters

3  and numbers, what information are you running

4  through NCIC when you're running a plate through

5  that program?

6         We know that Shauna Ashmon's license

7  plate had the same letters and numbers.  What would

8  differentiate the two plates in the NCIC system?

9    A    As far as what I run?  I don't think I

10  fully understand your question.

11   Q    So you got the picture of the tag --

12   A    Correct.

13   Q    -- and then you ran it through NCIC?

14   A    Yes.

15   Q    Had you run Shauna Ashmon's plate through

16  NCIC, would you get two different results?

17   A    No.

18   Q    Okay.  What would you get?

19   A    The same result.

20   Q    Just the letters and numbers that

21  indicate it was stolen?

22   A    Correct.

23   Q    Are you putting the state in the NCIC

24  provide when you're running an NCIC report?

25   A    No.  It defaults to South Carolina, but

1    NCIC -- there's no state specific.

2         Q    Okay.  So you're just putting in letters

3    and numbers.

4         A    Correct.  It's a license plate -- or it's

5    a NCIC and DMV records check.  So the state denotes

6    which DMV I'm pulling the records from; NCIC just

7    checks the information.

8         Q    And because we're in South Carolina, it

9    defaults to South Carolina.

10        A    Correct.

11        Q    I see.  Do you ever run an out-of-state

12   license plate through NCIC?

13        A    I mean, I'm sure I have.

14        Q    And then is there a mechanism in place

15   where you would then check it's the State of

16   Delaware, it's the State of North Carolina, or

17   something like that?

18        A    I can change the state within the

19   DMV/NCIC records check, yes.

20        Q    Okay.  And what information would that

21   give you about that plate?  Would it give you

22   information from outside the State of South

23   Carolina?

24        A    It would give me DMV information from the

25   state.

1    Q    Okay.  All right.  A little farther down

2 from that line it says, "I informed Corporal

3 Zalenski to initiate the stop at the current

4 stopped location to prevent any potential danger to

5 the public if the vehicle was given space in

6 traffic to flee."

7        How are you in the position of informing

8 him what to do under these circumstances?

9        Is he your supervisor?

10   A    He is.

11   Q    And so walk me through that.  When you

12 say, I informed him to keep the car there -- that's

13 how I read that -- is it within your authority to

14 inform him what to do under those circumstances?

15   A    Yes.

16   Q    How is that?

17   A    We have a good working relationship.

18   Q    So even though he's your supervisor, you

19 can --

20   A    Yes.

21   Q    Were you ordering him to do that?

22   A    No.

23   Q    Okay.  Just advising him to do that?

24   A    Correct.

25   Q    Okay.  And he, in fact, did that because

1    the car didn't move, right?  He was behind them and

2    they stayed there and then you came on the scene,

3    correct?

4         A    Correct.

5         Q    Okay.  Going down, kind of to the middle

6    of the page, it says, "I instructed her to stand up

7    and place her hands behind her back to which she

8    complied with hesitation."

9         Do you recall what kind of hesitation she

10   exhibited?

11        A    Not off the top of my head.

12        Q    Is it your opinion that she did show some

13   hesitation?

14        A    Off the top of my head, I don't recall

15   exactly.

16        Q    Okay.  Kind of three-quarters of the way

17   down it says, "At some point I moved far enough

18   behind the rear of the vehicle and observed an

19   Alaska state tag bearing FED953 displayed on the

20   vehicle."

21        Do you recall seeing that license plate?

22        MR. SPREEUWERS:  Object to the form.

23        You can answer.

24        THE WITNESS:  You said FED?

25   BY MS. DALZELL:

1    Q    I'm sorry.  VED.  I'm sorry.

2    A    Okay.  What was your question again?  I

3  apologize.

4    Q    You indicate in your statement that you

5  observed the Alaska state tag at some point.

6    A    Yes.

7    Q    Do you recall specifically when you did

8  that?

