IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA
COLUMBIA DIVISION

| | | |
|---|---|---|
| Shauna Ashmon and Genecia Drayton, | ) | C/A No.: 3:23-cv-05228-SAL-PJG |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| Cpl. Zalenski, M.D.; Tyler Wolfe; | ) | |
| Gen. Robert Harris; Deputy Christopher | ) | |
| Blackmon; and Richland County | ) | |
| Sheriff's Department, | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

# EXHIBIT C
## Deposition of Mariusz Zalewski

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA
COLUMBIA DIVISION
C/A NO. 3:23-CV-05228-SAL-PJG

Shauna Ashmon and Genecia Drayton,　)
　　　　　　　　　　　　　　　　　　　)
　　　　Plaintiffs,　　　　　　　　　)
　　　　　　　　　　　　　　　　　　　)
v.　　　　　　　　　　　　　　　　　　)
　　　　　　　　　　　　　　　　　　　)
Corporal Mariusz Zalewski, Master　 )
Deputy Tyler Wolfe, Deputy Robert　 )
Harris, Master Deputy Christopher　 )
Blackmon, and the Richland County　 )
Sheriff's Department,　　　　　　　 )
　　　　　　　　　　　　　　　　　　　)
　　　　Defendants.　　　　　　　　　)
_____)

### DEPOSITION OF

# CORPORAL MARIUSZ ZALEWSKI

******** 

### Wednesday, September 11, 2024
10:12 a.m. - 11:10 a.m.

The deposition of Corporal Mariusz Zalewski was taken on behalf of the Plaintiffs at the law offices of Crowe, LaFave, Garfield & Bagley, LLC, 2019 Park Street, Columbia, South Carolina, on the 11th day of September, 2024 before Mary Cooper Joy, Court Reporter and Notary Public in and for the State of South Carolina, pursuant to Notice of Deposition and/or agreement of counsel.

## APPEARANCES

**Elizabeth M. Dalzell, Esquire**
Shealey Law Firm
1507 Richland Street
Columbia, South Carolina 29201
Attorney for the Plaintiffs

**Steven R. Spreeuwers, Esquire**
**Robert D. Garfield, Esquire**
**Alyssa McMahon, Law Clerk**
Crowe, LaFave, Garfield, & Bagley, LLC
2019 Park Street
Columbia, South Carolina 29201
Attorney for the Defendants


**Also Present:**
Pamela Crabtree, Videographer, Virtual Media




## INDEX

**CORPORAL ZALEWSKI:**                                    **PAGE:**
MS. DALZELL . . . .    EXAMINATION. . . . . . . .   5
MR. SPREEUWERS. . .    EXAMINATION. . . . . . . .  44
MS. DALZELL . . .    RE-EXAMINATION . . . . . .  49
MR. SPREEUWERS. .    RE-EXAMINATION . . . . . . .  50
Signature Sheet . . . . . . . . . . . . . .  53
Certificate . . . . . . . . . . . . . . . .  54

## EXHIBITS

**Plaintiff's Exhibit Number 1** . . . . . . . . . . 34
  (Complaint and Statement)

**Plaintiff's Exhibit Number 2** . . . . . . . . . . 34
  (Document Description)

## <u>STIPULATIONS</u>

It is stipulated and agreed that this deposition is being taken pursuant to the Federal Rules of Civil Procedure.

It is further stipulated and agreed that the formalities of taking a videotaped deposition are hereby waived.

It is stipulated by and between counsel and the witness that the reading and signing of the following deposition be, and the same are, hereby not waived. Signature sheet is attached to the deposition at page 53.

1    **VIDEOGRAPHER:**  This is the beginning of media one.
2        Today is September the 11th, 2024.  We are on
3        the record at 10:12 a.m.  My name is Pamela
4        Crabtree, Notary and legal videographer with
5        Virtual Media, Columbia, South Carolina.  Mary
6        Joy is Notary and court reporter with Creel
7        Reporting, Columbia, South Carolina.  We are
8        engaged by Counsel for the Plaintiff to take
9        this video deposition of Corporal Zalewski,
10        with the deposition being held at Crowe,
11        LaFave, Garfield & Bagley, LLC, 2019 s- -- Park
12        Street, Columbia, South Carolina, 29201, Case
13        Number 3:23-CV-05228-SAL-PJG.
14            Will Counsel please introduce yourselves
15        for the record, after which the court reporter
16        will swear in the witness?
17    **MS. DALZELL:**  Liz Dalzell, here for the Plaintiffs,
18        Shauna Ashmon and Genecia Drayton.
19    **MR. SPREEUWERS:**  Steve Spreeuwers for the Defendants.
20    **MR. GARFIELD:**  Robert Garfield for the Defendants.
21    **COURT REPORTER:**  Corporal Zalewski, please raise your
22        right hand.
23    **CORPORAL ZALEWSKI:**  (Witness complies.)
24    **COURT REPORTER:**  Do you solemnly swear that the
25        testimony you will give in this matter today

1        will be truth, the whole truth, and nothing but

2        the truth, so help you God?

3    **CORPORAL ZALEWSKI:**  I do.

4    **COURT REPORTER:**  Thank you.

5    **CORPORAL ZALEWSKI - EXAMINATION BY MS. DALZELL:**

6    Q:   Good morning, Corporal Zalewski.  As you've ---

7    A:   Good mornin'.

8    Q:   --- heard, my name is Liz Dalzell, and I'm here

9         representing Shauna Ashmon and Genecia Drayton

10        in a lawsuit we filed against the Richland

11        County Sheriff's Department and you and a few

12        other officers for a, a stop, a traffic stop

13        that occurred on July 16th of 2023.  I'm here

14        today just to ask you some questions about your

15        background and what happened that day so that

16        we can kind of create a record in the lawsuit,

17        okay?

18   A:   Okay.

19   Q:   Have you ever given a deposition before?

20   A:   No.

21   Q:   No?

22   A:   No.

23   Q:   All right.  There are a few ground rules that

24        apply.  The court reporter here today is taking

25        everything down that we say, so we need to

1          speak loudly and clearly and actually give
2          affirmative responses to questions, so yes/no
3          as opposed to a shake of the head or a nod of
4          the head, something like that.
5               If you have any questions about anything
6          that I'm asking you, please ask me to rephrase
7          the question.  I don't want you guessing at
8          anything, we want a clear record, and I want to
9          be sure that you are answering the appropriate
10         question as it's meant to be asked, okay?  Uh-
11         huh?
12    A:   Yes, ma'am.
13    Q:   If you need a break or if you need a drink or
14         you need the restroom or anything like that, do
15         not hesitate to ask, we're not holding you
16         hostage here, okay?
17    A:   Yes, ma'am.
18    Q:   All right.  What is your current position with
19         Richland County?
20    A:   A corporal position, it's a shift supervisor.
21    Q:   Okay.  And how long have you been in that
22         position?
23    A:   Approximately three years.
24    Q:   Okay.  What was your position before that?
25    A:   Master deputy.

