IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA
COLUMBIA DIVISION

| | | |
|---|---|---|
| Shauna Ashmon and Genecia Drayton, | ) | C/A No.: 3:23-cv-05228-SAL-PJG |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| Cpl. Zalenski, M.D.; Tyler Wolfe; | ) | |
| Gen. Robert Harris; Deputy Christopher | ) | |
| Blackmon; and Richland County | ) | |
| Sheriff's Department, | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

# EXHIBIT D
## Deposition of Christopher Blackmon

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA
COLUMBIA DIVISION
C/A NO. 3:23-CV-05228-SAL-PJG

Shauna Ashmon and Genecia Drayton,  )
                                     )
     Plaintiffs,                    )
                                     )
v.                                   )
                                     )
Corporal Mariusz Zalewski, Master    )
Deputy Tyler Wolfe, Deputy Robert    )
Harris, Master Deputy Christopher    )
Blackmon, and the Richland County    )
Sheriff's Department,                )
                                     )
     Defendants.                    )
_____  )

DEPOSITION OF

# MASTER DEPUTY
# CHRISTOPHER BLACKMON

\*\*\*\*\*\*\*\*

**Wednesday, September 11, 2024**
11:02 a.m. - 11:34 a.m.

The deposition of Master Deputy Christopher Blackmon was taken on behalf of the Plaintiffs at the law offices of Crowe, LaFave, Garfield & Bagley, LLC, 2019 Park Street, Columbia, South Carolina, on the 11th day of September, 2024 before Mary Cooper Joy, Court Reporter and Notary Public in and for the State of South Carolina, pursuant to Notice of Deposition and/or agreement of counsel.

*CREEL COURT REPORTING, INC.*
*1230 Richland Street / Columbia, SC 29201*
*(803) 252-3445 / contact@creelreporting.com*

## APPEARANCES

**Elizabeth M. Dalzell, Esquire**
Shealey Law Firm
1507 Richland Street
Columbia, South Carolina 29201
Attorney for the Plaintiffs

**Steven R. Spreeuwers, Esquire**
**Robert D. Garfield, Esquire**
**Alyssa McMahon, Law Clerk**
Crowe, LaFave, Garfield, & Bagley, LLC
2019 Park Street
Columbia, South Carolina 29201
Attorney for the Defendants

**Also Present:**
Pamela Crabtree, Videographer, Virtual Media

## INDEX

**MASTER DEPUTY BLACKMON:**         **PAGE:**
MS. DALZELL . . . . EXAMINATION. . . . . . . . 5
MR. GARFIELD. . . . EXAMINATION. . . . . . . . 35
Signature Sheet . . . . . . . . . . . . . . . 42
Certificate . . . . . . . . . . . . . . . . . 43

## EXHIBITS

(No exhibits were marked during the deposition.)

## <u>STIPULATIONS</u>

It is stipulated and agreed that this deposition is being taken pursuant to the Federal Rules of Civil Procedure.

It is further stipulated and agreed that the formalities of taking a videotaped deposition are hereby waived.

It is stipulated by and between counsel and the witness that the reading and signing of the following deposition be, and the same are, hereby not waived. Signature sheet is attached to the deposition at page 42.

1    **VIDEOGRAPHER:**  This is the beginning of media one.

2         Just -- today is September the 11th, 2024.  We

3         are on the record at 1:02 p.m.  My name is

4         Pamela Crabtree, Notary and legal videographer.

5         Mary Joy is Notary and court reporter with

6         Creel Reporting.  We are engaged by Counsel for

7         the Plaintiff to take this video deposition of

8         Master Deputy Christopher Blackmon, with the

9         deposition being held at Crowe, LaFave,

10        Garfield, ba- -- and Bagley, LLC, 2019 Park

11        Street, Columbia, South Carolina, 29201, Case

12        Number 323-CV-05228-SAL-PJG.

13             Will Counsel please introduce yourselves

14        for the record, after which the court reporter

15        will swear in the witness?

16   **MS. DALZELL:**  Liz Dalzell, here for the Plaintiffs,

17        Shauna Ashmon and Genecia Drayton.

18   **MR. GARFIELD:**  Robert Garfield for the Defendants.

19   **MR. SPREEUWERS:**  Steve Spreeuwers for the Defendants.

20   **COURT REPORTER:**  Would you please raise your right

21        hand?

22   **MASTER DEPUTY BLACKMON:**  (Witness complies.)

23   **COURT REPORTER:**  Do you solemnly swear that the

24        testimony you will give in this matter today is

25        the truth, the whole truth, and nothing but the

1        truth, so help you God?

2    **MASTER DEPUTY BLACKMON:**  Yes, ma'am.

3    **COURT REPORTER:**  Thank you.

4    **MASTER DEPUTY BLACKMON - EXAMINATION BY MS. DALZELL:**

5    Q:   Hi, Deputy Blackmon.  We met a few minutes ago.

6    A:   Yes, ma'am.

7    Q:   Good to see you again.

8    A:   Same.

9    Q:   My name is Liz Dalzell, I'm an attorney at the

10        Shealey Law Firm, and I represent two women,

11        Shauna Ashmon and Genecia Drayton, who were

12        involved in a, a felony traffic stop involving

13        your office on July 16th of 2023.  I'm here

14        today just to gather information from you.  I

15        know you weren't front and center in the stop,

16        that you came kinda on the later end, so I just

17        wanted to fill some gaps with information that

18        I might be missing regarding what led to the

19        stop and what happened during the stop, okay?

