IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA
COLUMBIA DIVISION

Shauna Ashmon and Genecia Drayton,    )    C/A No.: 3:23-cv-05228-SAL-PJG
                                       )
        Plaintiffs,                    )
                                       )
v.                                     )
                                       )
Cpl. Zalenski, M.D.; Tyler Wolfe;      )
Gen. Robert Harris; Deputy Christopher )
Blackmon; and Richland County          )
Sheriff's Department,                  )
                                       )
        Defendants.                    )
_____)

# EXHIBIT E
## Deposition of Robert Harris

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA
COLUMBIA DIVISION
C/A NO. 3:23-CV-05228-SAL-PJG

Shauna Ashmon and Genecia Drayton,  )
  )
      Plaintiffs,  )
  )
v.  )
  )
Corporal Mariusz Zalewski, Master  )
Deputy Tyler Wolfe, Deputy Robert  )
Harris, Master Deputy Christopher  )
Blackmon, and the Richland County  )
Sheriff's Department,  )
  )
      Defendants.  )
_____)

DEPOSITION OF

# DEPUTY ROBERT HARRIS

********

**Wednesday, September 11, 2024**
3:06 p.m. - 3:23 p.m.

The deposition of Deputy Robert Harris was taken on behalf of the Plaintiffs at the law offices of Crowe, LaFave, Garfield & Bagley, LLC, 2019 Park Street, Columbia, South Carolina, on the 11th day of September, 2024 before Mary Cooper Joy, Court Reporter and Notary Public in and for the State of South Carolina, pursuant to Notice of Deposition and/or agreement of counsel.

**CREEL COURT REPORTING, INC.**
*1230 Richland Street / Columbia, SC 29201*
*(803) 252-3445 / contact@creelreporting.com*

## APPEARANCES

**Elizabeth M. Dalzell, Esquire**
Shealey Law Firm
1507 Richland Street
Columbia, South Carolina 29201
Attorney for the Plaintiffs

**Steven R. Spreeuwers, Esquire**
**Robert D. Garfield, Esquire**
**Alyssa McMahon, Law Clerk**
Crowe, LaFave, Garfield, & Bagley, LLC
2019 Park Street
Columbia, South Carolina 29201
Attorney for the Defendants


**Also Present:**
Pamela Crabtree, Videographer, Virtual Media


## INDEX

| DEPUTY HARRIS: | PAGE: |
|---|---|
| MS. DALZELL . . . . EXAMINATION. . . . . . . . . 5 | |
| Signature Sheet . . . . . . . . . . . . . . . 21 | |
| Certificate . . . . . . . . . . . . . . . . . 22 | |

## EXHIBITS

(No exhibits were marked during the deposition.)

### **<u>STIPULATIONS</u>**

It is stipulated and agreed that this deposition is being taken pursuant to the Federal Rules of Civil Procedure.

It is further stipulated and agreed that the formalities of taking a videotaped deposition are hereby waived.

It is stipulated by and between counsel and the witness that the reading and signing of the following deposition be, and the same are, hereby not waived. Signature sheet is attached to the deposition at page 21.

1    **VIDEOGRAPHER:**  This is the beginning of media one.

2         Today is September 11th of 2024.  We are on the

3         record at 3:06 p.m.  My name is Pamela

4         Crabtree, Notary and legal videographer with

5         Virtual Media.  Mary Joy is Notary and court

6         reporter with Creel Court Reporting.  We are

7         engaged by Counsel for the Plaintiff to take

8         this video deposition of Robert -- of Deputy

9         Robert Harris, with the deposition being held

10        at Crowe, LaFave, Garfield & Bagley, LLC, 2019

11        Park Street, Columbia, South Carolina, 29201,

12        Case Number 323-CV-05228-SAL-PJG.

13             Will Counsel please introduce yourselves

14        for the record, after which the court reporter

15        will swear in the witness?

16    **MS. DALZELL:**  Liz Dalzell, here for the Plaintiffs,

17        Shauna Ashmon and Genecia Drayton.

18    **MR. GARFIELD:**  Robert Garfield for the Defendants.

19    **MR. SPREEUWERS:**  Steve Spreeuwers for the Defendants.

20    **COURT REPORTER:**  Deputy Harris, please raise your

21    right hand.

22    **DEPUTY HARRIS:**  (Witness complies.)

