UNITED STATES DISTRICT COURT
DISTRICT OF SOUTH CAROLINA
COLUMBIA DIVISION

| | |
|---|---|
| Shauna Ashmon and Genecia Drayton, <br><br> Plaintiffs, <br><br> vs. <br><br> Cpl. Zalewski, M.D. Tyler Wolfe, Gen. Robert Harris, Deputy Christopher Blackmon, and Richland County Sheriff's Department. <br><br> Defendants. | **MEMORANDUM IN OPPOSITION TO MOTION FOR SUMMARY JUDGMENT** |

Plaintiffs Shauna Ashmon and Genecia Drayton ("Plaintiffs"), by and through their undersigned counsel, hereby submit their Memorandum in Opposition to Defendants' Motion for Summary Judgment and state as follows:

## INTRODUCTION

Defendants Richland County Sheriff's Department ("RCSD"), Cpl. Zalewski, M.D. Tyler Wolfe, Gen. Robert Harris, and Deputy Christopher Blackmon (collectively, "Defendants") have moved for summary judgment. For the reasons set forth herein, Defendants' Motion should be denied.

## STANDARD OF REVIEW

Summary judgment is only appropriate where the movant demonstrates that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of

1

law." Fed. R. Civ. P. 56(a). To survive summary judgment, a nonmovant must show that there is a genuine dispute of material fact. A dispute is "genuine" if the evidence could allow for a reasonable factfinder to find for the nonmovant, and a fact is "material" if it could influence the outcome of the suit under governing law. *Bhattacharya v. Murray*, 93 F.4th 675, 686 (4th Cir. 2024). In determining whether a genuine issue exists, the court must view all facts, and reasonable inferences therefrom, in the light most favorable to the nonmovant. *Id.* "Summary judgment is appropriate only if the pleadings, depositions, answers to interrogatories and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact." *Smith v. Continental Casualty Co.*, 369 F.3d 412, 417 (4th Cir. 2004) (citing Fed R. Civ. P. 56(c) and *Celotex Corp. v. Catrett*, 477 U.S. 317, (1986)). The threshold inquiry is whether "there are any genuine factual issues that properly can be resolved only by a finder of fact because they may be reasonably resolved in favor of either party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 252, 248 (1986). In making this determination, a court must assess the factual evidence, including the inferences to be drawn therefrom, in the light most favorable to the nonmovant. *Bhattacharya v. Murray*, 93 F.4th 675, 686 (4th Cir. 2024).

**FACTS**

*The Unlawful Arrest*

On July 16, 2023, Plaintiffs Shauna Ashmon and Genecia Drayton were leaving the Summit neighborhood in Richland County, South Carolina, where Genecia lived, on their way to meet some friends at a Sunday bingo game. (See Ex. A, 37:10-21; Ex. B, 30:13-20). Genecia testified that as they were leaving the neighborhood they got to the light to turn onto Clemson Road, and she saw a cop in the rear-view mirror, and he was "driving so fast." Genecia said to

2

Shauna "Oh, Shauna they about to go get somebody." (Ex. A, 43:9-12). That somebody was Genecia and Shauna. The next five minutes would forever change Genecia and Shauna's lives.

The RCSD vehicle "slammed in front of" Genecia and Shauna's car and "blocked them in." (Ex. A, 43:14-15); (*see also* Ex. B, 30: 21-25). According to Genecia and Shauna, Defendant Wolfe pointed his gun at them in the car and told them to put their hands out the window, to get out of the car, and to lay on the ground. (Ex. A, 43:15-20; Ex. B, 30:22-25; 31:22-24; 39:16-25; 40:1-13). In fact, Shauna testified as follows:

> Q. Okay. You said somebody pulled a gun.
> Which of those three officers was that?
> A That was cop one.
> Q That had stopped in front of your vehicle.
> A Yes.
> Q Okay. And describe for me any motions cop one made with the gun.
> A He let his window down, and he had it pointed out the window to us. He said, Put your hands up; and then he said, Put your keys out of the window; and then he said, Get out of the car; and he pointed the gun the whole time.
> Q Where was the gun pointed?
> A At us. In the car.
> Q And when you say us --
> A Myself and Genecia.
> Q Okay. So the cop was pointing the gun straight at you.
> A Yes.
> Q Okay. It was not down toward the pavement.
> A It was not.