9    A    At some point in between me walking from

10  kind of the center of where all the cars were

11  towards where Corporal Zalenski's car.

12    Q    And so when you were able to position

13  yourself behind the vehicle, you saw the tag?

14    A    I believe I walked around the car

15  multiple times, but that wasn't my priority of

16  events.  It was to gather that ID for him.

17    Q    Okay.  When you saw that it was Alaska

18  state tag, what did you do?

19    A    I believe me and my sergeant had a

20  conversation, but I believe I went to make contact

21  with the corporal about it.

22    Q    Okay.  And do you recall what he said?

23    A    Who?

24    Q    Your corporal.

25    A    No.

1    Q    Okay.  But you, at some point, talked to
2  him about the fact that it was an Alaska tag?
3    A    I don't think I ever had a chance to make
4  contact with him.
5    Q    Okay.  So who -- you said you talked to
6  your sergeant --
7    A    Correct.
8    Q    -- did you talk to anybody else about it
9  being an Alaska tag?
10   A    I don't know off the top of my head.  I
11 don't believe so.
12        (Wolfe Exhibit 4, Photograph, marked for
13    identification.)
14 BY MS. DALZELL:
15   Q    Okay.  I have previously marked Exhibit
16 4.
17   A    Okay.
18   Q    Does this picture, as far as you
19 remember, accurately depict the license plate that
20 was on the car that y'all stopped that day?
21   A    Yes.
22   Q    Okay.  Thanks.  All right.  Now we'll go
23 through the body cam just to quickly authenticate
24 it.  All right?  I'm just gonna have you watch the
25 body cam.

1   A    All right.

2        MR. SPREEUWERS:  And I don't want to mess

3   with what you're doing, but if all you want is

4   authentication, I think he can just see it and

5   confirm that it's his.  We're not --

6        MS. DALZELL:  Yeah.

7        MR. SPREEUWERS:  -- gonna dispute that.

8        MS. DALZELL:  Okay.

9        MR. SPREEUWERS:  But you do your --

10       MS. DALZELL:  All right.  My computer's

11  had a long day.  It's being very slow.

12       MR. SPREEUWERS:  When we gave you them --

13  I'm sorry.  We can go off the record.

14       THE VIDEOGRAPHER:  We are off the record

15  at 3:27.

16             (Off the record.)

17       THE VIDEOGRAPHER:  We are back on the

18  record at 3:29 p.m.

19  BY MS. DALZELL:

20   Q    All right.  So I just pulled up a video

21  that has been marked as your body cam video from

22  the day of this incident, or this incident.

23   A    Okay.

24   Q    And I'm just gonna play it and walk

25  through a couple things.  Okay?

1      A     Okay.

2            MS. DALZELL:  And I think the sound comes

3      on a couple seconds in.

4                  (Video played.)

5  BY MS. DALZELL:

6      Q     So I'm gonna stop there.  Is that --

7  you're picking up a radio.  Is that the radio you

8  were talking about earlier?

9      A     Yes.

10     Q     Okay.  And if I back up, that's the

11 computer you were talking about that's mounted in

12 your car?

13     A     Yes.

14     Q     Okay.  Where is your cell phone at this

15 point?

16     A     I don't know where it would have been

17 placed.

18     Q     Do you have a place you normally keep it

19 within the car?

20     A     I do in my current car, but it is no

21 longer the same as that car.

22     Q     Okay.

23     A     So I don't recall where the phone would

24 have been placed.

25     Q     Okay.  And it looks like you're talking

1    on the radio.  Is that the time when you're talking

2    to your corporal over the radio?  Right here.

3         A    Yes.

4         Q    Like you would have received -- is it

5    called a call through the radio or --

6         A    At that point I'm talking.

7              MS. DALZELL:  Here we go.

8                   (Video played.)

9    BY MS. DALZELL:

10        Q    Stop for second.  Is that you telling him

11   you're on the way?

12        A    Yes.

13             MS. DALZELL:  Okay.  All right.

14                  (Video played.)