1   Q:   And how long were you in that position?

2   A:   Approximately four years.

3   Q:   Well, okay.  And how about before that?

4   A:   I was just a regular deputy.

5   Q:   And how long were you a deputy?

6   A:   For about three years.

7   Q:   Okay.  So have you been with the sheriff's

8        office for 10 years?

9   A:   I've been with the Sheriff's Department for 12

10       years.

11  Q:   Oh, okay.  And what were the other two years,

12       what was your job title then?

13  A:   I start out as a JSO, a judicial security

14       officer at a courthouse.

15  Q:   Okay.  And then, when did you attend the

16       Criminal Justice Academy?

17  A:   Criminal Justi- -- I attended in March 2015.

18  Q:   Okay.  And how many weeks were you at the

19       Academy?

20  A:   Twelve.

21  Q:   Okay.  What di- -- what kind of training

22       occurred during those 12 weeks, can you

23       describe what you learned during that time?

24  A:   The legals, basic legals, defensive tactics,

25       domestic, traffic stops, DUIs, majority was at

1          -- just basic legal procedures.

2     Q:   Okay.  And is 12 weeks the standard time that

3          one s- -- should spend in the Criminal Justice

4          Academy?

5     **MR.   SPREEUWERS:**   Object  to  the  form.   You  can

6          answer.

7     A:   Yes.

8     Q:   Okay.  Are there any other variations of the

9          Criminal Justice Academy that you know of?  Any

10          ---

11    **MR. SPREEUWERS:**  Objection.

12    Q:   --- other ---

13    **MR. SPREEUWERS:**  You can answer.  Sorry, Liz.

14    **MS. DALZELL:**  That's okay.

15    Q:   Any other programs that would require more or

16          less time?

17    A:   N- -- no.  I don't -- I'm not sure ---

18    Q:   Okay.  Did you attend any training to become a

19          judicial officer?

20    A:   I did.

21    Q:   What kind of training did that ---

22    A:   I went to Academy (ph) for two weeks to learn

23          basic, basic law.

24    Q:   Oh, okay.  When did that occur?

25    A:   That was back in 2012.

1    Q:    Okay.  What did you do before you became a, a
2          judicial officer?
3    A:    I   did   office   furniture   delivery   and
4          installation.
5    Q:    Where was that?
6    A:    It was in Columbia.
7    Q:    Okay.  How long did you work in that field?
8    A:    For about 13 years.
9    Q:    Okay.    Are   you   from   cor-   --   Columbia
10         originally?
11   A:    No, ma'am.
12   Q:    Where are you from?
13   A:    I was born and raised in Poland and then moved
14         to United States.
15   Q:    When did you move to the United States?
16   A:    In 1991.
17   Q:    Okay.  And have you been in South Carolina that
18         whole time?
19   A:    I've been in South Carolina since 1994.
20   Q:    Okay.  Where did you live from 1991 to nine- --
21         -
22   A:    In New Jersey.
23   Q:    Okay.  What brought you to South Carolina?
24   A:    My parents moved down here for a job.
25   Q:    Okay.  All right.  Great.

1          Have you ever been disciplined by the

2     Richland County sheriff's office?

3  A:  Yes.

4  Q:  Tell me about that.

5  A:  I don't recall it.  There was -- I, I just got

6     written up for -- oh, I can't remember what it

7     was for right at this point, it's been a long

8     time ago.

9  Q:  Okay.  So you were written up for something?

10 A:  Yes, ma'am.

11 Q:  Well, just one time, or have you been written

12     up more than one time?

13 A:  More than one time.

14 Q:  All right.  Let's go back to the first time you

15     can remember.

16 A:  The first time I remember, I was over at the

17     courthouse, I got written up for not, not

18     letting my supervisors know that the air

19     condition (ph) (indicating) in the transporter

20     van wasn't workin', and somebody complained.

21 Q:  Okay.  And then, what was the next time you

22     were written up?

23 A:  The next time I got written up -- the next

24     write-up was for a chase of the vehicle where

25     I end up in a car wreck, where I -- I did hit

1          the suspect's vehicle in the rear end and then

2          keep on followin' them, so I left the scene of

3          accident and -- just to apprehend a suspect.

4    Q:    I see.    Okay.    When, when was that

5          approximately?

6    A:    Oh, God.  I don't recall it.  It's been a long

7          time.

8    Q:    Yeah.  I understand.  What about -- what was

9          the next write-up after that?

10   A:    I don't recall.  The next write-up was, I took

11         a suspect to the hospital, he want to use the

12         restroom, and I took restraints off of him,

13         which was against policy, I let him use the

14         restroom, he tried to escape, and then I had to

15         re-engage with him.

16   Q:    Okay.

17   A:    And that was the last -- what I can remember.

18   A:    So three write-ups, as far as you can remember?

19   A:    Yes, ma'am.

20   Q:    Okay.  Have you ever been written up or warned

21         with regard to any traffic stops?

22   A:    No.

23   Q:    Okay.  Did any of those write-ups result in

24         further disciplinary action?

25   A:    No.

1   Q:   Okay.  So what is, what is your understanding
2        of a write-up, it just goes into your file?
3   A:   Goes  in  my  file (indicating),  and  unless
4        there's an- -- another occurrence of the same
5        nature, then it's going to go farther, but it
6        just  goes  into  a  f- --  personal  file,  and
7        that's about it (indicating).
8   Q:   Okay.   And  then,  what  happens  if  you  get
9        multiple write-ups for the same kind of thing?
10  A:   Then the person'll have to be retrained.
11  Q:   I'm sorry.  Say that again?
12  A:   Then I'll have to be retrained (indicating).
13  Q:   Retrained?
14  A:   Retrained, and then, whatever they decide to do
15       ---
16  Q:   Okay.
17  A:   --- with ---
18  Q:   Has -- have you ever had to be retrained in any
19       area ---
20  A:   No.
21  Q:   --- of your job duties?  Okay.
22            It's my understanding that you're assigned
23       to  different  regions  at  different  times,  is
24       that  correct,  as  an  officer  with  Richland
25       County?

1    A:    We (ph) assigned to the same region most of the

2          time.

3    Q:    Okay.  And so, what region are you assigned to

4          now?

5    A:    Right now, I'm assigned to Region 7.

6    Q:    Okay.  And is that region you were assigned to

7          back in July of last year?

8    A:    Yes.

9    Q:    Okay.  How long have you been assigned to that

10         region?

11   A:    For about three years.

12   Q:    Okay.  So fa- -- familiar with the regions,

13         having worked that area ---

14   A:    Yes ---

15   Q:    --- for ---

16   A:    --- ma'am.

17   Q:    --- three years?  Okay.

18         Let's turn to the day of this incident.

19         Start from the beginning of your shift, if --

20         as far as you can remember, what you were doing

21         before the incident and, well, you know, in the

22         time leading up to the incident.