20   A:   Okay.

21   Q:   Have you gi- -- ever given a deposition before?

22   A:   No.

23   Q:   Okay.  There are a -- just a few basic rules.

24        There's a court reporter here taking down

25        everything we say today, and so giving verbal

1     responses  and  --  is  important  instead  of

2     shaking yes/no, you know, that kinda thing, you

3     want  to  say  yes  or  no.    If  you  have  any

4     questions about anything I'm asking you, you

5     can ask me to rephrase.  I'd rather you be ask-

6     -- I'm sorry, answering the right question as

7     opposed to guessing at some convoluted question

8     that I've asked you, okay?

9   A:    Okay.

10  Q:    If you need a break at all, which I don't think

11        you  will,  it's  not  gonna  take  us  very  long

12        today, but if you do for any reason, you just

13        let  me  know,  and  we'll,  we'll  pause  for  a

14        second, okay?

15  A:    Okay.

16  Q:    How long have you been with the Richland County

17        Sheriff's Department?

18  A:    About  three  and  a  fi-  --  three  and  a  half

19        years.

20  Q:    Okay.   What, what were you doing before you

21        started with them?

22  A:    Previous jobs ---

23  Q:    Yes.

24  A:    --- before  Richland  County?   I  worked  in  a

25        prison.

```
 1   Q:   Okay.

 2   A:   And before that, I worked as a photographer.

 3   Q:   Okay.  Were you a C/O in the prison?

 4   A:   Yes.

 5   Q:   What prison did you work in?

 6   A:   Kirkland.

 7   Q:   Okay.  What you there the whole time, or did

 8        you work at other facilities?

 9   A:   Just Kirkland.

10   Q:   Okay.  Did you have any training before you

11        became a C/O?

12   A:   Yes.  I went to the C/O Academy.

13   Q:   Okay.  Tell me what that entails.

14   A:   Well, it's kinda similar to the police academy,

15        you have two weeks of law, and then you have

16        two weeks of practical training and scenarios,

17        and then you also have DT, as well.

18   Q:   And what does DT stand for?

19   A:   It's more, like, physical, learning a little

20        bit of judo, learn a bit of boxing, it's not

21        really one set -- it's just somethin' to help

22        you in case you get into trouble in the prison

23        (indicating).

24   Q:   Okay.  And so, that's the physical part of the

25        training?
```

1   A:   Ye- -- yeah.  It's the defensive tactics.

2   Q:   Oh, okay.

3   A:   So to speak.

4   Q:   So that's what the DT stands for?

5   A:   Yeah.

6   Q:   Okay.  And so, you did that.  Was that also at

7        Broad River where the police academy is?

8   A:   Yes.  But it's in separate spots.

9   Q:   Oh, okay.

10  **VIDEOGRAPHER:**  (Adjusting Ms. Dalzell's microphone.)

11  **MS. DALZELL:**  Ooh, sorry, sorry about that.

12  Q:   All right.  So you did that for how many weeks?

13  A:   I did that for four weeks.  It used to be

14       eight.

15  Q:   Oh, okay.  And then, you worked f- -- for how

16       long as a C/O?

17  A:   About a year and a half.

18  Q:   Okay.  And then, what prompted the change from

19       your C/O position to Richland County?

20  A:   During the time, both my wife and I both worked

21       in a prison, and she de- -- decided to go to

22       Richland County, and I decided to follow after.

23  Q:   Okay.  So is she also a sheriff ---

24  A:   She used to be.

25  Q:   --- s- -- deputy?

 1   A:   She had resigned.

 2   Q:   Oh, okay.  Did you d- -- all go to the police

 3        academy together?

 4   A:   No.

 5   Q:   Oh, okay.  At different times?

 6   A:   Yeah.

 7   Q:   All right.  Did you work at all for Richland

 8        County before you went to the police academy?

 9   A:   No.  Well, yes, 'cause I did work at 8-50 a- --

10        as worked in Richland County, but it was

11        waiting to go the police academy, so -- if that

12        makes sense.

13   Q:   I -- and so, what were you doing during that

14        waiting time?

15   A:   Doin' the 8-50, which is the paddy wagon.

16   Q:   Oh, okay.  D- -- can you describe what that is?

17   A:   Basically, when a real deputy arrests somebody,

18        and, instead of them drivin' to the jail,

19        they'll call the 8-50 van to come pick 'em up

20        and bring 'em to the jail.

21   Q:   Okay.

22   A:   So I was kinda like the water boy,

23   Q:   Yeah.  (Laughing.)  Okay.  And so, that was

24        your, your, kind of, 1- -- sole duty at that

25        time ---

1   A:   Yes.

2   Q:   --- was driving the paddy wagon?  And you would

3       bring them down to Alvin S. Glenn?

4   A:   Yes.

5   Q:   Okay.  And how long did you do that for,

6       approximately, before you went to the police

7       academy?

8   A:   I don't know the specifics, but maybe eight

9       months.

10   Q:   Oh, okay.  And then, how long were you in the

11       police academy?

12   A:   Eight weeks.

13   Q:   Okay.  And what -- tell me about your training

14       there.