23    **COURT REPORTER:**  Do you solemnly swear that the

24        testimony you will give in this matter today

25        will be truth, the whole truth, and nothing but

1    the truth, so help you God?

2  **DEPUTY HARRIS:**  I do.

3  **COURT REPORTER:**  Thank you.

4  **DEPUTY HARRIS - EXAMINATION BY MS. DALZELL:**

5  Q:  Deputy Harris, as you just heard, my name is

6      Liz Dalzell.  I'm here today on behalf of

7      Shauna Ashmon and Genecia Drayton, who have

8      filed a lawsuit against the Richland County

9      Sheriff's Office and you, individually, with

10     regard to a traffic stop that occurred back in

11     July of 2023.  I realize that you were not, you

12     know, front and center in this traffic stop.

13 A:  (Nods head.)

14 Q:  So you are here today just to give me some

15     information, make sure I'm, you know, checking

16     all boxes in terms of representing my clients.

17     We shouldn't be here long today, okay?

18 A:  I understand.

19 Q:  Have you ever given a deposition before?

20 A:  This is the first.

21 Q:  Oh, okay.  Just a few basic ground rules, a

22     court reporter's taking down everything we say,

23     so, if you could please answer affirmatively

24     with a yes or a no instead of a shake of the

25     head or a nod of the head, that would be great.

1    A:    Yes.

2    Q:    If you have any questions about anything I'm

3          asking, please ask me to rephrase the question.

4          I want to make sure that you're answering

5          accurately and appropriately, and I don't want

6          to create a con- -- any confusion on the

7          record, okay?

8    A:    Yes.

9    Q:    If you need a break for any reason, which you

10         probably won't because it's going to be short,

11         but if you do, even if it's ten minutes from

12         now, that's okay, just let us know, and we can

13         go off the record and give you a break.

14   A:    Okay.

15   Q:    Okay.   How long have you been with the

16         Sheriff's Department?

17   A:    I've been employed with Richland County

18         Sheriff's Department approximately three and a

19         half, goin' on four years.

20   Q:    Okay.  Great.  And what did you do prior to

21         being employed by the Sheriff's Department?

22   A:    I was a volunteer firefighter with the Columbia

23         Fire Department.

24   Q:    How long did you do that for?

25   A:    Since 2019.  I still do it s- -- kinda, sorta

1      now.

2  Q:  Oh, that's awesome.  (Laughing.)  And what --

3      is it the -- you said it's with the Columbia

4      Fire Department

5  A:  Columbia-Richland Fire Department.

6  Q:  And then, did you have any jobs before that?

7  A:  I did stock work and unboxing at Ross on

8      Garner's Ferry.

9  Q:  Great.  What prompted your decision to join the

10      sheriff's office?

11  A:  Law enforcement was kinda my go-to since high

12      school, I always wanted to give back to my

13      community in a way.

14  Q:  I love that.  Where'd you go to high school?

15  A:  Lower Richland High School.

16  Q:  Okay.  Great.  When did you attend the Criminal

17      Justice Academy?

18  A:  I honestly don't recall.  I know it's between

19      the summer, but -- yeah, the 2022 summer.

20  Q:  Okay.  And how long were you at the Academy

21      for?

22  A:  I believe approximately six weeks.

23  Q:  Okay.  And what kinda training took place when

24      you were at the Academy?

25  A:  We did the pre-legals, legals, DUI

1          certification, field sobriety certifications,

2          we did a couple of trainin' scenarios, as well,

3          and shooting qualifications.

4    Q:   And that's all happening on Broad River Road --

5          -

6    A:   That's ---

7    Q:   --- correct?

8    A:   --- correct.

9    Q:   Okay.  Did you do any traffic stop training?

10   A:   That's correct.

11   Q:   Tell me about what kinda training you receive

12         regarding traffic stops.

13   A:   As far as trainin' at the Academy, they taught

14         us how to position our vehicles on a traffic

15         stop, our approach to a vehicle on a traffic

16         stop, scannin' the vehicle, lookin' for

17         anything out of the ordinary in the vehicle,

18         basically conductin' a traffic stop properly

19         and then closin' out the traffic stop.

20   Q:   And as -- d- -- did you have any training in

21         addition to the training received at the

22         Academy with regard to traffic stops?

23   A:   I did, with the Richland County Sheriff's

24         Department.

25   Q:   Okay.  Tell me about that, what kind of

1          training did they provide you?