(Ex. A, 39:16-25; 40: 1-13).

Defendant Wolfe denies that he pointed the gun at Genecia and Shauna and instead testified that he exited the vehicle, withdrew his issued firearm from its holster, kept it at a low ready position, and gave verbal commands to the occupants inside. (Ex. C, 47:4-6). Defendant Wolfe testified that he held his gun down at the low and ready despite the fact that protocol would be to point it at the occupants. (Ex. C, 47:17-21). What's more is that the body worn camera footage clearly shows the barrel of Defendant's Wolfe's gun being lowered after Genecia

3

and Shauna show their hands. (See Ex. F, Wolfe BWC 1:38-1:42)[1]. At best there is a question of fact as to whether Defendant Wolfe pointed his firearm at Genecia and Shauna and at worst, Defendant Wolfe is not being truthful.

After making some confusing demands that made Genecia believe that they had to get on the ground, Genecia exited the passenger side door, Defendant Wolfe put her in handcuffs and put her in the back of his vehicle with the door closed. (Ex. A, 43:20-25; 44:1-13; Ex. B, 31:6-10). Defendant Wolfe admitted that he was shaking, "assuming because of the adrenaline" (Ex. C, 73:1-5) and on his body worn camera he can be heard apologizing for his shakiness. (See Ex. F, Wolfe BWC 1:58-2:03). Genecia noticed this and felt fearful: "it made me even more afraid because I'm like, I could have just lost my life in like a second, you know, I could have just been a hash tag for no reason." (Ex. A, 44: 2-5).

At the same time Defendant Wolfe was handcuffing and detaining Genecia, Defendant Zalewski, whose vehicle was behind Genecia and Shauna's car, approached the driver's side of the car, handcuffed Shauna, and told her to stand behind the vehicle in plain sight. (Ex. B, 31:19-25). Shauna stayed outside in the sun and in full view of other drivers and people passing by for several minutes before she was finally put into the back of another patrol car. (Ex. B, 43:11-13). Genecia recalls looking over at Shauna and seeing "the tears coming down her face." (Ex. A, 44:14-16).

As they were handcuffed, both Genecia and Shauna were told that they were being detained because the license plate on Shauna's vehicle was coming up as stolen. (Def. Mot. Summ. J. 3). Only then did Defendants Zalewski and Wolfe retrieve Shauna's pocketbook from the car and get her license. It was eventually determined that Shauna's license plate was not the stolen plate they were looking for and the women were finally released from the handcuffs. (Def.

---

[1] Body worn camera footage will be provided via flash drive to the Court.

Mot. Summ. J. p. 3-4). Instead of going to bingo with their friends, Shuana and Genecia spent their time that day filing a complaint with the Richland County Sheriff's Department. (Ex. B, 35:5-25; 36:1-25).

*The Lack of Investigation Leading to the Unlawful Arrest*

Defendants allege that they received a FLOCK system alert notifying them that a stolen plate containing the letters and numbers "VED953" was in or around the Summit neighborhood on the date in question. (Def. Mot. Summ. J. p. 2). For unknown reasons, Defendants have been unable to produce images of the alert they received, so Plaintiffs have no choice but to take them at their word about what specific information they received in the notification.

Defendant Zalewski testified that he was somehow able to make out the make and model of the vehicle and the letters and numbers of the allegedly stolen tag but, that he was unable to make out the state where the tag was from. (*Id*.). According to Zalewski, the letters on the stolen tag were black. (Ex. D, 16:15-21). Zalewski ran the plate he was notified about via FLOCK through NCIC and allegedly confirmed the plate was stolen. (Ex. D, 17: 3-14). Defendant Zalewski then proceeded to patrol the neighborhood looking for the stolen plate.

According to Defendant Wolfe, the picture of the stolen plate he received via the FLOCK system looked like a "South Carolina collegiate style plate due to the white background with red letters and possibly a SC Gamecock plate." (Ex. C, 59:7-10; 60: 2-15).