15   BY MS. DALZELL:

16        Q    And right now you're on the way there.

17   How fast do you think you were driving?

18        A    I have no clue.  I don't look at speeds

19   when I'm driving.

20        Q    You don't?

21        A    Not when I'm driving blue lights and

22   sirens --potentially sirens but emergency

23   equipment.

24        Q    So you had your blue lights on but no

25   sirens at this point?

1    A    Correct.

2    Q    Why didn't you have the sirens on at this

3  point?

4    A    If it was, in fact, a stolen vehicle we

5  weren't -- I didn't want to alert my presence as an

6  emergency response to them.

7    Q    Okay.  All right.  So we stopped there.

8  You're pulling up to the scene right here and you

9  say something.  Can you hear what you say when I

10  replay it?  Hold on.  Take it down right here, what

11  does that mean?

12    A    That means initiate the traffic stop

13  there.

14    Q    And you're saying you're gonna do that?

15    A    No.  It's a we.

16    Q    Okay.  And so what would have been the

17  alternative when you say we're gonna take this down

18  right here?  What does that mean?

19    A    That means we're initiating the traffic

20  stop there.

21    Q    Okay.  And you're saying that to Corporal

22  Zalenski over the radio at the time?

23    A    Corporal Zalenski.

24        MS. DALZELL:  Zalenski.  I'm sorry.

25    Okay.  All right.

1            (Video played.)

2    BY MS. DALZELL:

3        Q    At this point I'm pausing, are you still

4    standing kind of in the door?

5        A    Yes.

6        Q    Okay.  So would you say your body is out

7    of the vehicle, or are you still sitting in the

8    vehicle?

9        A    I'm standing.

10       Q    You're standing kind of with the door to

11   your side?  Like up against your vehicle basically?

12       A    I'm standing in the driver door area with

13   the driver door still open.

14       Q    Okay.  Where is your gun at this point?

15       A    At the low ready.

16            MS. DALZELL:  Okay.

17                (Video played.)

18   BY MS. DALZELL:

19       Q    That's you detaining the passenger,

20   correct?

21       A    Yes.

22            MS. DALZELL:  Okay.  All right.  I'm

23       gonna back-up there for a second.

24                (Video played.)

25   BY MS. DALZELL:

1    Q    Do you recall being shaky?

2    A    Yeah.

3    Q    Why were you shaky?

4    A    I would assume because of adrenaline.

5  I'm not a doctor or anything.

6    Q    And you explain to her that you were kind

7  of feeling shaky and you said because you were

8  driving really fast?

9    A    I was driving at a rate that was above

10  the posted speed limit.  Yes.

11                  (Video played.)

12  BY MS. DALZELL:

13    Q    All right.  So you're putting her in the

14  car.  You're explaining to her now why they were

15  stopped.  Is that Corporal Zalenski?

16    A    Yes.

17    Q    Okay.  Is that Corporal Zalenski's car

18  behind her car with the blue lights on?

19    A    I believe so.

20                  (Video played.)

21  BY MS. DALZELL:

22    Q    Okay.  Right there.  Have you seen the

23  license plate at this point?

24    A    No.

25                  (Video played.)

1    BY MS. DALZELL:

2       Q    Okay.  And that's Corporal Zalenski going

3    with the ID to the car?

4       A    I believe so.

5       Q    Okay.  Who is that who just came to the

6    scene you said and you're asking about her going to

7    the car?

8       A    I can't see right now.

9       Q    Okay.  Sorry.

10      A    Deputy Blackmon.

11      Q    Okay.  All right.  Is this your sergeant?

12   Let me play it again.

13                    (Video played.)

14   BY MS. DALZELL:

15      Q    Is that your sergeant?

16      A    Yes.

17      Q    Okay.  So when you say that, when you say

18   it's a South Carolina plate, you knew that for sure

19   at that point?

20      A    At that point after the conversation me

21   and Corporal Zalenski had on the phone.