23   A:    To my recollection, the day was f- -- fairly

24         normal, just calls for service, and I've res-

25         -- I don't recall, but my squad was doin'

1      traffic   stops,   answering   calls   for,   for

2      service,  shopliftings,  maybe  domestic,  in  that

3      nature.

4  Q:  Okay.    And   then,   I   took   the   deposition   of

5      Master  Deputy  Wolfe,  and  he  said  that  he,  he

6      was  alerted  to  a  stolen  plate  in  or  around  the

7      Summit  neighborhood.   Did  you  receive  that  same

8      alert?

9  A:  Yes, ma'am.

10 Q:  All right.  Tell me about that, what -- how did

11     you  receive  that  alert?

12 A:  I  received  that  alert  in  two  ways,  ones  (ph)  is

13     on  my  cell  phone  as  a  text  message,  and  another

14     one  was  on  my  computer,  it  pops  on  a  alert  of

15     a  s-  --  stolen  plate.

16 Q:  Okay.  And so, tell me what you remember about

17     the  text  message.

18 A:  The  text  message  give  (ph)  us  location  and  the

19     plate  number.

20 Q:  And  is  it  a  picture  that  you're  receiving  on

21     the  text  message?

22 A:  No.

23 Q:  Oh, okay.  What are you receiving, just . . .

24 A:  I   received   the   location   (indicating),   time

25     stamp  (indicating),  when,  when  the  car  went

1       through the camera (indicating), a location of

2       the camera (indicating), and the tag number

3       (indicating) and reason for -- if it was

4       stolen, warrants, or anything like that.  At

5       this -- at that time, it was -- the plate was

6       stolen.

7   Q:  And so, no information is given about the state

8       of the plate?

9   A:  No.

10  Q:  You're just . . .

11  A:  At, at that time, it (indicating) did not.

12  Q:  Okay.  What about in the e-mail, is t- -- are

13      you getting any additional information in the

14      e-mail?

15  A:  I did not.  I do not accept to receive e-mails.

16  Q:  But earl- -- you just stated you also received

17      an e-mail, correct?

18  A:  No.  I received notification on my screen.

19      When we open up the website, it alerts the --

20      through notification through the website, not

21      through the e-mail.

22  Q:  Okay.  So you received some kinda notification

23      on your computer screen?

24  A:  Yes, ma'am.

25  Q:  Did you react to that or respond to that in any

1    way?

2  A:   Yes.

3  Q:   Okay.  Tell me about that.

4  A:   I opened up, and it show a blur (ph) picture of

5       the license plate, the only thing I could

6       confirm was the numbers and letters and the

7       vehicle, and there was a picture of the vehicle

8       that was driven that the plate was on.

9  Q:   And what kind of vehicle was that?

10 A:   It was a white sedan.

11 Q:   Do you know what -- the make and model?

12 A:   That was Toyota Camry.

13 Q:   It was a Toyota Camry?

14 A:   (Nods head.)

15 Q:   And what were the colors of -- on the plate?

16 A:   They were blurred, and there was a mixture of

17       colors.  I know the lettering was black.

18 Q:   And the what?

19 A:   Lettering was black.

20 Q:   Black?

21 A:   (Nods head.)

22 Q:   Okay.  What else do you remember about it?

23 A:   From the picture, I saw that it was on a white

24       Camry (indicating), a, a license plate that was

25       blurred, and the letters and, and numbers.

1   Q:   Okay.  And so, you received this picture.  And
2        what do you do after you received that picture?
3   A:   I put it in my computer to run it, to confirm
4        it, if it's stolen or not.
5   Q:   Okay.
6   A:   And once I put it in, and I -- it came back
7        stolen -- alert that it was stolen.
8   Q:   And that -- you're putting that into the NCIC?
9   A:   Correct.
10  Q:   Okay.  And that's how you get the information
11       back as to whether it was stolen?
12  A:   Correct.
13  Q:   What other information are you getting through
14       NCIC at that point?
15  A:   The vehicle make and model that the license
16       plate is assigned to and the name of the owner
17       of the vehicle.
18  Q:   Okay.  And what was the vehicle make and model
19       that that license plate was assigned to?
20  A:   I don't recall.
21  Q:   Oh, okay.  Would you have record of that
22       anywhere?
23  A:   I don't have a record.  I'll have to re-run it
24       again through the NCIC.
25  Q:   And that's something you could do still and get

1       the same information?

2   A:  Yes.

3   Q:  Okay.  When you're being alerted through the

4       Flock system of certain license plates, do you

5       sometimes get multiple notifications about the

6       same license plate?

7   A:  Can you rephrase it?

8   Q:  Yeah.  My understanding of the Flock system in

9       the -- is that it's taking pictures of license

10      plates, and it could be just any license

11      plates, and then, some kind of ping or create

12      an alert that then alerts you to then check

13      into it or run it through NCIC, that kinda

14      thing, is that correct?  Or could you explain

15      what the Flock system does?

16  A:  All right.  Well, a Flock system runs all the

17      license plates through NCIC, and when there is

18      discrepancy, it alerts us.

19  Q:  And, like, what do you mean by discrepancy?

20  A:  There are var- -- there are many different ways

21      that -- I don't say ways.  There are many

22      reasons why there's a plate enter (ph) in NCIC,

23      from em- -- and from missin' person, sex

24      offenders, endanger people, to warrants, stolen

25      cars, or stolen plates.

1  Q:  I see.  So, even if, let's say, I was driving

2      through the Summit and the Flock system took a

3      picture of my plate, it would automatically run

4      it through NCIC, and then it wouldn't alert

5      with anything 'cause I don't have anything on

6      my ---

7  A:  Correct.

8  Q:  --- record?  Oh, okay.  But when somebody does

9      have something attached to the license plate --

10     -

11 A:  (Nods head.)

12 Q:  --- you get an alert about that when it's in

13     your region?

14 A:  Correct.  I have my camera set up for my

15     region.  They're nationwide cameras, and so --

16     but mine are only set up for Richland County

17     (indicating) and ---

18 Q:  When you say ---

19 A:  --- my ---

20 Q:  --- your ---

21 A:  --- region.

22 Q:  --- cameras, what does that mean?

23 A:  Well, Richland County, the -- and through

24     Region 7.

25 Q:  Do you have control over those cameras at all?

1    A:   No.

2    Q:   Okay.  And so, when you say your cameras, you

3         just mean the ones that are in your region?

4    A:   Correct.

5    Q:   Okay.

6    A:   I have -- I can select which cameras I want to

7         be alerted on.

8    Q:   Ah, okay.  Within your region?

9    A:   Yeah, correct.

10   Q:   Could you be alerted on cameras outside of your

11        region?