15   A:   The first week is DT, similar to the C/O

16       academy, and then we f- -- focus a lot on

17       legals, most of the force -- the first four

18       weeks is al- -- strictly legals, then, when we

19       get to the last two weeks, then we start doin'

20       scenarios, we do the driving, and then we do

21       the DMT and start doin' more physical stuff.

22   Q:   Oh, okay.  And do you -- what do you learn

23       about traffic stops at -- in the police

24       academy?

25   A:   It's very brief 'cause we're not focused too

1        much on traffic.  We do learn how to initiate

2        a traffic stop, we do, do some scenarios on

3        ways to conduct ourselves durin' traffic stops,

4        we learn a little bit about the laws of the

5        traffic stops, but it really comes down to 'em

6        to get to our regular training.

7   Q:   Okay.  And your regular training is occurring

8        on the job outside of the Academy?

9   A:   Yes.  The FTO program.

10  Q:   Tell -- explain to me what that is.

11  A:   So the FT- -- -TO program consists of 28 days,

12       they could go longer than that dependin' on how

13       you're -- how good you are or how you -- -ever

14       you -- if the FTO feels you're good wit' it.

15       Every FTO is different.  If the FTO is focused

16       on traffic, they'll explain things more to you

17       about, you know, when we're going to do felony

18       stops, when we're going to do regular traffic

19       stops, and etcetera.

20  Q:   And what does FTL [sic] stand for?

21  A:   Field training officer.

22  Q:   Okay.  So, when you come out of the Academy,

23       are you assigned a field training officer?

24  A:   Yes.

25  Q:   Okay.  And you would work with that person

1          alone, or are you in a group?

2    A:   You will be at -- with that person alone.  The

3          program changes frequently, but currently,

4          you'll be with that person for 28 until you

5          finish.

6    Q:   Okay.  And so, going back to the time that you

7          were doing that, were you with a person alone?

8    A:   I was.

9    Q:   Okay.  And how long did you train with that

10         person ---

11   A:   I transitioned to three people, I was

12         originally with depuly (ph) -- Deputy Hamlin,

13         then I got moved to Deputy Rebecca, and then I

14         was with another deputy towards the end of the

15         two weeks.

16   Q:   Okay.

17   A:   So you can, you can -- it's -- their ideal is

18         you'll stay with one, but sometimes, you can

19         jump around dependin' on how people are

20         rotating.

21   Q:   Okay.  And are you in a car with that person

22         during that time and learning that way, or how

23         does it, how ---

24   A:   Yep.

25   Q:   --- does it go?

1   A:   Yep.

2   Q:   Okay.

3   A:   We're in the car with 'em.

4   Q:   Okay.  So kinda shadowing and learning out in

5        the field?

6   A:   Yep.

7   Q:   Okay.  Have you ever been disciplined by the

8        sheriff's office?

9   A:   Yes.

10  Q:   Okay.  Tell me about that.

11  A:   So there was an incident where there was a

12       juvenile and his mom getting into a fight, I --

13       there is -- I, I was -- I'm a FTO right now,

14       and I had a trainee at this time who -- I

15       wanted him to focus more on dividing up the,

16       the, the juvenile and the mother, this was his

17       last day of training, so, instead of me jumpin'

18       in and separate (ph) 'em like I needed to, I

19       wanted him (indicating) to do it instead, so I

20       stayed back.  However, it went too long, and

21       eventually, the lieutenant showed up and

22       separated them, and I should'a jumped in

23       earlier to separate them, but I chose not to.

24  Q:   Uh-huh.

25  A:   And I learned my lesson from there, I just

1     wanted him to engage into it more, and I

2     understand that probably wasn't a good time to

3     instill that training with him, I just wanted

4     to show -- him show a little bit, because I --

5     as I explained to Martinez (indicating), at

6     some point, I'm not goin' to be there, and he's

7     gonna need to be able to step up, and that's

8     what I was tryin' to install in my lesson, but

9     I should not ha' let it gone that far, and that

10    was the one time I got disciplined.

11 Q:  Okay. And was that in the form of a write-up,

12    or was it something else?

13 A:  It was just a write-up.

14 Q:  Okay.

15 A:  It was a write-up and a conversation and went

16    from there.

17 Q:  Okay. And that was the only time you've ever

18    had any disciplinary action?

19 A:  Yes.

20 Q:  Okay. Is there any consequence other than the

21    write-up, are you've -- it -- suspended or

22    anything like that, or is just the write-up?

23 A:  There's different levels, it depends how severe

24    it is.

25 Q:  Okay. And in your case, what level was it?

1  A:   In, in this case, it was lo- -- kind of a low

2       level, I, I got a write-up, we had a counseling

3       and just told to do better, 'cause he -- 'cause

4       my sergeant understand (ph) what I was tryin'

5       to do, but I kinda implement (ph) it in the

6       wrong way.

7  Q:   Okay.  Okay.  And so, no other write-ups or

8       anything like that in your file?

9  A:   No.

10 Q:   Okay.  All right.  We're going to turn to the

11      day of this incident, which was July 16th of

12      2023, okay?

13 A:   Okay.

14 Q:   Do you recall what you were doing before this

15      traffic stop on that day?

16 A:   I do not know.

17 Q:   Okay.  Is it safe to say you were assigned to

18      Region 7 at that time?

19 A:   Yes.

20 Q:   Are you still assigned to Region 7?

21 A:   Yes, ma'am.

22 Q:   Okay.  How -- when were you first assigned to

23      Region 7?

24 A:   I don't know the day, but sometime in January

25      -- I meant, February of '23.