2    A:    They also provided traffic stop trainin'.

3    Q:    How does that work?

4    A:    It's pretty much the same, the way we angled

5          our vehicles, the approach to the vehicle,

6          walkin' up, introducin' ourself, explaining the

7          reason for a stop, ID'ing the individuals in

8          the vehicle, goin' back and runnin' everyone

9          through the MDT or South Carolina Department of

10         Motor Vehicles records system, and basically

11         closin' out a traffic stop, rather (ph) it's a

12         written warning or a ticket submitted to that

13         driver for the reason we stopped them.

14   Q:    Okay.  And are there differences in the way you

15         conduct a regular traffic stop versus a felony

16         traffic stop?

17   A:    Yes.

18   Q:    Tell me about those differences.

19   A:    So a felony traffic stop is a -- more of a

20         high-risk traffic stop based off of the, the

21         nature of -- the reason for the felony stop, as

22         far as somethin' being stolen or a armed

23         suspect or a wanted terrorist or somethin' like

24         that, it's different, the way we would approach

25         the vehicle, as to a normal traffic stop.

1  Q:   And can you explain the differences?

2  A:   So, on a felony traffic stop, we're trained to

3       have our, our weapons at a -- have our weapons

4       out in case shot are fired or anything like

5       that, but we're trained also to call the

6       occupants from the vehicle one at a time with

7       their hands up, basically removin' them from

8       the vehicle and then detainin' them and then

9       closin' that out.

10 Q:   Okay.  And when you say you were trained to

11      have your weapons out, are they supposed to be

12      held in a certain manner?

13 A:   Not -- no, no, they're not.

14 Q:   Okay.  So it's at your discretion on how to

15      hold your weapon?

16 A:   Yeah.  It's -- they trained us either to have

17      it at SUL, which is the low-ready position, or

18      have it out and aimed.

19 Q:   Okay.  And out and aimed, meaning out ---

20 A:   Pointed ---

21 Q:   --- and aimed ---

22 A:   --- at the ---

23 Q:   --- at ---

24 A:   --- subject.

25 Q:   Okay.  And that's up to you, whether you ---

1    A:    Based ---

2    Q:    --- choose ---

3    A:    --- off the intensity of the call.

4    Q:    Okay.

5    **MR. GARFIELD:**   And, and I'm sorry, y'all, you're

6          kinda talking over each other inadvertently, so

7          just ple- -- be sure for her to be completely

8          through with her question before you answer.

9    **DEPUTY HARRIS:**  Yes, sir.

10   **MR. GARFIELD:**  It's, it's very easy to do that, so

11         thank you.  Sorry, Liz.

12   **MS. DALZELL:**  No, not at all.

13   Q:    And so, you're saying it depends on the nature

14         of the stop as to whether you hold it out and

15         aimed or s- -- I, I -- well, how, how do you

16         pronounce it, swole?

17   A:    Swul (ph).

18   Q:    Swul (ph).  How do you spell that?

19   A:    I'm not sure.

20   Q:    Oh, okay.  (Laughing.)  And so, it's up to you

21         determine that at the time?

22   A:    Based off the nature of the call, yes.

23   Q:    Okay.  At what -- can you give some examples of

24         a c- -- a call that would prompt you to hold

25         your  gun  in  the  --  a  pointed  and  aimed

1       position?

2  A:   You run a vehicle's license plate and it comes

3       back that that individual's wanted and is known

4       to be armed, so you suspect there's either a

5       weapon in the car, but you're not 100-percent

6       sure.

7  Q:   Okay.  Any other examples you can give?

8  **MR. GARFIELD:**  And just object to the form of the

9       question.  You can answer.

10 A:   No.

11 Q:   Okay.  So, when somebody's armed or potentially

12      armed and dangerous is when you would probably

13      point and aim the gun?

14 A:   Yes.

15 Q:   Okay.  Back in July of '23, which is the date

16      of this incident, is it safe to say you were

17      assigned to Region 7?

18 A:   That is correct.

19 Q:   Are you still assigned to Region 7?

20 A:   No.

21 Q:   Okay.  Where are you working now?

22 A:   I'm currently assigned to Region 3.

23 Q:   Okay.  What region is that?

24 A:   Monticello Road area and North Columbia side of

25      town.