Q. But you describe a plate that you believe to be a South Carolina plate, correct?
A. Yes.

(Ex. C, 59:24-25). In fact, it is readily apparent on his body worn camera footage that Defendant Wolfe was fully aware of the fact that the stolen plate they were looking for was from South Carolina. (See Ex. F, Wolfe BWC 4:43-4:50). Defendant Wolfe also testified that when one runs

5

a plate through NCIC the system defaults to South Carolina and provides information about South Carolina vehicles. (Ex. C, 62:20-25; 63: 1-10). Therefore, it logically follows that when Defendant Zalewski ran the plate information he received via FLOCK through NCIC the information he received should have been regarding a South Carolina plate.

During his patrol of the neighborhood, Defendant Zalewski pulled behind Shauna's car and noticed her license plate (Def. Mot. Summ. J. p.2).



Although Shauna's license plate had the same letters and numbers as the stolen plate, the letters were blue, the plate was from Alaska, and it indicated that the owner is a Veteran – the

6

"Alaska" and "Veteran" are in red. (See above and Exhibit E attached hereto.)  Despite these obvious differences, Defendant Zalewski told Defendant Wolfe over the phone that he is initiating a felony stop because he has located the vehicle they had been looking for. (Ex. D, 21:5-20)

Shauna and Genecia's lives were then forever changed.  What followed was the felony stop and the arrest described above.  Even though the arrest took place over about five minutes, to them it felt like an eternity. (Ex. B, 32:23-25; Ex. A, 45: 13-14).  A gun had been pointed at them and they had been handcuffed, so during those five minutes they feared for their lives. (Ex. A, 43:17-18, 50:22-25; 51:1-15; Ex. B, 32:3-6).

While Genecia and Shauna were detained, Defendant Zalewski's and Wolfe's Sergeant, Sergeant Womsley, appeared on the scene.  In body worn camera footage he is seen looking into Defendant Zalewski's car as Zalewski is finally doing an investigation.

**Zalewski BWC:**

**0:04:21:**

| | |
|---|---|
| Womsley: | "Are you sure? I think it was showing North Carolina…" |
| Zalewski: | "It's a South Carolina" |
| Wolfe: | "It's a South Carolina plate" |
| Womsley: | "So if this isn't it, why is she in handcuffs then?" |
| Wolfe: | "He stopped her" (points at Zalewski) |
| Womsley: | "Hey, if that's not the tag why is she in handcuffs?" |
| Wolfe: | "That's the tag that hit" |
| Zalewski: | "They are verifying to make sure it's the same tag" |

7

Womsley:   "Its been hitting all week, it keeps on hitting as a South Carolina tag. So we need to verify tags before we start making traffic stops."

Womsley:   "You guys need to start verifying this stuff before we start pulling people over"

Defendants knew that the plate they were looking for was from South Carolina and they were chastised on the scene by their Sergeant for not verifying that Shauna's plate was the one pinging on FLOCK before stopping the Plaintiffs. Both Defendants Zalewski and Wolfe are each heard admitting it on the body cam footage and in his deposition, Defendant Zalewski even admitted that Shauna's license plate, which he noticed when he pulled behind her car, was different from the picture he received through the FLOCK system:

> Q: And I'm going to show you another document, this document was marked as Exhibit 4 in Master Deputy Wolfe's deposition. Does that look like a picture of the license plate of the car that you, you were behind when you made the felony traffic stop?
> A: It does not. It -- the picture on the Flock was blurred, I could not make out the state.
> Q: Oh, okay. So the picture on Flock looked different than this?
> A: Correct.
> Q: Okay.

(Ex. D, 35:1-12).

Defendants knew the stolen plate was from South Carolina, saw a plate with the same letters and numbers that was from Alaska that had completely different coloring, and failed to do any investigation before conducting a felony stop of the vehicle with the Alaska plate. A simple search in the FLOCK system for other pictures of the plate that had been pinging all week would have easily shown that it was a South Carolina plate. Or running the Alaska plate through NCIC would have easily proven that it was not stolen. (See Ex. D, 42:5-25, 43: 1-22).