22      Q    Which one are you referring to?  The one

23   before all this happened?

24      A    Correct.

25      Q    Okay.  And that's Sergeant Womsley?

1      A     Correct.

2                 (Video played.)

3    BY MS. DALZELL:

4      Q     What did you just say right there?  Did

5    you hear it?

6      A     I believe he said he stopped them, or I

7    said he stopped them.

8      Q     Okay.  So he's questioning why did you

9    stop when it's an Alaska plate, correct, and you

10   said, well, he stopped her.

11               MR. SPREEUWERS:  Object to the form.

12               You can answer.

13               MS. DALZELL:  I'll play it again.

14                 (Video played.)

15   BY MS. DALZELL:

16     Q     When he says it's been hitting all week,

17   do you know what he's referring to?

18     A     I have my assumption, but I don't know.

19     Q     What would you assume?

20     A     That he's referring to the FLOCK system.

21     Q     I mean the FLOCK system has been hilting

22   what?

23     A     That the plate that we have stopped has

24   been -- I'm trying to look for the word -- has been

25   alerted to law enforcement.

1    Q    Prior to this?

2    A    In his words, yes.  I had no knowledge of

3  that.

4    Q    Okay.  And I don't want you guessing, but

5  would a reason be because an out-of-state tag?

6    A    I don't know why it would have

7  continually hit other than the NCIC --

8    Q    Okay.

9    A    -- return on it.

10        MS. DALZELL:  Okay.

11              (Video played.)

12  BY MS. DALZELL:

13    Q    Do you know the other officers here?  It

14  looks like there's numerous cars here at this

15  point, correct?  One, two, three, four, and yours

16  is up in front of the car?

17    A    Yes.

18    Q    Five cars?

19    A    Okay.

20    Q    Do you know the names of each of the

21  officers that were there that day?

22    A    That I've seen so far on the video, yes.

23    Q    Okay.  And you said Officer Blackmon.

24    A    Yes.

25    Q    There was another black man, who was

1  that?

2      A    Deputy Harris.

3      Q    Okay.  And then your corporal and then

4  your sergeant and you?

5      A    Correct.

6           MS. DALZELL:  Okay.

7                (Video played.)

8  BY MS. DALZELL:

9      Q    So you're now asking her for her

10 registration, correct?

11     A    Yes.

12     Q    And she's still detained even though you

13 guys know that this is not the tag?

14         MR. SPREEUWERS:  Object to the form.

15         You can answer.

16         THE WITNESS:  At this point, yes.

17 BY MS. DALZELL:

18     Q    So you're letting the passenger go at

19 this point, or releasing her from the handcuffs?

20     A    Yes.

21     Q    Okay.  Do you know how long this

22 detainment was?

23     A    Less than five minutes.

24     Q    And how do you know that?

25     A    Based on watching the body cam.

1    Q    So looking at the start of the body cam

2  to the end.  Is this a complete and accurate

3  recording of your body cam from that day?

4    A    Yes.

5    Q    Is there anything missing from it?

6    A    Not to my knowledge.

7    Q    Did you ever turn it off, or turn it on

8  and off again?

9    A    I turned it off when I left.

10    Q    That was the first time you turned it

11  off?

12    A    Correct.

13         MS. DALZELL:  Okay.  That's all I have.

14    Thank you.

15                      - - -

16                   EXAMINATION

17                      - - -

18  BY MR. SPREEUWERS:

19    Q    All right.  I have a few questions.

20    A    Yes, sir.

21    Q    First of all, you talked about your

22  training when you came onboard with the Richland

23  County Sheriff's Department.  You came on as a

24  Class 3 --

25    A    Yes.

1     Q     -- and went through the academy with a

2   Class 3 Certification, and then you were promoted

3   to Class 1 which is a full law enforcement officer,

4   right?

5     A     Yes.

6     Q     Went back through the academy, right?

7     A     Yes.

8     Q     And then before you were released on your

9   own as a Class 1 law enforcement, did you go

10  through field training officer, ride-alongs, and

11  stuff like that?