12   A:   Yes.

13   Q:   Okay.  So you get this alert with regard to

14        this license plate, and then what do you do?

15   A:   I'll ran (ph) through NCIC and make sure -- to

16        confirm it's stolen and then drive through the

17        area and attempt to locate the vehicle with

18        that plate.

19   Q:   Oh, okay.  So, given that you got the re- --

20        the alert and you have -- you think that it's

21        possibly in the area, so you kind of patrol

22        looking for that vehicle and that license

23        plate?

24   A:   Yes.

25   Q:   Or looking for the license plate?

1   A:   Yes.

2   Q:   Okay.   And  do  you  know  how  long  you  were

3        patrolling after you got that alert?

4   A:   I'm not sure.

5   Q:   Okay.  And then, tell me what happens next.

6   A:   I  was  on  the  phone  with  Master  Deputy  Wolfe

7        about  the,  the  plate  being  stolen,  and  I

8        located  the,  the  vehicle  with  the  plate,  I

9        advise  him that  I was  behind the  vehicle, and

10       our  procedure  is  that  we  always  wait  for

11       another  unit  (indicating)  to  show  up  for  --

12       just  in case the person that's in the vehicle

13       (indicating) runs, it's  better for two people

14       --  at  least  two  people  to  be  --  for  if  --  for

15       safety of other drivers (indicating) in case he

16       runs,  in  case  there  are  weapons  discharged

17       towards  us  (indicating),  and  make  sure  nobody

18       gets,  gets  hit  and  everybody's  safe,  and  at

19       that  point,  when  we  have  more  units  available,

20       then  we  can  perform  a  felony  traffic  stop.

21   Q:   Okay.  And so, you're on the phone with Master

22        Deputy  Wolfe,  and  you  asked  him  to  come  provide

23        you with backup, is that fair to say?

24   A:   Yes.

25   Q:   Did  you  call  anybody  else?

1    A:   I went out on the radio and -- 'cause the main
2         thing is to alert the whole region, whoever's
3         on this -- on the radio channel that I am
4         behind a stolen plate (indicating) and my
5         location and the reason why we're gonna perform
6         a traffic stop (indicating).
7    Q:   Okay.  And so, when you say you were behind the
8         stolen plate, are you -- where are you located
9         when you f- -- notice this plate?
10   A:   I was on Summit Parkway goin' towards Clemson
11        Road.
12   Q:   And were you at a stop light?
13   A:   I located before we got to a stop light.  I
14        initiated the felony traffic stop while we were
15        at the traffic light, that's when my backup
16        arrived.
17   Q:   Okay.  Who made the decision to initiate it as
18        a felony traffic stop?
19   A:   I did.
20   Q:   Okay.  And what goes into that decision, what,
21        what made you decide to initiate it as a felony
22        traffic stop?
23   A:   It's our procedure to initiate traffic stops on
24        stolen vehicles, stolen plates, warrants for
25        the possibility of them runnin'.

1   Q:   And so, what's the difference between a felony

2        traffic stop and a regular traffic stop?

3   A:   A regurl- -- regular traffic stop, we conduct

4        on  a  --  speeding  vehicles,  minor  traffic

5        infractions,  runnin'  a  red  light,  and  that

6        sort.  Felony traffic stop is for a felonies

7        (ph)  crime,  a  possession  of  a  stolen  --  a

8        stolen  plate  and  a  po-  --  possibility  of  a

9        vehicle being stolen, that becomes a felanious

10       (ph) crime, and at that point, that's when we

11       have  to  take  all  the  caution  and  try  to

12       apprehend the potential suspect.

13  Q:   And tell me, what is the procedure a felony

14       traffic stop?

15  A:   The  procedure  is  to  attempt  to  stop  the

16       vehicle, if the vehicle stops, we announce for

17       the driver to turn the car off or to see their

18       hands, make sure they don't have anything, and

19       then we take one person at a time out of the

20       vehicle, bring 'em to us, and detain them for

21       investigation.

22  Q:   Okay.  And then how -- what is supposed to

23       happen in the investigation?

24  A:   We verify, make sure everything is correct th-

25       -- from the information that we have and the

1      information with the driver -- wis- -- possibly

2      passenger, that the vehicle and the license

3      plate -- make sure everything is in order with

4      the information that we received.

5   Q: So, for example, you would look at the

6      registration in the car?

7   A: Yes.

8   Q: Okay.  What else would you look at?

9   A: The VIN number.

10  Q: Okay.

11  A: And make sure it matches the registration.

12  Q: Okay.  What else?

13  A: We check the driver's license and make sure the

14     information on their driver's license is

15     correct, make sure they're not suspended.

16  Q: Okay.  And does a felony -- it's like you said

17     earlier, and just correct me if I'm wrong here,

18     a felony traffic stop requires backup, you

19     don't want to do it by yourself?

20  A: Correct.

21  Q: Does it require a certain amount of backup?

22  A: No.

23  Q: Oh, okay.  Just -- it could be one officer?

24  A: It could be one extra (indicating), could be

25     two (indicating), it has to be multiple

1           officers there.

2    Q:    Okay.  So,  when  you  initiated  this  felony

3           traffic  stop,  you  were  behind  the  vehicle,

4           correct?

5    A:    Yes, ma'am.

6    Q:    And   Master   Deputy   Wolfe   came   from   what

7           direction?

8    A:    He came from behind me.

9    Q:    Okay.  And then what did he do at that point

10          when he got to the scene?

11   A:    He blocked the vehicle from, from leaving, so

12          he  parked,  he  parked  his  vehicle,  patrol

13          vehicle in front (indicating) of the suspected

14          car.

15   Q:    Okay.  And what were you doing during that time

16          when he was blocking the vehicle?

17   A:    I was giving commands for the driver to come

18          out,  and  to  my  recollection,  I  brought  the

19          driver towards me (indicating) so I can detain

20          'em for investigation.

21   Q:    Did you have your gun drawn?

22   A:    At  first,  I  had  my  gun  drawn  in  the  SUL

23          position.

24   Q:    What does that mean?

25   A:    A SUL position is like a ready, ready to fire,

1      it's not pointing at anybody, but it's ready to

2      present and, and -- if it needs to be.

3  Q:  Can you demonstrate that, like where -- how are

4      you holding it if it's ready to fire?

5  A:  When I'm holdin' my gun, it's usually pointing

6      down (indicating).

7  Q:  Okay.

8  A:  With my hand on the grip (indicating) away from

9      the trigger.

10 Q:  But ready to pull the trigger if you need to?

11 A:  Well, and then -- ready to engage (indicating).

12 Q:  Okay.  At s- -- what does that mean?

13 A:  Engage  means  pointin'  it  at  my  target

14     (indicating).

15 Q:  Okay.  So back up and tell me, you're behind

16     the car, you -- are you waiting in the car

17     until Master Deputy Wolfe arrives?