1   Q:   Okay.   So  you  had  been  assigned  there  for
2        several months when this incident occurred?
3   A:   Yes.
4   Q:   Okay.  And as -- being assigned to Region 7,
5        were you regularly patrolling that area?
6   A:   Sometimes.
7   Q:   All right.  Tell me what you, you regularly did
8        in your job duties, or what do you do for your
9        job duties as -- (laughing) -- an officer in,
10       in Region 7?
11  A:   Well, the goal is mostly to respond to calls,
12       but if no s- -- calls are comin' in, I'd kinda
13       ride through neighborhoods, kinda ride through
14       different streets.  At this time -- since this
15       -- it was '23, right, the -- June, I was
16       probably still learning the Region 7, 'cause I
17       originally came from Region 2, so most of the
18       time, I was drivin' around tryin' to learn the
19       area, stop if anybody needed help, and just
20       wait for calls to come in.
21  Q:   Okay.  And how would you get calls if someone
22       needed help?
23  A:   Dispatch would inform us through the radio.
24  Q:   Okay.  Like, the radio you have on your chest
25       right now?

1  A:  Yes.

2  Q:  That's whe- -- that's where you would hear the

3      call coming from?

4  A:  Yes, ma'am.

5  Q:  Okay.  And you don't remember any specific

6      calls or a -- service calls earlier that day,

7      on July 16th of 2023?

8  A:  No.

9  Q:  Okay.  Deputy Wolfe testified that he was

10     actually patrolling that area for a stolen

11     plate.

12 A:  (Nods head.)

13 Q:  Did you -- were you informed of a stolen plate

14     at any point on, on that day?

15 A:  When it first came through, we all got informed

16     about it, and that's when we all came towards

17     the area lookin' for it.

18 Q:  Okay.  So, when -- you said when it first came

19     through, what are you talking about there, what

20     came through?

21 A:  So, in the -- some areas, there are cameras and

22     -- that'll read plates that come through.  If

23     it comes back s- -- sn- -- it'll either read

24     stolen, not stolen, etcetera.  If it's stolen,

25     it'll let us know that it's stolen, and we get

1          a notification (indicating) if we're logged

2          into the app on the computer (indicating), and

3          we can go look for it, it's -- it just says

4          where it just been, but it's not sayin' exactly

5          where, so we'll go look in that area and see if

6          we can come across it.

7   Q:     And you're all getting that notification at the

8          same time?

9   A:     If we're logged into it.  Sometimes, we're

10         payin' attention to it, sometimes we're not,

11         'cause it's, it's not a mandated thing for us

12         to be on.

13  Q:     Oh, okay.  And when you're saying logged into

14         it, is that the Flock system?

15  A:     Yes.

16  Q:     Okay.  So you don't have to be logged into the

17         Flock system?

18  A:     No.

19  Q:     Okay.  But if you are, you get notified of any

20         stolen plates or an- -- any other issues

21         related to license plates?

22  A:     Yes.

23  Q:     Okay.  And do you recall getting a notification

24         about a stolen plate that day with the letters

25         and numbers VED 953?

1    A:    Yes.

2    Q:    Okay.    What    do    you    remember    about    that

3          notification?

4    A:    The    only    thing    I    remember    from    that

5          notification    is    that    it    came    through,    down

6          Summit Parkway,  towards  where  the  Food  Lion  is

7          at  the  end  of  the  road  (indicating)  comin'

8          towards Clemson Road.   From there, we all went

9          into    the    area    (indicating)    and    started    to

10         search for it.

11   Q:    Okay.

12   A:    Uh-huh.

13   Q:    Did you get a picture of it?

14   A:    Yes.

15   Q:    And what do you recall about the picture?

16   A:    The only thing I remember is the plate number,

17         but  I  can't  remember  the  picture  specifically

18         'cause it's been a good minute.

19   Q:    Yeah.   And would -- do you have any record of

20         that picture?

21   A:    I do not, no.

22   Q:    Okay.    Would  you  have  a  way  to  access  that

23         picture?

24   A:    No.  So -- and we can try and log into it, but

25         it only goes back to a certain point.

1  Q:   Okay.  So it expires or something if ---

2  A:   Yeah.

3  Q:   Okay.  So you just remember the letters and

4       numbers from that picture?

5  A:   Yes.

6  Q:   Do you remember any colors that were on the

7       picture?

8  A:   No, not particularly.

9  Q:   Okay.  Was there a state identified on the

10      picture?

11 A:   No.

12 Q:   Okay.  No, or you don't remember?

13 A:   No.  There, there -- there's no state, just the

14      letters that's on there.

15 Q:   Okay.  And so, you're just looking for letters

16      and numbers when ---

17 A:   Yeah.

18 Q:   --- you're driving around?  Okay.  Do you know

19      when -- approximately when you got that

20      notification, what point in the day?

21 A:   What -- no.  I -- (laughing) -- nothin'

22      specifically, when it came in the day.