1   Q:   Okay.  Why did you change regions?

2   A:   So I was previously assigned to Region 7, I

3        ended up having a newborn, and I have switched

4        to school resource officer, I noticed that

5        division wasn't really for me, it doesn't fit

6        my, my style of policin', and I requested to

7        transfer back to the road, and that's when I

8        was assigned to Region 3.

9   Q:   Oh, okay.  Who was your supervis- -- your

10       direct supervisor when you were in Region 7?

11  A:   Be (ph) Master Deputy Wolfe and Corporal

12       Zalewski.

13  Q:   Okay.  And so, it -- you -- is it -- as

14       supervisors, they're -- you report to them,

15       correct?

16  A:   Correct.

17  Q:   Okay.  And then, was your ser- -- who was your

18       sergeant at the time?

19  A:   Sergeant Gavin Walmsley.

20  Q:   Okay.  Were -- did you ever have any

21       disciplinary issues, or have you had any

22       disciplinary issues with the Richland County

23       Sheriff's ---

24  A:   Yes.

25  Q:   --- Department?  All right.  Tell me about

1        that.

2   A:   The first discinplar- -- disciplinary issue I

3        had was back in Region 7, it was somethin'

4        pertaining my uniform that I received verbal

5        counselin' on, it's been corrected.  The second

6        one was the -- a -- well, it was unissued

7        county equipment in the vehicle, such as, like,

8        a radar and a, a Motorola mic that's --

9        connects to the car, I was written up for that

10       and told to remove it, it's been removed.  And

11       failer- -- fairly recently, I missed a court

12       date about, maybe, three weeks ago or so due to

13       a family issue, and because I didn't notify the

14       proper chain of command, I was written up for

15       that and my car privileges were taken from me,

16       but they have since been reinstated.

17  Q:   Okay.  Going back to the uniform issue, what

18       was the issue with your uniform?

19  A:   It was pertaining my name tag, I had misplaced

20       my name tag and was instructed to go and

21       contact the supply and pick up a new name tag,

22       but I ended up locating my name tag.

23  Q:   Okay.  And then, what about the equipment in

24       your car, what kind of equipment did you have

25       in your car?

1  A:   It was a radar and Motorola microphone.

2  Q:   Why did you have that equipment in your car?

3  A:   It's to be used for, I guess, kinda, road work.

4  Q:   What does that mean?

5  **MR. GARFIELD:**   I'm gonna object to the form of the

6        question, but go ahead and do the best you can.

7  A:   As far as, like, daily road work as a law

8        enforcement officer.

9  Q:   And so, what were you using the radar and the

10        microphone for?

11  A:   The radar was bein' used for speeding in the

12        school zones when I was on day shift, and the

13        Motorola microphone was used due to I was

14        unable to access my -- the Motorola knob to

15        change channels, because it sits, like, right

16        up underneath my laptop.

17  Q:   And so, this was equipment you bought on your

18        own and put in your car to help you in those

19        areas?

20  A:   Yes.

21  Q:   Why didn't you ask the sheriff's office for

22        that kind of equipment?

23  **MR. GARFIELD:**   Object to the form.  You can answer.

24  A:   At the time, I wasn't aware of, like, the

25        procedure, as far as granting permission by

1           asking the sheriff.

2     Q:    Okay.

3     A:    But since then, I've been made aware, and

4           that's the protocol I follow now.

5     Q:    Oh, okay.    And so, all three of those

6           disciplinary actions involves write-ups --

7           involved write-ups?

8     A:    The first one, which is back in reason --

9           Region 7 was verbal counselin'.  The other two

10          were write-ups.

11    Q:    Okay.  And you said, with the last one, the --

12          wait, which one resulted in the loss of your

13          car privileges?

14    A:    It was due to me missing court due to a family

15          emergency.

16    Q:    Oh, okay.    How long did you l- -- lose

17          privileges for?

18    A:    It was supposed to be until October 24th, but

19          it has since been reinstated about, maybe, last

20          Monday.

21    Q:    Why was it reinstated so, so much earlier?

22    A:    I don't know.

23    Q:    Okay.  They just told you that it was being

24          reinstated?

25    **MR. GARFIELD:**  Object ---

1  A:   And my ---

2  **MR. GARFIELD:**   --- to the form.