*Physical and Emotional Impact:*

8

As a result of the wrongful detainment and the conduct of the defendants, Genecia and Shauna suffered emotional distress, anxiety, and fear for their safety. As black women, this is what they have feared. (See Ex. B, 32:4-6). They didn't want to move the wrong way (See Ex. A, 50:11-16), stops like this are what they always fear will go the wrong way (See. Ex. A, 49:20-21), and they sadly realize that if it had been one of their sons or their husbands who had been stopped, they'd be dead (See. Ex. B, 34:9-14). They don't feel safe and don't trust the police. (See. Ex B, 65:7-12). Due to the effects of the incident, Shauna has suffered from anxiety and has been diagnosed with post-traumatic stress disorder (See Ex. B, 13:7-22). Further, Shauna struggles with paranoia regarding the police and is often unable to sleep. (Ex. B, 14:13-17. 15:1-2). She has been prescribed medication to help (Ex. B, 15:13-14). Genecia has suffered from increased anxiety and has been referred to counseling. (Ex. A, 31:14-17, 77:2-10).

   I.    **A JURY COULD DETERMINE THAT DEFENDANTS ZALEWSKI AND WOLFE VIOLATED PLAINTIFFS' FOURTH AMENDMENT RIGHTS AND ARE THEREFORE LIABLE TO PLAINITFFS UNDER 42 U.S.C. § 1983.**

A question of fact exists regarding whether Defendants lacked a reasonable, articulable suspicion that Plaintiffs were driving a car with a stolen plate. The Fourth Amendment protects "[t]he right of the people to be secure in their persons . . . against unreasonable searches and seizures." U.S. Const. amend. IV. It is well established that a temporary detention of the occupants of a car stopped by police, even for a brief time and for a limited purpose, is a Fourth Amendment seizure. *See e.g. Delaware v. Prouse*, 440 U.S. 648 (1979). However, "[T]he underlying command of the Fourth Amendment is always that searches and seizures be reasonable." *Wilson v. Arkansas*, 514 U.S. 927, 931 (1995); *see also Whren v. United State*, 517 U.S. 806, 810 (1996) ("An automobile stop is thus subject to the constitutional imperative that it not be 'unreasonable' under the circumstances."). "The touchstone of our analysis under the

Fourth Amendment is always 'the reasonableness in all the circumstances of the particular governmental invasion of a citizen's personal security,'" *Pa. v. Mimms*, 434 U.S. 106, 108-09 (1977) (quoting *Terry v. Ohio*, 392 U.S. 1, 19 (1968)), and that reasonableness "depends 'on a balance between the public interest and the individual's right to personal security free from arbitrary interference by law officers,'" 434 U.S. at 109 (quoting *United States v. Brignoni-Ponce*, 422 U.S. 873, 878 (1975))."

"The scheme of the Fourth Amendment becomes meaningful only when it is assured that at some point the conduct of those charged with enforcing the laws can be subjected to the more detached, neutral scrutiny of a judge who must evaluate the reasonableness of a particular search or seizure in light of the particular circumstances. And in making that assessment it is imperative that the facts be judged against an objective standard: would the facts available to the officer at the moment of the seizure or the search "warrant a man of reasonable caution in the belief" that the action taken was appropriate"? *Terry*, 392 U.S. at 21-22. "Anything less would invite intrusions upon constitutionally guaranteed rights based on nothing more substantial than inarticulate hunches, a result this Court has consistently refused to sanction." *Id*. at 22. Simple "'good faith on the part of the arresting officer is not enough.' . . . If subjective good faith alone were the test, the protections of the Fourth Amendment would evaporate, and the people would be 'secure in their persons, houses, papers, and effects,' only in the discretion of the police. *Id*. (*citing Beck v. Ohio*, 379 U.S. 89 (1964)).