12    A     I went through a field training program.

13    Q     Okay.  And how long is that, roughly?

14    A     I believe it's roughly 30 shifts, so from

15  start to finish a couple months.

16    Q     And describe that for me.  What does that

17  entail.

18    A     The program?

19    Q     Yes.

20    A     Sit in the passenger seat for the first

21  little bit, riding with a field training officer

22  who's been designated to train and help me apply

23  what I learned in the academy, and policies, into

24  the real world helping people; and responding to

25  different calls for service, traffic stops.

1       Q    Always accompanied by the FTO, right?

2       A    Correct.

3       Q    Okay.  And do you also have monthly or

4  quarterly training with the sheriff's department?

5       A    Yes.  We have in-service training.

6       Q    Okay.  You've attended each one that

7  you're required to attend, correct?

8       A    Yes, sir.  Without fail.

9       Q    Okay.  And that's been throughout your

10 entire employment at the sheriff's department.

11      A    Yes.

12      Q    Okay.  I want to clarify a few things.

13 You were asked a question earlier about these folks

14 being arrested.  Was anybody on the scene arrested

15 that day?

16      A    No.

17      Q    Okay.  They were placed in handcuffs,

18 correct?

19      A    Yes.

20      Q    And that's an investigatory detention?

21      A    Correct.

22      Q    But no one was arrested?

23      A    Correct.

24      Q    Okay.  The FLOCK system, FLOCK is a

25 separate company, right?

1      A     Yes.

2      Q     Okay.  And this company places the

3  cameras at various locations throughout Richland

4  County, right?

5      A     I would assume so.

6      Q     Okay.  And sometimes they're on light

7  poles, or things like that?

8      A     Yes.

9      Q     Okay.  The -- when -- so the function of

10 the FLOCK camera is to read and interpret license

11 plates as far as --

12     A     That is my understanding.

13     Q     Okay.  And when you got a hit for this

14 particular series of letters and numbers that

15 appeared on Ms. Ashmon's plate, were you able to

16 tell definitively what state that hit came from?

17     A     No.

18     Q     Okay.  So you have a picture of a plate,

19 and it has on it, VED953, right?

20     A     Yes.

21     Q     And you can't tell what state it's from?

22     A     Correct.

23     Q     And that's a function of the particular

24 angle or the particular camera that's being used by

25 FLOCK, right?

1      A     Correct.

2      Q     And then FLOCK, as far as you know, is an

3  automated system that will read and interpret those

4  letters or numbers, and perform some sort of check

5  through its system before sending the alert; is

6  that your understanding?

7      A     That's my understanding of it.

8      Q     That's not a function that's performed by

9  the Richland County Sheriff's Department, correct?

10     A     Correct.

11     Q     Okay.  And so your ability to check this

12 particular plate against NCIC is a function that

13 you do on your mobile data terminal in your patrol

14 vehicle, right?

15     A     Correct.

16     Q     Okay.  And I think you said that takes

17 some time for those hits to come back, or those

18 responses to come back, right?

19     A     The responses, yes.

20     Q     All right.  And so if you had plugged in

21 this exact same tag number, VED953, in NCIC, would

22 that have still come back as stolen?

23     A     Yes.

24     Q     Okay.  And does it then provide you with

25 a state?

1      A     The NCIC entry does, yes.

2      Q     Okay.  So the NCIC search is a function

3 that's done by the sheriff's department; the

4 automated hit from license place reader is

5 performed by the FLOCK system, correct?

6      A     Yes.

7      Q     Okay.  And so I want to go through your

8 statement here.  You've had an opportunity to read

9 this statement on several occasions now, right?

10     A     Yes.  Yes.

11     Q     Okay.  And you made this statement within

12 several days of the incident in question, right?

13     A     Yes.

14     Q     Okay.  And is this statement true and

15 accurate to the best of your knowledge?