18 A:  I, I -- well, I can't recall it, exactly what

19     happened that day, but at -- we usually -- I

20     don't s- -- turn my blue lights on until I know

21     he's within vicinity, so, at the same time as

22     he pullin' (ph) in, I could be gettin' outta my

23     car (indicating) and callin' the driver out

24     from the vehicle.

25 Q:  So you left your blue lights off so that you

1    didn't alert them as to the stop until he was

2    there?

3  A:  Until I will -- we were ready to, to do --

4    perform a, a felony traffic stop (indicating).

5  Q:  Oh, okay.  And so, when did you put your blue

6    lights on?

7  A:  When, when I had Master Deputy Wolfe in sight.

8  Q:  Okay.  So you put your blue lights on, then

9    what happened?

10  A:  I see Master Deputy Wolfe comin' around the

11    corner, blockin' the vehicle (indicating), I

12    open my door and, of course, draw my weapon

13    (indicating) and put it in the SUL position

14    (indicating), and at that time, I start callin'

15    out the driver.

16  Q:  Do you recall what you said?

17  A:  Not from the top of my head.

18  Q:  Okay.  Di- -- and then, what happened?

19  A:  Then, masdeputy (ph) -- Master Deputy Wolfe

20    (indicating) became a cover for me while I was

21    engagin' into a driver, I explained to the

22    driver what happened while I was handcuffin'

23    her and explained, this is just a detention

24    because the plate was come -- stolen.

25  Q:  Okay.

1    A:    And we need to do investigation.

2    Q:    Okay.  And so, you handcuffed the driver, and

3          then what did you do?

4    A:    And the driver was standin' by me, and I waited

5          for Master Deputy Wolfe to get the passenger

6          out from the vehicle, and, of course, at the

7          same time, two more deputies -- or one more

8          dep- -- two more deputies t- -- came in ---

9    Q:    What ---

10   A:    --- to ---

11   Q:    --- what ---

12   A:    --- to put ---

13   Q:    --- deputies were those?

14   A:    Master Deputy Blackmon and Deputy Harris.

15   Q:    Okay.  So they arrived de- -- after you had

16         detained the driver?

17   A:    Yes.  I know Harris did.

18   Q:    Okay.  And so, at this point, there are four

19         officers at the scene?

20   A:    Yes, ma'am.

21   Q:    Okay.  And you have the driver detained.  Where

22         do you have her placed?

23   A:    We are in the front of my car, my patrol car.

24   Q:    Okay.

25   A:    Then, the other two officers (indicating) were

1       providing cover for Master Deputy Wolfe ---

2   Q:  Uh-huh.

3   A:  --- so he can detain and place her in her car.

4   Q:  Okay.  And when they're providing cover, what

5       are they doing?

6   A:  Make sure -- just in -- make sure that nothin'

7       happens to anybody that's surrounding Master

8       Deputy Wolfe or any other cars (indicating)

9       that -- drivin' by.

10  Q:  And how are they doing that, are -- do they

11      have their guns drawn?

12  A:  Usually, it's the, the same way, the way I did,

13      in the SUL position (indicating).

14  Q:  Which would mean it's out of the holster,

15      correct?

16  A:  It's out of -- yes, ma'am.

17  Q:  Okay.  And you said you investigate once you

18      have the driver detained, correct?

19  A:  Yes, ma'am.

20  Q:  Well, how -- what did you do to investigate?

21  A:  I gathered all the information available for me

22      that got that -- at the time when I looked at

23      it, it was a Alaska license plate (indicating),

24      enter into NCIC as an Alaska license plate.  I

25      also got the driver's information and enter

1           (ph) into NCIC, as well.

2   Q:    Okay.  And what happened when you did that?

3   A:    I'll ran (ph) everythin' through NCIC, and it

4         came back clear.  Then I verify and make sure

5         the VIN number was correct with the NCIC.

6   Q:    Where did you get the VIN number?

7   A:    The VIN number from -- there -- there's a VIN

8         number on the vehicle.

9   Q:    Inside the front door or something?

10  A:    It's under the wind- -- it's in the windshield

11        (indicating), the -- visible ---

12  Q:    Okay.

13  A:    --- at all times.

14  Q:    Okay.

15  A:    And there is one on a door, and there's another

16        one in the floorboard.

17  Q:    Okay.  And so, when you first saw the car in

18        front of you and noticed the license plate, did

19        you notice that it was an Alaska license plate?

20  A:    I did.

21  Q:    Okay.  So you knew that before you had detained

22        the driver and the passenger?

23  A:    That it was (ph) Alaska plate?

24  Q:    Correct.

25  A:    Yes.



***CREEL COURT REPORTING, INC.***
*1230 Richland Street / Columbia, SC 29201*
*(803) 252-3445 / contact@creelreporting.com*

1   Q:   Okay.   Okay.   So,  once  you  realized  that

2        everything  was  clear  in  NCIC,  what  happens

3        next?

4   A:   I   apologized   to   the   driver   for   any

5        inconvenience,  and  I  released  'em  from  my

6        handcuffs, from our custody.

7   Q:   Okay.  And did the driver react in any way?

8   A:   She was crying, and she asked for everybody's

9        information, which I provided to her.

10  Q:   Okay.  So you gave her the names of all of the

11       deputies that were there?

12  A:   Correct.

13  Q:   And did she explain why she was crying?

14  A:   Not to me directly.

15  Q:   Did you hear her explain it to somebody else?

16  A:   I did not hear, I just hear her explaining, but

17       what did she say, I wasn't aware of ---

18  Q:   Okay.

19  A:   --- at that time.

20  Q:   You just knew she was talking, but you couldn't

21       hear what she was saying?

22  A:   Yes, ma'am.

23  Q:   Okay.   I  know  that,  at  some  point,  Deputy

24       Blackmon went to speak with her.  Did you ask

25       him to go do that?

1   A:   No.

2   Q:   Who do -- asked him to go do that?

3   A:   Nobody.  He just went out there and talked to

4        her, try to calm her down and explain the

5        situation again.

6   Q:   Okay.  Did you ever talk to her after you had

7        released her from the handcuffs?

8   A:   After I released from her cuffs, I apologized

9        for the inconvenience that I caused her, and

10       she asked to get the names of the officers

11       involved, which I provided to her at that time.

12  Q:   Okay.  And I am ---

13  **MS. DALZELL:**  This is the Complaint, and I just have

14       the two copies with his statement on the back

15       that you printed out yesterday.

16  Q:   Have you ever seen this document?

17  A:   I, I did.

18  Q:   Okay.  When did you see that document?

19  A:   About a week ago.

20  Q:   All right.  Did your attorney show it to you?

21  A:   Yes.

22  Q:   In preparation for the deposition?

23  A:   Yes.

24  Q:   You -- so you haven't seen it before a week

25       ago?