23 Q:   Yeah.

24 A:   I know it was daytime.

25 Q:   Okay.  What was your shift that day?

```
 1    A:   Do -- what do you mean by shift?

 2    Q:   What -- wh- -- what hours were your shift,

 3         what, what ---

 4    A:   This was during daytime, so, probably, this was

 5         5 a.m. to 5 p.m.

 6    Q:   Okay.  All right.  And do you -- so you were

 7         actively patrolling, looking for that stolen

 8         plate that day?

 9    A:   When it came through.

10    Q:   Okay.  Who -- after it came through?

11    A:   When it -- yeah.  Well, after it came through

12         the Flock system.

13    Q:   Yeah.

14    A:   Yes.

15    Q:   Okay.  And then, at some point, you were

16         notified about Corporal Zalewski -- I'm messing

17         up his name -- (laughing) -- spotting the

18         plate, correct?

19    A:   Yes.

20    Q:   Tell me what you remember about that.

21    A:   At this point, I was in Summit, but I was

22         further down than where Zalewski was.

23    Q:   Okay.

24    A:   And he came on the radio and said, I got it.

25         He coordinated with Wolfe.  Even if he doesn't
```

1       let us know through the radio, he'll say, I'm

2       10-48 this, and he'll read the plate over, so

3       I was, like, okay, he's got that plate.  So,

4       after he conducted his 48, his suspicious

5       vehicle stop, which became the felony stop,

6       both me and Harris tried to transition back

7       towards this way.

8    Q:  Okay.  So what does 10-48 mean?

9    A:  A suspicious vehicle stop.

10   Q:  Okay.  And so, he's alerting the entire region,

11       all the officers in the region that he had

12       located that plate?

13   A:  Yes.

14   Q:  And wh- -- how are you getting that alert, is

15       it through the radio?

16   A:  Yes.

17   Q:  Okay.  And so, were you with Officer Harris at

18       the time, or are you in two separate vehicles?

19   A:  We're two separate vehicles, so we're kinda

20       close by.

21   Q:  Okay.  And so, you changed course and came

22       towards ---

23   A:  (Nods head.)

24   Q:  --- where he was?

25   A:  Yes.

1  Q:  Okay.  And then, what do you remember next?

2  A:  I remember fighting a lotta traffic to get up

3      there, which took a little bit.  Once we got

4      there to the traffic stop, as soon as I pull

5      up, I see the ladies already detained and Z and

6      Wolfe standing there with their said

7      individuals, and the car was already stopped

8      towards Summit Parkway and Clemson

9      (indicating).

10 Q:  Okay.  And what do you remember next?

11 A:  From there -- well, as soon as I got out of the

12     car, Z asked me to put her in my car because

13     his car had his swim gear in it, so I put her

14     in my car and turned my camera on, and from

15     there, I was seein' if they needed me to make

16     any phone calls or figure out what we are gonna

17     do next with the vehicle.

18 Q:  And the woman you put in your car, she was

19     already handcuffed?

20 A:  Yes.

21 Q:  Okay.  And when you say Z, you're talking about

22     Corporal ---

23 A:  Za- -- yeah.  Corporal Zalewski.  I ---

24 Q:  Zalewski.

25 A:  I say Z because I messed up his name a lot ---

1  Q:   Yeah.  Okay.

2  A:   --- so ---

3  Q:   Good.  (Laughing.)  Okay.  I'll call him that,

4       as well.

5  A:   Yeah.

6  Q:   Okay.  So Corporal Z asked you to put her in

7       the car?

8  A:   (Nods head.)

9  Q:   And then, what happened?

10 A:   After I put her in the car, I turned my camera

11      on, the one that records towards the back, and

12      from there, I guess I -- I saw Z get in the car

13      on his side, and I guess they were figurin' out

14      what they're gonna do next.  I think -- I can't

15      remember exactly what I did specifically, but

16      maybe I called the desk sergeant, but I don't

17      know by hand (ph) what I was doin'.

18 Q:   Okay.

19 A:   Other ---

20 Q:   Why ---

21 A:   --- than ---

22 Q:   --- would you ---

23 A:   --- sitting in ---

24 Q:   --- call ---

25 A:   --- the car.

1    Q:    --- the desk ch- -- sergeant?

2    A:    Usually, when we have a felony traffic stop,

3          there's usually a NIC number that goes along

4          wit' it.  By the -- usually, we'll -- by this

5          time, when we have someone detained, we're

6          gonna call the NIC number and have the desk

7          sergeant verify if it's an active warrant or it

8          hasn't been cleared yet, and that's why, most

9          of the times, when we pull somebody over, we'll

10         tell 'em you're just detained for now, you're

11         not under arrest.

12   Q:    Okay.  And so, the -- is the desk sergeant,

13         Sergeant Wormsley (ph)?

14   A:    No.

15   Q:    Walmsley?

16   A:    The desk sergeant's a rotation of sergeants

17         that sit at the desk, so it's someone different

18         each time.

19   Q:    Oh, okay.  And what would be the purpose of

20         calling the desk sergeant?

21   A:    He's the one whose (ph) has access to the other

22         agencies and confirming if this NIC number is

23         legit or not.

24   Q:    Oh, okay.  When you say NIC number, what are

25         you referring to?



1   A:   So everything that's stolen or -- so to speak

2        -- say someone has a warrant or somethin', it's

3        usually connected with a NIC number, that's

4        kinda like they're, they're branded, that's

5        connected to the -- no matter what state

6        they're goin' to.

7   Q:   Okay.  And so, where do you get the NIC number?

8   A:   It -- it's assigned through NCIC.

9   Q:   I see.  So you still -- you s- -- have to start

10       by running someone's identifying information

11       through NCIC?