3  Q:   Okay.   All right.   Turning to the day in

4       question, which was July 16th of '23, what do

5       you recall about that day, if anything?

6  A:   That day, I recall being in the Sandhills

7       subdivision doing community policin', checkin'

8       businesses.   We received a Flock system

9       notification in reference to a stolen tag in

10      the area of Summit and -- Summit and Clemson

11      Road, I believe.   My supervisors were a lot

12      closer than I were (ph), so I slowly proceeded

13      that way, my supervisor advised on the radio he

14      had that vehicle in question that hit the

15      camera in front of him, they were goin' to go

16      ahead and basically conduct their felony stop

17      and detain the party, so I was slowly headed

18      that way, but by the time I got that way, I was

19      basically cleared.

20 Q:   Oh, okay.   So, by the time -- what did you --

21      when you came on the scene, what was happening?

22 A:   When I got on the scene, the occupants of the

23      vehicle were detained, we were sortin' through,

24      confirmin' the tag, and after that, I was -- I

25      left the scene.

1    Q:   Okay.   What  do  you  remember  about  the  Flock

2         system notification?

3    A:   I don't recall exactly.

4    Q:   Okay.  Did  you  receive  a  picture  of  the  tag  in

5         that Flock system notification?

6    A:   I recall the alert comin' to my computer system

7         while I was workin'.

8    Q:   And the -- did you open it up on the computer

9         system?

10   A:   I did not due to the fact that I wasn't the

11        closest one to it.

12   Q:   Oh, okay.  So did you ever see a picture of the

13        tag that you received the notification about?

14   A:   I did not.

15   Q:   Okay.  Did you ever look at the tag on the car

16        at the scene of the felony stop?

17   A:   I did not.

18   Q:   Okay.  Did  you  ever  interact  with  either  the

19        driver  or  the  passenger  at  the  scene  of  the

20        felony stop?

21   A:   I don't recall.

22   Q:   Who did you talk to at the scene?

23   A:   When  I  arrived  on  the  scene,  I  don't  think  I

24        made  any  verbal  contact  with  anyone.   After  I

25        he- -- overheard my sergeant sayin' it was the

1          wrong vehicle or tag, that's when I proceeded

2          to get in my vehicle and clear the scene.

3    Q:   Okay.  And so, you learned it was the wrong

4          veliker (ph) or tag through the sergeant saying

5          something.  Who was he talking to?

6    A:   That is correct.  He was speaking with my

7          corporal.

8    Q:   Okay.  And you just ho- -- overheard that?

9    A:   That is correct.

10   Q:   Okay.  Did you talk to the sergeant or any

11         other members of your Region 7 teen (ph) a- --

12         it's -- team about this incident after it

13         happened?

14   A:   I don't recall.

15   Q:   Was there any kind of meeting of the team to

16         talk about the stop or anything related to the

17         stop?

18   A:   No.

19   Q:   Okay.  Did anybody suggest any different

20         policies or procedures should be put in place

21         after this stop occurred?

22   A:   No.

23   Q:   Okay.  And that's all I have.

24   **MR. GARFIELD:**  You know, it's been 22 minutes?

25   A:   No.

1    **MS. DALZELL:**  (Laughing.)

2    **MR. GARFIELD:**  I don't have anything.

3    **VIDEOGRAPHER:**  Please standby.  This concludes this

4        deposition of Deputy Robert Harris.  We are off

5        the record at thr- -- 3:23 p.m.

6    **(There being no further questions, the deposition**

7    **concluded at 3:23 p.m.)**

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

## CERTIFICATE

This is to certify that the deposition of **DEPUTY ROBERT HARRIS,** consisting of twenty (20) pages, is a true and correct transcript of the testimony given by said deponent after being duly sworn; said deposition was reported by the method of Stenomask with Backup.

I further certify that I am neither employed by nor related to any of the parties in this matter or their counsel; nor do I have any interest, financial or otherwise, in the outcome of same.

IN WITNESS WHEREOF I have hereunto set my hand and seal on October 4, 2024.

_____
Mary Cooper Joy
Court Reporter

Notary Public for South Carolina
My Commission Expires: December 5, 2032

**CREEL COURT REPORTING, INC.**
*1230 Richland Street / Columbia, SC 29201*
*(803) 252-3445 / contact@creelreporting.com*