"As a general matter, the decision to stop an automobile is reasonable where the police have probable cause to believe that a traffic violation has occurred." *Id*. Probable cause only exists if, given the totality of the circumstances, the officer "had reasonably trustworthy information . . . sufficient to warrant a prudent [person] in believing that the petitioner had

committed or was committing an offense." *Beck*, 379 U.S. at 91 (1964); *see also Porterfield v. Lott*, 156 F.3d 563, 569 (4th Cir. 1998). The burden is on the Government to prove that reasonable suspicion justified a warrantless seizure. *United States v. Kehoe*, 893 F.3d 232, 237 (4th Cir. 2018). The suspicion must be articulable—that is, "[t]he officer must be able to articulate" objective reasons for his suspicion. *Illinois v. Wardlow*, 528 U.S. 119, 123–24 (2000). A mere "'hunch'" or "'inchoate and unparticularized suspicion'" will not do. *Id*. at 124 (quoting *Terry*, 392 U.S. at 27); *see United States v. Gist-Davis*, 41 F.4th 259, 264 (4th Cir. 2022). In making this assessment, the Court considers the totality of the circumstances to determine whether the facts known to the officers at the time of the stop objectively gave rise to reasonable suspicion. See *Kansas v. Glover*, 589 U.S. 376, 380 (2020); *Walker v. Donahoe*, 3 F.4th 676, 682 (4th Cir. 2021). In determining whether the seizure and search were unreasonable, the Court's inquiry is a dual one -- whether the officer's action was justified at its inception, and whether it was reasonably related in scope to the circumstances which justified the interference in the first place. *Terry,* 392 U.S. at 19-20.

In the present case, a jury could determine that Defendants Zalewski and Wolfe's felony stop of the Plaintiffs was unreasonable and completely unjustified at its inception. Both Officers were fully aware of the fact that they were looking for a stolen plate that was from South Carolina. The plate on Shauna's car was completely different from the one they were looking for – it was from Alaska, it was a Veterans tag, and it had red and blue lettering. (See Ex. E)

Also, it is undisputed that there was no other justification for the stop – the Plaintiffs were not engaged in any suspicious behavior, their tag wasn't expired, and they had not committed any traffic offenses. Even giving Defendants the benefit of the doubt by assuming that some confusion was created by the fact that the plates had the same numbers and letters, a

11

simple investigation through either the FLOCK or NCIC systems would have quickly and easily established that they had the wrong plate. In fact, had Zalewski bothered to notice that the plate was from Alaska it would have arguably taken him seconds to verify that it was not stolen by running the plate through NCIC. (Def. Mot. Summ. J. p.11 (showing that it took 1 minute and 36 seconds for Zalewski to take Shauna's driver's license from Defendant Wolfe, return to his car, and then verify that the car and the tag were not stolen). Instead, Zalewski made the reckless and brash decision to initiate a felony stop of a vehicle that two black women were driving to a bingo game based on the mere fact that the license plate had the same letters and numbers as a stolen South Carolina plate. This wasn't even a hunch. It was a willful failure to pay enough attention to the details of the plate and a willful failure to investigate to confirm suspicion. Defendant Wolfe furthered the recklessness of the stop when he appeared on the scene and failed to simply look at the plate to confirm that it was in fact the plate they were looking for. Neither Defendant have given an objective reason why they failed to perform any kind of investigation.

 Even assuming that some confusion was created by the fact that the plates had the same letters and numbers, Defendants could have initiated a non-felony stop to give them time to investigate. They could have pulled the car over, asked for Ms. Ashmon's license and registration, and then quickly and easily determined that the car and the plate were not stolen. *Terry*, 392 U.S. at 28 ("The manner in which the seizure and search were conducted is, of course, as vital a part of the inquiry as whether they were warranted at all."). Because the felony stop was not justified from its inception, the entire stop was unlawful despite the fact that it was relatively brief and the officers were relatively polite after they put their firearms back in their holsters.

Considering the totality of the circumstances and the facts known to the officers at the time of the stop, a jury could determine that there was no reasonable suspicion to conduct a felony stop in this case and that Defendants violated Plaintiffs' rights under the Fourth Amendment. Accordingly, this Court must dent Defendant's Motion for Summary Judgment.