16     A     To the best of my knowledge, yes.

17     Q     Okay.  Are you aware of anything in here

18 that was incorrect or misstated, or anything like

19 that?

20     A     No.

21     Q     When you placed Ms. Drayton in your

22 patrol vehicle, what was the purpose of doing that?

23     A     To secure her as a potential passenger in

24 a stolen -- or in a vehicle that had a stolen

25 plate, and to keep her outside of the hot elements

1    and hot pavement.

2        Q    Okay.  And that was the same purpose for

3    having Ms. Ashmon placed in the patrol vehicle as

4    well?

5        A    The driver, yes.

6        Q    Okay.  You already testified to this, but

7    I want to be clear.  Did you ever point your

8    sidearm at the vehicle that these two women were

9    passengers -- or occupants of?

10       A    No.

11       Q    Did you ever point your sidearm at either

12   one of these two women?

13       A    No.

14       Q    Okay.  And is there anything about the

15   body cam, itself, that confirms that for you?

16       A    So at the end of the body camera you can

17   see the muzzle towards the top of frame, and had I

18   actually pointed the fire arm, you would see my

19   arms extended out in front of the body camera

20   visible.  I specifically put my body camera lower

21   on my vest to capture that image.

22       Q    And you're wearing a body cam as we sit

23   here today, correct?

24       A    Correct.

25       Q    Okay.  Can you just -- if you just lean

1  up from your seat, or stand up briefly to show

2  where that body cam is located.

3      A    (Witness complying.)

4      Q    And is that approximately the height that

5  your body cam was in July of 2023?

6      A    Yes.

7      Q    All right.  Just point to it for us, if

8  you would.

9      A    (Witness complying.)

10      Q    Okay.  All right.  So you purposely place

11  your body cam at a height that you would have been

12  able to see your arms and your weapon had you

13  pointed it or extended your arms out and pointed

14  it, correct?

15      A    Yes.  You would have seen the bottom

16  portion of my forearms and the magwell and bottom

17  of the gun.

18      Q    And you just watched your body worn

19  camera video from start, at least until folks were

20  being removed from handcuffs, correct?

21      A    Yes.

22      Q    And were you able to confirm from

23  watching that that, in fact, you never pointed your

24  weapon at these women?

25      A    Yes.  Yes.

1    Q    Okay.  As we sit here today, can you tell
2  me when it was confirmed that this license plate,
3  VED953, was in fact a South Carolina license plate
4  that had been reported stolen?
5    A    As far as a specific time, no.  It was
6  during a conversation near Corporal Zalenski's car.
7    Q    Okay.  But that took place -- that
8  confirmation took place after the stop, correct?
9    A    Yes.
10   Q    Okay.  So before you stopped them you
11 couldn't tell whether this was the stolen plate or
12 not?
13   A    Correct.
14   Q    And that's because the hit that you got
15 from the FLOCK system, you could not tell which
16 state the plate was from?
17   A    Correct.
18   Q    But it matched every single letter and
19 every single number, right?
20   A    Correct.
21        MR. SPREEUWERS:  Okay.  Can we go off the
22   record.
23        THE VIDEOGRAPHER:  We're off the record
24   at 3:52 p.m.
25           (A recess transpired.)

1          THE VIDEOGRAPHER:  We are back on the

2     record at 3:55 p.m.

3  BY MR. SPREEUWERS:

4     Q    All right.  Master Deputy Wolfe, one more

5  thing about the plate, itself.  I think earlier on

6  in your statement to IA you indicated that although

7  you couldn't tell the state from the FLOCK alert,

8  you were able to tell that it had red writing on

9  it, correct?

10     A    Yes.

11     Q    Okay.  All right.  And I want to get into

12  a little bit of the -- we talked earlier about a

13  felony traffic stop versus a routine stop, and I

14  think you said you activated your blue lights but

15  not your siren.