1    A:    No, I have not.

2    Q:    Okay.  Did -- do you recall giving a statement

3          to Internal Affairs about this incident?

4    A:    I did.

5    Q:    Okay.  That's on the back of that.  I just want

6          you to confirm that this is your statement.  Is

7          that the statement that you gave to Internal

8          Affairs?

9    A:    Yes.

10   **MR. SPREEUWERS:**  And just for the record, this is

11        Exhibit 1 from the other ---

12   **MS. DALZELL:**  From ---

13   **MR. SPREEUWERS:**  --- deposition?

14   **MS. DALZELL:**  --- Wolfe deposition, yes.  And I ---

15   **MR. SPREEUWERS:**  Thank you.

16   **MS. DALZELL:**  --- have another copy we can e- ---

17   **MR. SPREEUWERS:**  And ---

18   **MS. DALZELL:**  --- we ---

19   **MR. SPREEUWERS:**  --- it's ---

20   **MS. DALZELL:**  --- can ---

21   **MR. SPREEUWERS:**  --- Ashmon A-001 through -005.

22   **MS. DALZELL:**  Right.

23   **MR. SPREEUWERS:**  And it's not all one document, it's

24        just been condensed into one ---

25   **MS. DALZELL:**  Into ---

1  **MR. SPREEUWERS:** --- for us.

2  **MS. DALZELL:** --- one.

3  **MR. SPREEUWERS:** Yeah.

4  **MS. DALZELL:** Yeah.

5  **MR. SPREEUWERS:** Just for the record.

6  **MS. DALZELL:** Yeah.

7  **MR. SPREEUWERS:** Thank you.

8  **MS. DALZELL:** Okay.  Thank you.

9  **(Plaintiff's Exhibit Number 1 was marked for**

10  **identification purposes at this time.)**

11  Q:   So when did you give this statement?

12  A:   A couple days after the incident.

13  Q:   Okay.  And were you disciplined after this

14       incident?

15  A:   No.

16  Q:   Okay.  Was there anythin- -- any follow up or

17       any further discussion with Internal Affairs

18       after you gave this statement?

19  A:   No.

20  Q:   Okay.

21  **MS. DALZELL:** I'll do this as a separate Exhibit.

22       (Passing Exhibit to court reporter.)  Thank

23       you.

24  **(Plaintiff's Exhibit Number 2 was marked for**

25  **identification purposes at this time.)**

1    Q:   And I'm going to show you another document,

2         this document was marked as Exhibit 4 in Master

3         Deputy Wolfe's deposition.  Does that look like

4         a picture of the license plate of the car that

5         you, you were behind when you made the felony

6         traffic stop?

7    A:   It does not.  It -- the picture on the Flock

8         was blurred, I could not make out the state.

9    Q:   Oh, okay.  So the picture on Flock looked

10        different than this?

11   A:   Correct.

12   Q:   Okay.

13   **MS. DALZELL:**  That's Exhibit 4, previously was ---

14   Q:   Were you wearing your bodycam at the time of

15        this stop?

16   A:   I did.

17   Q:   Did you have it on the entire time, or did you

18        turn it off at any point?

19   A:   At the end of the, the felony traffic stop, I

20        turned it off.

21   Q:   At the end of it?

22   A:   (Nods head.)

23   Q:   Okay.

24   A:   Yes, ma'am.  That's our procedure.

25   Q:   Oh, okay.  Like, once the stop was complete,

1          they were released, you turned it off?

2   A:     Correct.

3   Q:     Okay.

4   **MS. DALZELL:**  I'm hesitating on whether to play the

5          bodycam.  You guys would authenticate it since

6          you s- -- sent it to me, saved, as his bodycam?

7   **MR. SPREEUWERS:**  Yes, ma'am.

8   **MS. DALZELL:**  Okay.

9   **MR. SPREEUWERS:**  Yeah.

10  **MS. DALZELL:**  And if -- and tell me if you want me

11         to play this as opposed to replay what they

12         said in it.

13  Q:     But in the bodycam footage -- have you reviewed

14         that recently?

15  A:     I've seen, yes.

16  Q:     Okay.   Do you recall that your sergeant

17         appeared at the scene?

18  A:     From behind me, yes.

19  Q:     Okay.  How, how did he appear at the scene?

20         Why did he appear at the scene?

21  A:     He was my supervisor, and he came in and told

22         me that the tag was, was clear.

23  Q:     At what point did he get to the scene?

24  A:     When I was runnin' the driver's information

25         through NCIC.

1   Q:   And would he have come to the scene because
2        he'd heard your call on the radio?
3   A:   He would have, yes.
4   Q:   Okay.  And so, he appears, and I, and I recall,
5        from the bodycam, he's kinda standing in the
6        doorway of your vehicle, correct?
7   A:   Yes, ma'am.
8   Q:   At -- as you're running the, the tag through
9        NCIC?
10  A:   I was runnin' the driver's information ---
11  Q:   The license.
12  A:   --- at that time.
13  Q:   Oh, okay.  And do you recall what he said to
14       you?
15  A:   He told me that this tag had been hittin' Flock
16       all week long.
17  Q:   Okay.
18  A:   And I don't recall if he said that wasn't a
19       correct tag or not.
20  Q:   And when he says it's hitting Flock all week
21       long, what does that mean?
22  A:   It means that car has been goin' by the cameras
23       for several days prior to the ---
24  Q:   Okay.
25  A:   --- our felony traffic stop.

1   Q:   And he was saying this car or this tag?

2   A:   I'm not sure.

3   Q:   Okay.  Does a car hit Flock, or does a tag hit

4        Flock?

5   A:   The tag hit (ph) Flock.

6   Q:   Oh, okay.  And what else did he say about that

7        tag that had been hitting Flock?

8   A:   I, I don't recall ---

9   Q:   And ---

10  A:   --- everything he said.

11  Q:   And do you recall what else he said to you as

12       you were running the driver's information?

13  A:   He told us to released (ph) everybody.

14  Q:   And why is that?

15  A:   Because we already -- we knew that the t- --

16       the tag was correct on the vehicle, it wasn't

17       the stolen one that we were lookin' for.

18  Q:   And was there some discussion about the state

19       of the tag, what ---

20  A:   A- ---

21  Q:   --- state the tag was from?

22  A:   Afterwards, yes.

23  Q:   And what do you recall about that?

24  A:   That the tag that was stolen was from South

25       Carolina, not from Alaska.

1    Q:   All right.  And how would he have known that

2         the tag was -- that's -- was stolen was from

3         South Carolina?

4    **MR. SPREEUWERS:**   Object to the form.  You can

5         answer.

6    A:   I'm not sure.

7    Q:   Okay.   But he said, the tag's from South

8         Carolina, so you gotta release these women?

9    A:   Correct.

10   Q:   Okay.   Did he say anything else that you

11        recall?