12  A:   Yes.

13  Q:   And then, you get the number?

14  A:   Yes.

15  Q:   And then, you have to call the desk s- --

16       sergeant to confirm?

17  A:   Well, we'll call the desk sergeant and give him

18       the NIC number, and he'll handle the rest from

19       there, and he'll let us know.

20  Q:   Okay.  And what is the desk sergeant able to

21       tell you that the NCIC's not able to tell you?

22  A:   A -- if it's unde- -- it -- it'll -- if he

23       pulled up that NCIC and it say (ph) that it's

24       stolen, the next thing he'll do is he's goin'

25       to call the said agency where it's connected

1      to, 'cause these NIC numbers are connected to

2      whatever state, county that it's connected to,

3      and then, their desk sergeant or whoever's in

4      charge for their NCIC will then confirm if that

5      warrant or whatever -- stolen property or

6      felony is still legit.  Usually, they get a

7      time frame, sometimes it 10 minutes, dependin'

8      on which county it is, and they have a time

9      frame to find that warrant.  If they can't find

10     that warrant on-hand or they can't confirm it,

11     then it's invalid.

12  Q:  I see.  And then, you have to let that person

13     go?

14  A:  Yes.

15  Q:  I see.  Okay.  So do you know if that actually

16     happened in this case?

17  A:  No.

18  Q:  Okay.  You don't know, or it, or it did not

19     happen?

20  A:  No.  It did not happen in this case.

21  Q:  Okay.  Why is that?

22  A:  Because if -- I'm not sure if I made the phone

23     call, but at some point, Zawolski [sic] and

24     Wolfe figured out what was goin' on and just

25     let me know that she needs to be let go.

1   Q:   Oh, okay.

2   A:   So I'm not sure if I made the phone call to

3       desk sergeant yet or not.

4   Q:   Oh, okay.  Would there be a record of that if

5       you had?

6   A:   No.

7   Q:   Okay.  Do you recall your Sergeant Walmsley

8       coming to the scene?

9   A:   Briefly.

10   Q:   Okay.  Did you talk to him?

11   A:   No.

12   Q:   Okay.  Did you interact with him at all?

13   A:   No.

14   Q:   Okay.  So it ends up that this plate and the

15       driver's identifying information were run

16       through NCIC?

17   A:   (Nods head.)

18   Q:   And it came back as negative, right?

19   A:   Yep.

20   Q:   Had that ever happened before with officers in

21       your region?

22   A:   Specifically for mixed-up states, or

23       specifically for things bein' let go from --

24       after we did a felony stop?

25   Q:   Yeah.  Like a, a -- how often does that happen?

1   A:   Doesn't happen often.

2   Q:   Okay.

3   A:   But it can happen.

4   Q:   Okay.  Did -- can you think of another example

5        when it did happen?

6   A:   There are some examples where people have had

7        their car stolen, and somehow, they find their

8        car, and they're running to -- down the road

9        (indicating), and they go through one of our

10       systems, or we -- just runnin' plates and we

11       come across their vehicle, so we do a felony

12       stop on them, and then, we get 'em detained and

13       get 'em in the car and all that and turns --

14       and then we discover that it's actually the

15       owner who actually has his car just because he

16       failed to inform us that his car -- he got his

17       car back.

18  Q:   Got it.  So it's still reported as stolen?

19  A:   Yep.  Un- --

20  Q:   Okay.

21  A:   Until we get informed that it's in our hands or

22       someone else's hand or even the owner lettin'

23       us know he's got it in-hand, it will still show

24       in the system that it's stolen, so it will --

25       a felony stop will still be conducted until ---

1   Q:   Okay.

2   A:   --- it's taken out the NCIC.

3   Q:   Okay.  And when Sergeant Walmsley came onto the

4        scene, he said something about, we've got to

5        investigate these kind of stops.

6   A:   Yeah.

7   Q:   Is that something you all are working on or

8        have worked on to improve?

9   A:   We always investigate our stops.  This is just

10       one of those cases where we didn't see what the

11       state was, but the letters of the plate matched

12       up perfectly, the issue was just the states.

13  Q:   Oh, okay.  W- -- would there have been a way to

14       find out what state the plate was from easily,

15       from your car?

16  A:   Yes.

17  Q:   How would you do that?

18  A:   So, with our CAD system, we could put the, the

19       plate in and bring it back.  The issue is what

20       -- we weren't 100-percent sure what the plate

21       was just based on the picture, we could just

22       see the letters.  So, just like on the scene,

23       Wolfe looked at the plate and saw that it was

24       an Arkansas plate, and the plate that was

25       stolen was in South Carolina, so, after seein'

1      it, he was able to figure it out, but when

2      we're lookin' for it, we didn't know what the

3      state was.

4   Q: Do you recall ever getting a Flock notification

5      about that stolen plate before this in- -- this

6      day or this incident?

7   A: No.

8   Q: Okay.  This was the only time you had gotten a

9      Flock notification about this plate?

10  A: That I'm aware of, yes.

11  Q: Okay.  Is it possible that you had another

12     Flock notification about this plate earlier in

13     that week?

14  A: If there was another one, I'm not aware of it.

15  Q: Okay.  And so, were you the officer who

16     released the driver from her handcuffs?

17  A: Yes.

18  Q: Okay.  And tell me about that.  Did you end up

19     having a conversation with her?