## II.     DEFENDANT DEPUTIES ARE NOT ENTITLED TO QUALIFIED IMMUNITY FROM ALL LIABILITY

In the Fourth Circuit, law enforcement officers are not entitled to qualified immunity when sued in their individual capacities when there is a violation of federal statutory or constitutional rights, and the unlawfulness of their conduct is clearly established at the time of the incident. *Omeish v. Kincaid*, 86 F.4th 546, 555 (4th Cir. 2023). The "clearly established" requirement means that "at the time of the officer's conduct, the law was sufficiently clear that every reasonable official would understand that what he was going is unlawful." *Id.* Therefore, the law must have placed the constitutionality of the officer's conduct "beyond debate," such that "all but the plainly incompetent or those who knowingly violate the law" are protected. *Id.* (citing *Columbia v. Wesby,* 583 U.S. 48, 62-63 (2018). Defendant deputies bear the burden of showing that they are entitled to qualified immunity. *Mays v. Sprinkle*, 992 F.3d 295, 302 n. 5 (4th Cir. 2021).

In the present case, for the reasons stated above, a jury could determine that Defendants Zalewski and Wolfe's felony stop of the Plaintiffs was unreasonable and completely unjustified at its inception. Both Officers were fully aware of the fact that they were looking for a stolen plate that was from South Carolina and performed a felony stop on a car with a plate from Alaska. This is plain incompetence and a knowing violation of the law Plaintiffs' rights under the Fourth Amendment. In fact, Defendant Wolfe and Zalewski's Sergeant called them out on their incompetence at the scene when he said: "You guys need to start verifying this stuff before we

13

start pulling people over." (See Ex. G, Zalewski BWC starting at 4:21)[2]. Although the plate had the same letters and numbers as the stolen plate, the colors and design were completely different, and Defendants failed to conduct any investigation until after the stop was initiated. Even giving Defendants the benefit of the doubt by assuming that some confusion was created by the fact that the plates had the same numbers and letters, a simple investigation through either the FLOCK or NCIC systems would have quickly and easily established that they had the wrong plate.

Also, even if a jury could find that a stop was warranted because the plate had the same letters and numbers but was from Alaska, a jury could find that a felony stop under those circumstances was excessive. Here, there is a genuine issue of material fact as to whether the force used by Defendant deputies was reasonable under these circumstances. While the deputies allege that their actions were reasonable due the FLOCK safety system and NCIC system confirming that the plate was stolen, Zalewski and Wolfe failed to notice that the plate on Plaintiff's car in no way resembled a South Carolina license plate. Even once they began the felony stop, they failed to confirm that the license plate at issue in the stop was a South Carolina plate until almost five minutes after the stop was initiated. It was not until investigative detention had begun that Zalewski noted the Alaska license plate. When he ran the plate, it came back as clear. Defendant deputies' use of physical force, including pointing a firearm and handcuffing the Plaintiffs, was unreasonable in light of the circumstances existing at the time of the stop. This unreasonable force was a violation of Plaintiffs constitutional rights under the Fourth and Fourteenth amendments to the United States Constitution to be free from an unwanted search and seizure and to be free from excessive, unreasonable, and unjustified force against their persons. Even if a stop was warranted, Defendant deputies should have performed a routine traffic stop to investigate, instead of a felony stop.

---

[2] Body worn camera footage will be provided via flash drive to the Court.

A genuine issue of material fact exists as to whether Defendant deputies acted reasonably in initiating a traffic stop, and alternatively initiating a felony traffic stop as opposed to a non-felony traffic stop considering the facts available to them at the time. Accordingly, summary judgment is not appropriate. [3]

**Conclusion:**

Plaintiffs Shauna Ashmon and Genecia Drayton assert that the facts, viewed in the light most favorable to the non-moving party, demonstrate that there was a clear violation of their Fourth Amendment rights by the Defendants Zalewski and Wolfe. There are substantial disputes of material fact regarding the legality of the stop, the conduct of the officers, and the applicability of any immunity defenses. Therefore, the court should deny the Defendants' Motion for Summary Judgment and allow these matters to be resolved by a jury.

*s/ Elizabeth Dalzell*
Elizabeth Dalzell
Fed I.D. No. #68797
Shealey Law Firm
1507 Richland Street
Columbia, SC 29201
(803) 929-0008
*Attorney for the Plaintiff*

Columbia, South Carolina
November 18, 2024

---

[3] Plaintiff concedes that the other arguments made in Defendant's Motion for Summary Judgment have merit and asks the court to focus it determination on the arguments made regarding Defendants Zalewski and Wolfe's liability under 42 U.S.C. §1983 and the qualified immunity defense.