16     A    En route to, yes.

17     Q    Okay.  And why was that?

18     A    Not to alert the driver of the stop --

19  the felony stop that was to occur to a second units

20  presence.

21     Q    That everybody is on the way.

22     A    Yes.

23     Q    You don't want them to know that.

24     A    Yes.

25     Q    Okay.  And why is that?

1      A     It prevents the vehicle from getting an
2  early flight from law enforcement without other
3  units being available to assist, whether it's a
4  pursuit, or perimeter, a fight, whatever it may be.
5      Q     And you've run plenty of stolen vehicle
6  calls in your time as a law enforcement officer,
7  right?
8      A     Quite a few.
9      Q     Okay.  What are some of the things that
10 you encounter with a potential stolen vehicle call
11 that you're concerned about?
12     A     Vehicle pursuits; firearms; and fights.
13     Q     And are those pretty common with stolen
14 vehicles?
15     A     Yes.
16     Q     Or potential stolen vehicles?
17     A     Yes.
18     Q     Okay.  All right.  And is that the
19 purpose behind the felony stop protocol is to sort
20 --
21     A     Yes.
22     Q     -- of mitigate some of those concerns?
23     A     Mitigate and increase officer safety with
24 the initial contact.
25     Q     All right.  You said that it includes

1  fleeing, so somebody running from the cops and

2  crashing into people, stuff like that?

3      A     Correct.

4      Q     Weapons are frequently associated with

5  stolen vehicles, or potential stolen vehicles?

6      A     In my experience.  Yes, sir.

7      Q     Okay.  And then frequently the drivers,

8  and/or occupants of a potential stolen vehicle will

9  also get out and run on foot, right?

10     A     Correct.

11     Q     Okay.  And associated with that then is

12  some sort of physical conflict or interaction

13  between the officers and the fleeing occupants,

14  right?

15     A     Yes.

16     Q     Okay.  And so the felony stop protocols

17  are designed to reduce those potential issues,

18  correct?

19     A     Correct.

20         MR. SPREEUWERS:  Okay.  I don't have any

21     other questions.

22         MS. DALZELL:  I don't have anything

23     further.  Thank you.

24         THE VIDEOGRAPHER:  Please stand by.  This

25     concludes the deposition of Master Deputy

1    Tyler Wolfe.  We are off the record at

2    3:58 p.m.

3        THE COURT REPORTER:  Would you like him

4    to read and sign?

5        MR. SPREEUWERS:  Waive.

6        THE COURT REPORTER:  And would you guys

7    like a copy?

8        MR. SPREEUWERS:  Yes.  PDF, please.

9                    - - -

10    (The deposition concluded at 3:58 p.m.)

11                    - - -

12            (Witness excused.)

13                    - - -

14

15

16

17

18

19

20

21

22

23

24

25

```
 1                  CERTIFICATE OF REPORTER

 2

 3           I, Lisa A. Garson, Court Reporter and
    Notary Public for the State of South Carolina at
 4  Large, do hereby certify:
            That the foregoing deposition was taken
 5  before me on the date and at the time and location
    stated on page 1 of this transcript; that the
 6  deponent was duly sworn to testify to the truth,
    the whole truth and nothing but the truth; that the
 7  testimony of the deponent and all objections made
    at the time of the examination were recorded
 8  stenographically by me and were thereafter
    transcribed; that the foregoing deposition as typed
 9  is a true, accurate, and complete record of the
    testimony of the deponent and of all objections
10  made at the time of the examination to the best of
    my ability.
11           I further certify that I am neither
    related to nor counsel for any party to the cause
12  pending or interested in the events thereof.
    Witness my hand, I have hereunto affixed my
13  official seal this 10th day of September, 2024, at
    Greenville, Greenville County, South Carolina.

14

15

16

17

18
                 _____
19
                 Lisa A. Garson
20               Court Reporter
                 Notary Public
21               State of South Carolina at Large
                 My Commission Expires:
22               December 2, 2029

23

24

25
```