12   A:   I don't recall.

13   Q:   Do you re- -- recall him saying anything to the

14        effect of we've gotta start investigating these

15        things before we detain people?

16   **MR. SPREEUWERS:**   Object to the form.  You can

17        answer.

18   A:   I don't recall.

19   Q:   Okay.   I'll pull up that part of the video

20        quickly.  Let's see.  All right.  And I'm just

21        pulling up your bodycam video, I'm gonna --

22        just gonna pull up what he says so we can walk

23        through it quickly, I won't play the whole

24        thing.   (Whispering)  Actually, actually --

25        actually, I believe it's in Master depuly (ph)

1    Wolfe's video.  (Computer sound is heard.)  I'm
2    sorry.  Gimme a second.  It is not pullin' up,
3    oh, it's not pullin' up, so I will leave that
4    there.

5        But is it unusual for the sergeant to show
6    up at a stop like that?

7  A:  If he's workin', no.

8  Q:  Okay.  Did he d- -- have any discussion with
9    you or any of the other deputies after the stop
10   about what happened with the stop?

11 A:  Yeah.  We have (ph) a conversation.

12 Q:  Tell me about that.

13 A:  I don't recall the whole entire en- --
14   conversation, but he did mention that we need
15   to investigate the tags.  But at the time that
16   we got alerted from the Flock and -- we didn't
17   the state that the tag was stolen from.

18 Q:  Okay.  So what did he suggest should've been
19   done differently, if anything?

20 A:  I, I don't recall.

21 Q:  When did this conversation take place?

22 A:  We talk (ph) about it, I know, after the
23   traffic stop.

24 Q:  Oh, like, right at the scene?

25 A:  I know we -- we'd -- we talk a lot, so it was

1    after we all cleared out, I know we had a

2    conversation.

3  Q:  Okay.  And do you think you were still at the

4    scene?

5  A:  No.

6  Q:  Okay.  Do you recall where that conversation

7    took place?

8  A:  Could've been at -- be our office or could be

9    our meeting place where we meet up.

10  Q:  Okay.  Was it just the two of you?

11  A:  I don't recall.

12  Q:  All right.  Do you -- it -- do you recall if

13    you had more than one conversation about it?

14  A:  I don't.  I think another conversation was when

15    we get the IA complaint.

16  Q:  Say that again.

17  A:  The -- another conversation about this was when

18    we got the IA complaint.

19  Q:  What's an IA complaint?

20  A:  In- -- internal investigation complaint, that's

21    when we made the statement ---

22  Q:  Okay.

23  A:  --- for the IA.

24  Q:  When she get -- filed the Complaint?

25  A:  Yes.

1   Q:   Okay.  Did you all talk about it after you got
2        wind of the lawsuit?
3   A:   I don't (ph) find out a lawsuit till a couple
4        of weeks ago.
5   Q:   Okay.  All right.  Have you all changed any of
6        the policies or procedures in place since this
7        stop?
8   A:   No.
9   Q:   Have you changed the way you do anything at all
10       after this stop?
11  A:   I'd -- I do.  I, I check and make sure it's
12       South Carolina plate, and if there's no plate,
13       then we try to investigate more and research
14       through Flock if -- has hit any other cameras
15       to get a better, clearer picture.
16  Q:   And how di- -- how, how do you research whether
17       it's a South Carolina plate?
18  A:   We enter the, the plate into a system, and it
19       pulls out and -- the pictures from other
20       cameras (indicating).
21  Q:   Trying to look at different angles so you can,
22       maybe, glean the state from a picture that you
23       might not otherwise in another picture?
24  (Alarm beeping is heard.)
25  A:   Well, some pictures come out blurred.

1   Q:   Okay.

2   A:   And it won't tell us the state.

3   Q:   Okay.

4   A:   And we -- if we have time, then we investigate
5        farther and try to find that plate, make sure
6        it's correct.  A lot of times, when the, the
7        plates hit the Flock, we might be right there
8        (indicating), and we don't even have time to do
9        investigation, and that's when we perform the
10       felony traffic stop.

11  Q:   Oh, okay.  And I just want to be clear, the
12       investigation would require you doing what,
13       what kind of steps do you take when you're
14       investigating?

15  A:   Go through Flock and make sure it hit multiple
16       times, see better, clearer picture, and run 'em
17       through NCIC and make sure it's still stolen or
18       not.

19  Q:   And ---

20  A:   Or ---

21  Q:   --- can you do that all from your vehicle?

22  A:   Yes.

23  Q:   Okay.  All right.  That's all I have.  Thank
24       you.

25  A:   Thank you.

1   **CORPORAL ZALEWSKI - EXAMINATION BY MR. SPREEUWERS:**

2   Q:   All right.  Corporal Zalewski, the, the text

3        message that you get from a Flock hit, tell me

4        again what information is in there.  The

5        location?

6   A:   Time, location of the camera, which direction

7        the vehicle's comin', and the tag number.

8   Q:   Okay.  And then, there is a, a link in that

9        text message, as well, right?

10  A:   Correct.

11  Q:   Okay.  And that link, if you press that link

12       and you follow it, it opens a Web browser?

13  A:   Correct.

14  Q:   And the Web browser is what contains the -- any

15       pictures that the Flock camera was able to

16       gather, correct?

17  A:   Correct.

18  Q:   Okay.  And I think you said that the particular

19       picture of the license plate bearing VED 953

20       that led to this stop was blurred?

21  A:   The letters were readable, but everything else

22       was blurred (indicating).

23  Q:   So that the ---

24  A:   This ---

25  Q:   --- perimeter of the plate where the, where the

1    state was -- would have been located was

2    blurred?

3    A:   Correct.

4    Q:   Okay.  And obviously, if a plate is coming back

5         stolen, that plate would not be on the vehicle

6         to which it was registered, right?

7    A:   Yes.

8    Q:   It would be on some other vehicle?

9    A:   Correct.

10   Q:   So there's nothing about the vehicle to which

11        the stolen plate is registered that would help

12        you in your investigation at all?

13   A:   No.

14   **MS. DALZELL:**  Object to the form.

15   Q:   And you mentioned that Sergeant Walmsley said

16        on the scene that he had been getting hits for

17        this particular plate all week, is that right?

18   A:   Correct.

19   Q:   But you don't recall having gotten a previous

20        hit that week, correct?

21   A:   That's correct.

22   Q:   Okay.  So is it possible that one of the

23        previous hits that Sergeant Walmsley got may

24        have been more clear than the hit that you got?