20  A: I did have a conversation.  As soon as I took

21     her out of the cuffs, she tri- -- tried to

22     speak with Z for a little bit, and then, she

23     wandered off, and then, from there, I tried to

24     explain to her that this wasn't personal, this

25     had nothin' to do with the feelings that she's

1      feelin', other than we s- -- saw a plate that

2      we believed was stolen, and we treat it is --

3      as such, and then, once we realized it wasn't

4      stolen, then we, you know, release everybody

5      and send them on their way.

6  Q:  Okay.  Was she visibly upset?

7  A:  Yes.

8  Q:  Okay.  And did you have any interaction with

9      her beyond that?

10 A:  No.

11 Q:  Okay.  W- -- were you a -- made aw- -- made

12     aware of the complaint that she filed with the

13     sheriff's office after this stop?

14 A:  Not until recently.

15 Q:  Okay.  When did that happen?

16 A:  At -- soon as I got my text message from --

17     about this deposition.

18 Q:  Okay.  So ---

19 A:  So ---

20 Q:  --- you reviewed that complaint as part of your

21     preparation for this?

22 A:  Yeah.

23 Q:  Okay.  Did you and your -- the other officers

24     in your region, including Corporal Z and your

25     sergeant, ever talk about this incident after

1          it occurred?

2    A:    No.

3    Q:    There was no further training?

4    A:    We had a discussion about -- especially with

5          the sergeant bein' (indicating) -- t- -- 'cause

6          he did show up on the scene and tell us, you

7          know, that we need to investigate, so we --

8          afterwards, we did gather and have a little

9          conversation about, you know, payin' attention

10         to the plates and all that stuff while readin'

11         it on the CAD system and the plate before we

12         pull it over, so we did have a conversation

13         about it, but we're -- it's not like we're just

14         gonna improve and ne- -- we're always trainin'

15         and improvin', so -- but we won't be havin' the

16         same conversation about that specific stop, but

17         we'll just -- how we can improve on further

18         stops, if ---

19   Q:    Yeah.

20   A:    --- that makes sense.

21   Q:    And so, that conversation happened on the scene

22         after everybody was let go?

23   A:    Sometime after (indicating).

24   Q:    Okay.  But you were still there?

25   A:    No.  After we let them go, we cleared the area

1      'cause we were blockin' traffic, and we met

2      somewhere else, and then we kinda briefed from

3      there.

4  Q:  Do you recall where you met?

5  A:  No.

6  Q:  Do you -- was it the same day?

7  A:  I believe so, but I'm not 100-percent sure.

8  Q:  Okay.  And when you said something about the

9      CAT [sic] system, what is that?

10 A:  The CAD system's the computer system that we

11     have in our cars.

12 Q:  Okay.  And what was your -- the sergeant

13     saying, you could've used that system for to

14     help in, in this investigation?

15 A:  He was sayin', when we run the plate, just to

16     look down and read the state that it is.

17 Q:  Okay.

18 A:  And then read the, the plate on the car

19     (indicating).

20 Q:  Okay.  So it's ---

21 A:  That's ---

22 Q:  --- kinda that easy, just look at the screen

23     and then look at the plate?

24 A:  Yeah.

25 Q:  Okay.  Thank you.  That's all I have.

**MASTER DEPUTY BLACKMON - EXAMINATION BY MR. GARFIELD:**

Q:   Okay.  Deputy Blackmon, I just have a, a few
     follow-ups and maybe a clarification or two.

          Ms. Dalzell had asked you about your role
     on this particular day, and she asked whether
     you were the officer that released Ms. Ashmon
     from her handcuffs?

A:   Yes.

Q:   And that's correct?

A:   Yes.

Q:   All right.  So I want to back up and talk about
     that for just a moment.  So ---

A:   Okay.

Q:   --- when you arrived at the scene, Ms. Ashmon
     was standing up in handcuffs, is that right?

A:   Yes.

Q:   She was at the rear of her own vehicle?

A:   Yes.

Q:   And when you approached her, you approached her
     from behind, is that right?

A:   Yes.

Q:   And your -- the reason why you did that was to
     release her from handcuffs?

A:   Yes.

Q:   All right.  Are there different modes or

1      different ways that an officer can lock

2      handcuffs on a subject?

3   A:  If you're -- the only difference is the brand

4      of the cuffs, so, if it's Smith and Wessoron's

5      (ph), you take the back pin, and you pull it to

6      the side and click it.

7   Q:  Uh-huh.

8   A:  And then, if it's a -- the other brand that's

9      not comin' to me, there's a button on the side

10     (indicating), and you click it.  But those are

11     the only two ways you can double-lock the

12     handcuffs.

13  Q:  Okay.  So -- and you just said double-lock.  Is

14     there a ---

15  A:  Yes.

16  Q:  --- a difference between single-locking a

17     handcuff and double-locking?

18  A:  Yes.

19  Q:  Okay.

20  A:  So single lock is that it's not secured, so you

21     can push on it (indicating), it'll get tighter;

22     if it's double-locked, it won't move at all.

23  Q:  All right.  And so, what would be the purpose

24     of double-locking, you know, a subject?

25  A:  So the purpose of double-locking is so the, the

1       cuffs do not get tightened, 'cause when you're

2       in the back of the seat, they're gonna be

3       leanin' on the back of your hands, and it'll

4       tighten, and it'll just keep tightenin' and

5       won't stop, so the double lock is to prevent

6       that, that way it's in a -- it's not goin' to

7       be the most comfortable (indicating) way of

8       wearin' it, but at least it won't tighten up on

9       your hand, and it'll stay stationary.