25   A:   Correct.

1  Q:   Okay.  So he could have gotten a picture of the
2       plate earlier in the week that you did not get
3       that, maybe, he was able to ascertain the state
4       on that plate, is that, is that right?
5  A:   Correct.
6  Q:   Okay.  The -- and I just wanted to clarify,
7       you, you mentioned having your weapon out, and
8       tell me the name of the position.  You said SUL
9       position?
10 A:   SUL position.
11 Q:   So can you spell that for me?
12 A:   S-O-U-L [sic], I believe.
13 Q:   Okay.  And that just refers to a low-ready kind
14      of position?
15 A:   Yes, sir.
16 Q:   Okay.  Where the -- and you, you showed us in
17      person, but I want to describe it with words so
18      it shows up on the transcript.  Your weapon is
19      drawn in your right hand, is that right?
20 A:   Correct.
21 Q:   Okay.  And then it's held flat up against your
22      vest, right?
23 A:   Correct.
24 Q:   In your abdomen or chest area?
25 A:   Yes.

1  Q:  Okay.   With  the  barrel  pointed  toward  the
2      ground?

3  A:  Correct.

4  Q:  Your finger is outside of the trigger guard?

5  A:  Correct.

6  Q:  Okay.    And   at   any   point   during   this
7      interaction, did you point your weapon at the
8      vehicle?

9  A:  No.

10 Q:  At any point in this interaction, did you see
11     any  other  officer  point  a  weapon  at  the
12     vehicle?

13 A:  No.

14 Q:  At any point during this interaction, did you
15     point your weapon at another person?

16 A:  No.

17 Q:  At any point during this interaction, did you
18     see any other officer point their weapon at a
19     person?

20 A:  No.

21 Q:  Now, you mentioned that it was possible that,
22     when Harris and Blackmon arrived and they were
23     providing cover, they may or may not have had
24     their weapons out, as well, right?

25 A:  Correct.

1   Q:   Did you see them with their weapons out?

2   A:   I don't recall.

3   Q:   Okay.  They were behind you, right?

4   A:   Correct.

5   Q:   Okay.  So that means they would've been a, a

6        distance behind Ms. Ashmon and Ms. Drayton, as

7        well?

8   A:   Correct.

9   Q:   Okay.  All right.  And if they did have their

10       weapons out, the policy would have been and the

11       practice would have been to have them in the

12       low-ready or the SUL position?

13  A:   Correct.

14  Q:   Not pointing at anybody?

15  A:   Correct.

16  Q:   Okay.  Corporal Zalewski, since we have the

17       benefit of a camera here, if you're able to,

18       can you please stand up for us and demonstrate

19       for the camera this SUL position using just

20       your hand in the shape of a gun or the low-

21       ready or SUL position that you and the other

22       officers would've employed?

23  A:   Okay.  (Witness complies.)  When we get a

24       firearm out, put it down, I -- of course, I

25       believe I was wearin' a different vest at that

1    time, so my taser wasn't here (indicating).  So

2    I'll usually put it right here (indicating) or,

3    or right in front, right in front of -- so I'd

4    be blockin' my camera that, that is right now,

5    but it will be pointing down at that position

6    (indicating).

7  Q:  Okay.  And to the best of your recollection,

8      where would your bodycam have been mounted in

9      July of 2023?

10 A:  Should've been mounted on my left-hand side,

11     top pocket.

12 Q:  On your left breast?

13 A:  Yes.

14 Q:  Okay.  And so, your low-ready or SUL position

15     would've been ---

16 A:  Up ---

17 Q:  --- either in the center of your chest or to

18     the -- slightly to the right?

19 A:  A little bit to the right and below my chest,

20     should be in my abdominal area front

21     (indicating) around, around my stomach.

22 Q:  Thank you for that.  I don't have any other

23     questions.

24 **CORPORAL ZALEWSKI - RE-EXAMINATION BY MS. DALZELL:**

25 Q:  I just have one follow-up.  Why would Sergeant

1    Walmsley or any other officer get hits from

2    Flock that you aren't getting?

3    **MR. SPREEUWERS:**  Objection.

4    A:    I don't know.

5    Q:    Do officers get different hits from Flock in,

6          in the same region?

7    A:    I shouldn't be.  It's dependin' on what cameras

8          he has set up, I have set up cameras for Region

9          7 (indicating), he might have a county-wide or

10         a state-wide or a nationwide.  I'm not sure.

11   Q:    But is there any reason why you wouldn't get

12         hits from Flock in Region 7 that he got?

13   **MR. SPREEUWERS:**  Objection.

14   A:    No.

15   **MR. SPREEUWERS:**  You can ---

16   Q:    No?

17   **MR. SPREEUWERS:**  --- answer.

18   A:    No.

19   Q:    Okay.  So you -- technically, you should be

20         seeing hits from Flock that he sees?

21   A:    Correct.

22   Q:    Thank you.

23   **CORPORAL ZALEWSKI - RE-EXAMINATION BY MR. SPREEUWERS:**

24   Q:    Corporal Zalewski, if you are not on shift, are

25         you looking at every Flock hit that comes in?

1    A:    No.

2    Q:    Okay.  If you are busy with a call, are you

3          looking at every Flock hit that comes in?

4    A:    No.

5    Q:    If you are on lunch break, are you looking at

6          every Flock hit that comes in?

7    A:    I'm -- if I'm -- we don't get a lunch break, s-

8          -- so, ye- -- yes.  I mean, if, if I have my

9          phone, my county-issued phone with me, yes,

10         we'd take a glance at it, make sure it's not in

11         our area or where is it and what is it for.

12   Q:    And you, and you try your best to look at these

13         hits as they come in while you're on duty,

14         right?

15   A:    Correct.

16   Q:    But certainly, while you're on duty, you're

17         handling a number of other calls and have other

18         responsibilities, right?

19   A:    Correct.

20   Q:    That prevents you from looking at every Flock

21         hit?

22   A:    Correct.

23   Q:    Okay.  Thank you.  No further questions.

24   **MS. DALZELL:**  Thank you.

25   **VIDEOGRAPHER:**  Please ---



1   A:     Uh-huh.

2   **VIDEOGRAPHER:**    --- stand by.   This concludes this

3          deposition of Corporal lez- -- le- -- levet- --

4          I apologize.

5   **MR. GARFIELD:**   Zalewski.

6   **MS. DALZELL:**   (Laughing.)

7   **VIDEOGRAPHER:**   --- Zalewski.  We are off the record

8          at 11:10 a.m.

9   **(There being no further questions, the deposition**

10  **concluded at 11:10 a.m.)**

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

## CERTIFICATE

This is to certify that the deposition of **CORPORAL MARIUSZ ZALEWSKI,** consisting of fifty-two (52) pages, is a true and correct transcript of the testimony given by said deponent after being duly sworn; said deposition was reported by the method of Stenomask with Backup.

I further certify that I am neither employed by nor related to any of the parties in this matter or their counsel; nor do I have any interest, financial or otherwise, in the outcome of same.

IN WITNESS WHEREOF I have hereunto set my hand and seal on October 4, 2024.

_____
Mary Cooper Joy
Court Reporter

Notary Public for South Carolina
My Commission Expires: December 5, 2032