10  Q:  And is it part of your experience that that

11       prevents injury?

12  A:  Yes.

13  Q:  Okay. Is it part of your experience that, with

14       a subject in the backseat with the handcuffs

15       behind their back, that that pre- -- you know,

16       prevents the cuffs from cl- -- you know,

17       clamping down on a, on a wrist?

18  A:  Yes.

19  Q:  Causing injury?

20  A:  Yep.

21  Q:  All right. And in this particular case, you

22       were unlocking these handcuffs, were they

23       single-locked or were they double-locked?

24  A:  Double-locked.

25  Q:  Okay. And Ms. Dalzell asked you, that you had



*CREEL COURT REPORTING, INC.*
*1230 Richland Street / Columbia, SC 29201*
*(803) 252-3445 / contact@creelreporting.com*

1        a conversation with both Ms. Ashmon and Ms.
2        Drayton, is that right?
3   A:   Yes.
4   Q:   All right.  And am I correct that Ms. Ashmon
5        had questions for you, such as what was the
6        reason why she was stopped?
7   A:   Yes.
8   Q:   And why was it -- why the officer who stopped
9        her didn't ask for her registration first,
10       things like that?
11  A:   Yes.
12  Q:   All right.  And d- -- did you answer her
13       questions?
14  A:   I did t- -- yes.
15  Q:   Okay.  And you also told Ms. Dalzell, in
16       recalling the conversation with, with these
17       ladies, is that you told them that there was
18       nothing personal about this.
19  A:   Yes.
20  Q:   And you told them that the reasons why that
21       there is such a protocol for a felony vehicle
22       stop is that, oftentimes, that a subject could
23       run on you?
24  A:   Yep.
25  Q:   Is that true?

 1  A:   That is true.

 2  Q:   And sometimes, a person could shoot at y'all?

 3  A:   Yes.

 4  Q:   And when you told them that, sometimes, that

 5       someone can run on you, that could come in the

 6       form of a vehicle pursuit?

 7  A:   Yes.

 8  Q:   That could come in the form of a, a pursuit and

 9       potentially somebody getting out of a car and,

10       and running and fleeing on foot?

11  A:   Yes.

12  Q:   And do, do those scenarios create any kind of

13       danger or risk for, for officers?

14  A:   For officers and the public, as well.

15  Q:   And the public, as well.  All right.  And if

16       you had to actually go and chase someone on

17       foot and you had to interact with them one-on-

18       one, oftentimes, you would have to fight that

19       person?

20  A:   Dependin' on the person, yes.

21  Q:   Okay.  It's possible that that could happen?

22  A:   It's possible, yes.

23  Q:   All right.  And then, you also had told the

24       ladies    that,    sometimes,    that    people

25       unfortunately shoot at y'all?

1   A:   Yes.

2   Q:   Okay.  And that would be another reason for

3        facilitating this kind of f- -- you know, stop

4        in a felony vehicle situation?

5   A:   Yes.

6   Q:   In fact, you told them that it happens a lot?

7   A:   Yes.

8   Q:   They also asked you to assist them with getting

9        the, the names of the deputies and all of

10       y'all's badge numbers?

11  A:   They did ask me, yes.

12  Q:   Okay.  And you assisted them with that process

13       or made sure that they ha- -- they got that

14       information?

15  A:   Yes.  I informed them that Corporal Zawolski

16       [sic] is writin' it down, and he (indicating)

17       already had the hand -- sheet in his hand.

18  Q:   Uh-huh.  And you asked them at the end whether

19       they had any more questions for you, didn't

20       you?

21  A:   Yes.

22  Q:   And did they have any more questions ---

23  A:   They ---

24  Q:   --- for ---

25  A:   --- did ---

1    Q:    --- you?

2    A:    --- not.

3    Q:    Okay.  Just one moment.  Okay.  That's all I

4          have.

5    **MS. DALZELL:**  That's all I have.

6    **MR. GARFIELD:**  Okay.

7    **MS. DALZELL:**  Thank you.

8    **VIDEOGRAPHER:**  Ple- ---

9    A:    No?

10   **VIDEOGRAPHER:**  Please standby.  This marks -- this

11         concludes this video deposition of Master

12         Deputy Christopher Blackmon.  We are off the

13         record at 1:34 p.m.

14   **(There being no further questions, the deposition**

15   **concluded at 1:34 p.m.)**

16

17

18

19

20

21

22

23

24

25

**CERTIFICATE**

This is to certify that the deposition of **MASER DEPUTY CHRISTOPHER BLACKMON,** consisting of forty-one (41) pages, is a true and correct transcript of the testimony given by said deponent after being duly sworn; said deposition was reported by the method of Stenomask with Backup.

I further certify that I am neither employed by nor related to any of the parties in this matter or their counsel; nor do I have any interest, financial or otherwise, in the outcome of same.

IN WITNESS WHEREOF I have hereunto set my hand and seal on October 4, 2024.

_Mary Cooper Joy_

Mary Cooper Joy
Court Reporter

Notary Public for South Carolina
My Commission Expires: December 5, 2032

**CREEL COURT REPORTING, INC.**
*1230 Richland Street / Columbia, SC 29201*
*(803) 252-3445 / contact@creelreporting.com*