IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA
COLUMBIA DIVISION

| | |
|---|---|
| Shauna Ashmon; Genecia Drayton<br><br>                              Plaintiff(s),<br><br>        vs.<br><br><br><br>Cpl. Zalenski; M.D. Tyler Wolfe; Gen. Robert Harris; Deputy Christopher Blackmon; Richland County Sheriff's Department,<br><br>                              Defendant(s). | Civil Action No.  3:23-cv-5228-SAL-PJG<br><br><br><br>**PLAINTIFF'S NOTICE OF MOTION AND MOTION TO ALTER OR AMEND JUDGEMNT PURSUANT TO RULE 59, FRCP AND MOTION TO RECONSIDER PURUSUANT TO RULE 52, FRCP** |

## **INTRODUCTION**

On July 21, 2025, Magistrate Judge Paige J. Gossett issued a report and recommendation ("Report") in this matter. (ECF No. 47). In her Honor's Report she recommended this Court grant the Defendants' motion for summary judgment (ECF No. 29). This Court adopted the Report and Recommendation in an Order dated August 19, 2025 (ECF No. 51). Plaintiff now respectfully requests that this court reconsider its Order which recommends granting Defendants' motion for summary judgment as to claims against Defendants Zalewski and Wolfe under 42 U.S.C. § 1983 for the violation of Plaintiffs' rights under the Fourth Amendment of the United States Constitution.

## **FACTS**

### *The Unlawful Vehicle Stop*

On July 16, 2023, Plaintiffs Shauna Ashmon and Genecia Drayton were leaving the Summit neighborhood in Richland County, South Carolina, where Genecia lived, on their way to

1

meet some friends at a Sunday bingo game.  (See Ex. A, 37:10-21; Ex. B, 30:13-20).  Genecia testified that as they were leaving the neighborhood they got to the light to turn onto Clemson Road, and she saw a cop in the rear-view mirror, and he was "driving so fast." Genecia said to Shauna "Oh, Shauna they about to go get somebody." (Ex. A, 43:9-12).  That somebody was Genecia and Shauna.  The next five minutes would forever change Genecia and Shauna's lives.

The RCSD vehicle "slammed in front of" Genecia and Shauna's car and "blocked them in." (Ex. A, 43:14-15); (*see also* Ex. B, 30: 21-25).   According to Genecia and Shauna, Defendant Wolfe pointed his gun at them in the car and told them to put their hands out the window, to get out of the car, and to lay on the ground. (Ex. A, 43:15-20; Ex. B, 30:22-25; 31:22-24; 39:16-25; 40:1-13).  In fact, Shauna testified as follows:

Q. Okay. You said somebody pulled a gun.

Which of those three officers was that?

A That was cop one.

Q That had stopped in front of your vehicle.

A Yes.

Q Okay. And describe for me any motions cop one made with the gun.

A He let his window down, and he had it pointed out the window to us. He said, Put your hands up; and then he said, Put your keys out of the window; and then he said, Get out of the car; and he pointed the gun the whole time.

Q Where was the gun pointed?

A At us. In the car.

Q And when you say us --

A Myself and Genecia.

Q Okay. So the cop was pointing the gun straight at you.

A Yes.

Q Okay. It was not down toward the pavement.

A It was not.

(Ex. A, 39:16-25; 40: 1-13).

Defendant Wolfe denies that he pointed the gun at Genecia and Shauna and instead testified that he exited the vehicle, withdrew his issued firearm from its holster, kept it at a low ready position, and gave verbal commands to the occupants inside. (Ex. C, 47:4-6). Defendant Wolfe testified that he held his gun down at the low and ready despite the fact that protocol would be to point it at the occupants. (Ex. C, 47:17-21). What's more is that the body worn camera footage clearly shows the barrel of Defendant's Wolfe's gun being lowered after Genecia and Shauna show their hands. (See Ex. F, Wolfe BWC 1:38-1:42)[1]. At best there is a question of fact as to whether Defendant Wolfe pointed his firearm at Genecia and Shauna and at worst, Defendant Wolfe is not being truthful.

After making some confusing demands that made Genecia believe that they had to get on the ground, Genecia exited the passenger side door, Defendant Wolfe put her in handcuffs and put her in the back of his vehicle with the door closed. (Ex. A, 43:20-25; 44:1-13; Ex. B, 31:6-10). Defendant Wolfe admitted that he was shaking, "assuming because of the adrenaline" (Ex. C, 73:1-5) and on his body worn camera he can be heard apologizing for his shakiness. (See Ex. F, Wolfe BWC 1:58-2:03). Genecia noticed this and felt fearful: "it made me even more afraid because I'm like, I could have just lost my life in like a second, you know, I could have just been a hash tag for no reason." (Ex. A, 44: 2-5).

At the same time Defendant Wolfe was handcuffing and detaining Genecia, Defendant Zalewski, whose vehicle was behind Genecia and Shauna's car, approached the driver's side of

---

[1] Body worn camera footage was provided via flash drive to the Court.

the car, handcuffed Shauna, and told her to stand behind the vehicle in plain sight. (Ex. B, 31:19-25).  Shauna stayed outside in the sun and in full view of other drivers and people passing by for several minutes before she was finally put into the back of another patrol car. (Ex. B, 43:11-13). Genecia recalls looking over at Shauna and seeing "the tears coming down her face." (Ex. A, 44:14-16).

As they were handcuffed, both Genecia and Shauna were told that they were being detained because the license plate on Shauna's vehicle was coming up as stolen. (Def. Mot. Summ. J. 3).  Only then did Defendants Zalewski and Wolfe retrieve Shauna's pocketbook from the car and get her license. It was eventually determined that Shauna's license plate was not the stolen plate they were looking for and the women were finally released from the handcuffs. (Def. Mot. Summ. J. p. 3-4).

The officers testified that they initiated the more intrusive "felony stop," as opposed to an investigative traffic stop, because a stolen plate on a car indicates a high likelihood that a vehicle is stolen or, as counsel for Defendants put it "was likely indicative of some more sinister activity than may appear at first glance." (D. Mot. Summ. J. p.7).

*The Lack of Investigation Leading to the Unlawful Vehicle Stop*

Defendants allege that they received a FLOCK system alert notifying them that a stolen plate containing the letters and numbers "VED953" was in or around the Summit neighborhood on the date in question. (Def. Mot. Summ. J. p. 2). For unknown reasons, Defendants have been unable to produce images of the alert they received, so Plaintiffs have no choice but to take them at their word about what specific information they received in the notification.

Defendant Zalewski testified that he was somehow able to make out the make and model of the vehicle but that the letters were "blurred" and that there were "a mixture of colors. I know the lettering was black." (Ex. D, 16:15-21). Defendant Zalewski testified that saw "a license plate that was blurred." (*Id*.) Zalewski ran the plate he was notified about via FLOCK through NCIC and allegedly confirmed the plate was stolen. (Ex. D, 17: 3-14). Defendant Zalewski then proceeded to patrol the neighborhood looking for the stolen plate.

According to Defendant Wolfe, the picture of the stolen plate he received via the FLOCK system looked like a "South Carolina collegiate style plate due to the white background with red letters and possibly a SC Gamecock plate." (Ex. C, 59:7-10; 60: 2-15).

Q. But you describe a plate that you believe to be a South Carolina plate, correct?

A. Yes.

(Ex. C, 59:24-25). In fact, it is readily apparent on his body worn camera footage that Defendant Wolfe was fully aware of the fact that the stolen plate they were looking for was from South Carolina. (See Ex. F, Wolfe BWC 4:43-4:50). Defendant Wolfe also testified that when one runs a plate through NCIC the system defaults to South Carolina and provides information about South Carolina vehicles. (Ex. C, 62:20-25; 63: 1-10). Therefore, it logically follows that when Defendant Zalewski ran the plate information he received via FLOCK through NCIC the information he received should have been regarding a South Carolina plate.

During his patrol of the neighborhood, Defendant Zalewski pulled behind Shauna's car and noticed her license plate (Def. Mot. Summ. J. p.2). Although Shauna's license plate allegedly had the same letters and numbers as the stolen plate (again Defendants have failed to produce the FLOCK image), the letters were blue, the plate was from Alaska, and it indicated

that the owner is a Veteran – the "Alaska" and "Veteran" are in red. (See below and Exhibit E attached hereto.)



Despite these obvious differences and despite the fact that all he had was an allegedly blurry picture, Defendant Zalewski performed no investigation and instead told Defendant Wolfe over the phone that he is initiating a felony stop because he has located the vehicle they had been looking for. (Ex. D, 21:5-20)

Shauna and Genecia's lives were then forever changed. What followed was the felony stop and the detainment described above. Even though the detainment took place over about five minutes, to them it felt like an eternity. (Ex. B, 32:23-25; Ex. A, 45: 13-14). A gun had been pointed at them and they had been handcuffed, so during those five minutes they feared for their lives. (Ex. A, 43:17-18, 50:22-25; 51:1-15; Ex. B, 32:3-6).

While Genecia and Shauna were detained, Defendant Zalewski's and Wolfe's Sergeant, Sergeant Womsley, appeared on the scene. In body worn camera footage he is seen looking into Defendant Zalewski's car as Zalewski is finally doing an investigation.

**<u>Zalewski BWC:</u>**

**0:04:21:**

Womsley:        "Are you sure? I think it was showing North Carolina…"

Zalewski:        "It's a South Carolina"

Wolfe:          "It's a South Carolina plate"

Womsley:        "So if this isn't it, why is she in handcuffs then?"

Wolfe:          "He stopped her" (points at Zalewski)

Womsley:        "Hey, if that's not the tag why is she in handcuffs?"

Wolfe:          "That's the tag that hit"

Zalewski:        "They are verifying to make sure it's the same tag"

Womsley:        "Its been hitting all week, it keeps on hitting as a South Carolina tag. So we need to verify tags before we start making traffic stops."

Womsley:      "You guys need to start verifying this stuff before we start pulling people over"

Defendants knew that the plate they were looking for was from South Carolina and they were chastised on the scene by their Sergeant for not verifying that Shauna's plate was the one pinging on FLOCK before stopping the Plaintiffs.  Both Defendants Zalewski and Wolfe are each heard admitting it on the body cam footage and in his deposition, Defendant Zalewski even admitted that Shauna's license plate, which he noticed when he pulled behind her car, was different from the picture he received through the FLOCK system:

> Q: And I'm going to show you another document,
> this document was marked as Exhibit 4 in Master
> Deputy Wolfe's deposition. Does that look like
> a picture of the license plate of the car that
> you, you were behind when you made the felony
> traffic stop?
> A: It does not. It -- the picture on the Flock
> was blurred, I could not make out the state.
> Q: Oh, okay. So the picture on Flock looked
> different than this?
> A: Correct.
> Q: Okay.

(Ex. D, 35:1-12).

Defendants knew the stolen plate was from South Carolina, allegedly saw a plate with the same letters and numbers that was from Alaska that had completely different coloring, and failed to do any investigation before conducting a felony stop of the vehicle with the Alaska plate.  A simple search in the FLOCK system for other pictures of the plate that had allegedly been

pinging all week would have easily shown that it was a South Carolina plate. Or running the Alaska plate through NCIC would have easily proven that it was not stolen. (See Ex. D, 42:5-25, 43: 1-22).

*Physical and Emotional Impact:*

As a result of the wrongful detainment and the conduct of the defendants, Genecia and Shauna suffered emotional distress, anxiety, and fear for their safety. As black women, this is what they have feared. (See Ex. B, 32:4-6). They didn't want to move the wrong way (See Ex. A, 50:11-16), stops like this are what they always fear will go the wrong way (See. Ex. A, 49:20-21), and they sadly realize that if it had been one of their sons or their husbands who had been stopped, they'd be dead (See Ex. B, 34:9-14). They don't feel safe and don't trust the police. (See. Ex B, 65:7-12). Due to the effects of the incident, Shauna has suffered from anxiety and has been diagnosed with post-traumatic stress disorder (See Ex. B, 13:7-22). Further, Shauna struggles with paranoia regarding the police and is often unable to sleep. (Ex. B, 14:13-17. 15:1-2). She has been prescribed medication to help (Ex. B, 15:13-14). Genecia has suffered from increased anxiety and has been referred to counseling. (Ex. A, 31:14-17, 77:2-10).

*Procedural History*

The Plaintiffs filed this civil action on October 19, 2023, raising § 1983 claims as well as several state law claims against the individual officers and Richland County Sheriff s Department. The Defendants moved for summary judgment as to all of the claims asserted, and in response the Plaintiffs conceded that Defendants Harris, Blackmon, and Richland Country Sheriff s Department are entitled to summary judgment as to all claims, and that all Defendants are entitled to summary judgment on the state law claims. (Pls. Resp. Opp n Summ. J. at 1 5 n. 3 , ECF No. 3 5 at 1 5 ) (stating that the plaintiffs "concede[ ] that the other arguments

made in Defendant s Motion for Summary Judgment have merit and ask[ ] the court to focus it[ s ] determination on the arguments made regarding Defendants Zalewski and Wolfe's liability under 42 U.S.C. §1983 and the qualified immunity defense. ").   The Plaintiffs' opposition therefore only focuses on the argument that a reasonable jury could find that Defendants Zalewski and Wolfe violated the Plaintiffs Fourth Amendment rights and that the Defendants are not entitled to qualified immunity on this claim.

This Court held that Defendants are entitled to summary judgment on the Plaintiff's §1983 claim against Zalewski and Wolfe holding that "Plaintiffs have failed to demonstrate the constitutional rights at issue were clearly established at the time of the alleged violation." (Order p.9)

## **LEGAL STANDARD**

### Rule 59(e)

"Pursuant to Fed. R. Civ. P. 59(e), the court may alter or amend its judgment (1) to accommodate an intervening change in controlling law; (2) to account for new evidence not available at trial; or (3) to correct clear error of law or prevent manifest injustice. *Pac. Ins. Co. v. Am. Nat'l Fire Ins. Co.,* 148 F.3d 396, 403 (4th Cir. 1998)." Plaintiff files this Motion to Reconsider because the Court's Order Granting Defendant's Motion for Summary fails to consider clearly established law in the Fourth Circuit.

### Rule 56(a)

Summary judgment is appropriate only "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(a).  It is well established that summary judgment should be granted "only when it is clear that there is no dispute concerning either the facts of the controversy or the inferences to be

drawn from those facts." *Pulliam Inv. Co. v. Cameo Props.,* 810 F.2d 1282, 1286 (4th Cir. 1987). The movant has the burden of showing the absence of a genuine dispute on an issue of material fact, and the Court must view the evidence before it and the inferences to be drawn therefrom in the light most favorable to the nonmoving party. *U.S. v. Diebold, Inc.,* 369 U.S. 654 (1962). Summary judgment is inappropriate "when the evidence is susceptible of different interpretations or inferences by the trier of fact." *Hunt v. Cromartie*, 526 U.S. 541, 553 (1999).

Once the moving party has made the threshold demonstration, the non-moving party, to survive the motion for summary judgment, many not simply rest on the allegations averred in the pleadings. Rather, the non-moving party must demonstrate that specific material facts exist which give rise to a genuine dispute. *Celotex Corp v. Catrett*, 477 U.S. 317, 324 (1986). "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment. Factual disputes that are irrelevant or unnecessary will not be counted." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986).

In deciding a summary judgment motion, the Court "must not weigh the evidence" but only determine whether there is a genuine issue to be decided by the trier of fact. *Smith v. City of N. Charleston*, 401 F. Supp. 530, 532 (D.S.C. 2005) (citing *Anderson*, 477 U.S. at 249). The Court must not make credibility determinations and, "where resolution of an issue of fact depends upon such a determination, summary judgment is inappropriate." *McRay v. Pee Dee Reg'l Transp. Auth.*, 263 Fed. Appx. 301 (4th Cir. 2008) (citing *Gray v. Spillman*, 925 F.2d 90, 95 (4th Cir. 1991)). Plaintiffs need only prove their case "by a preponderance of the evidence," and may do so by either "direct or circumstantial evidence." *Postal Service Bd. Of Governors v. Aikens*, 460 U.S. 711, 714, n. 3 (1983).

In sum, material disputes of fact end the summary judgment inquiry, leaving factual conclusions to a jury. So long as the fact is material and genuinely disputed, summary judgment cannot be granted on substantive constitutional claim or a qualified immunity defense. *Vathekan v. Prince George's Cnty.*, 154 F.3d 173, 180 (4th Cir. 1998) ("summary judgment on qualified immunity grounds is improper as long as there remains any material factual dispute regarding the actual conduct of the defendants"). Even if the dispute is simply which party is to be believed—the suspect or the officer—a jury must be the one to decide. *Myers v. Baltimore Cnty., Md.*, 713 F.3d 723, 733 (4th Cir. 2013) ("Although a jury ultimately may find the officers' version of events is more credible, [this court] is not permitted to make such credibility determinations when considering whether a police officer properly was held immune from suit under the doctrine of qualified immunity"); *Rainey v. Conerly*, 973 F.2d 321, 324 (4th Cir. 1992).

Simply arguing the officer used force by mistake does not alter this principle in any way. The objective reasonableness of an alleged mistake presents a jury question if disputed by competent evidence. *Santos v. Gates*, 287 F.3d 846, 855 n. 12 (9th Cir. 2002) (denying summary judgment on qualified immunity "because whether the officers may be said to have made a reasonable mistake of fact or law may depend on the jury's resolution of disputed facts") (citations omitted); *Burns v. City of Redwood City*, 737 F. Supp. 2d 1047, 1062-63 (N.D. Cal. 2010) ("if [suspect] behaved as the officers contend, their mistake of fact might be objectively reasonable. If he did not, the mistake may be deemed unreasonable").

## DISCUSSION

A defendant is not entitled to summary judgment on a qualified immunity defense when the evidence presents disputed issues of fact. *Tolan v. Cotton*, 134 S. Ct. 1861, 1866 (2014) (holding that for both a substantive Fourth Amendment inquiry and qualified immunity analysis "courts may not resolve genuine disputes of fact in favor of the party seeking summary judgment").

The court must view the facts in a light most favorable to the plaintiff when deciding on the application of qualified immunity. *Gomez v. Atkins*, 296 F.2d 253, 260-61 (4th Cir. 2002) (citing *Saucier v. Katz*, 533 U.S. 194, 201 (2001)). In practical terms, the court must resolve any dispute of fact in the plaintiff's favor. *Gomez*, 296 F.2d at 261. Plus, qualified immunity is not "good faith" immunity. *Gould v. Davis*, 165 F.3d 265, 273 (4th Cir. 1998). Zalewski's and Wolfe's subjective beliefs regarding the perceived threat Plaintiffs posed are not relevant. Qualified immunity is governed by the objective reasonableness of Defendants' conduct. Id.

In some instances, the question of qualified immunity may be answered at the summary judgment stage of litigation. However, there are other instances where the exact course of events surrounding the defendant's alleged constitutional violation is unclear and summary judgment is not an appropriate means of deciding the issue. For example, in *Rainey*, the court denied summary judgment because "a determination of what actually happened is absolutely necessary to decide whether [the defendant] could reasonably have believed his actions were lawful." 973 F.2d at 324; *Vathekan v. Prince George's County*, 154 F.3d 173, 179-80 (4th Cir. 1998) (denying summary judgment where disputed facts existed as to events surrounding the alleged constitutional violation).

When determining the reasonableness of a defendant's conduct for qualified immunity purposes, issues may arise that "necessitate the resolution of disputed factual issues surrounding the conduct." *Pritchett v. Alford*, 973 F. 2d 307, 312 (4th Cir. 1992). Additionally, many credibility questions bearing on the qualified immunity question cannot be decided at the summary judgment stage. *See Robinson v. S.C. Dep't of Pub. Safety*, 222 Fed. Appx. 330, 332 (4th Cir. 2007) (finding district court "made an improper credibility finding" in finding defendant was entitled to qualified immunity"); *Rainey,* 973 F.2d at 324 (denying summary judgment on qualified

immunity issue as case "depend[ed] entirely on a credibility determination . . . and as such, the issue is inappropriate for resolution by summary judgment").

The qualified immunity issue is resolved through a multi-step analysis where the court first considers the "threshold question" of whether the facts alleged show defendant's conduct violated a constitutional right. *Saucier*, 533 U.S. at 201. This requirement is met "if a violation could be made out on a favorable view of the parties' submissions*." Id.* Next, the court considers whether the constitutional right was clearly established at the time defendant acted. Finally, the court considers whether "a reasonable officer could have believed, in light of the clearly established law, that his conduct was lawful." Id. at 199.

Both this Court's Order and the Report and Recommendation only address the question of whether the Plaintiffs' rights at issue were clearly identified at the time of the alleged violation implying that a jury could determine that the officers violated Plaintiffs' Fourth Amendment rights. However, the first prong of the test warrants analysis as it directly relates to the issue of whether a reasonable officer could have believed, considering clearly established law, that his conduct was lawful.

I.     **A JURY COULD DETERMINE THAT DEFENDANTS ZALEWSKI AND WOLFE VIOLATED PLAINTIFFS' FOURTH AMENDMENT RIGHTS AND ARE THEREFORE LIABLE TO PLAINITFFS UNDER 42 U.S.C. § 1983.**

The Fourth Amendment protects "[t]he right of the people to be secure in their persons . . . against unreasonable searches and seizures." U.S. Const. amend. IV. It is well established that a temporary detention of the occupants of a car stopped by police, even for a brief time and for a limited purpose, is a Fourth Amendment seizure. *See e.g. Delaware v. Prouse*, 440 U.S. 648 (1979). However, "[T]he underlying command of the Fourth Amendment is always that searches and seizures be reasonable." *Wilson v. Arkansas*, 514 U.S. 927, 931 (1995); *see also Whren v.*

*United State*, 517 U.S. 806, 810 (1996) ("An automobile stop is thus subject to the constitutional imperative that it not be 'unreasonable' under the circumstances."). "The touchstone of our analysis under the Fourth Amendment is always 'the reasonableness in all the circumstances of the particular governmental invasion of a citizen's personal security,'" *Pa. v. Mimms*, 434 U.S. 106, 108-09 (1977) (quoting *Terry v. Ohio*, 392 U.S. 1, 19 (1968)), and that reasonableness "depends 'on a balance between the public interest and the individual's right to personal security free from arbitrary interference by law officers,'" 434 U.S. at 109 (quoting *United States v. Brignoni-Ponce*, 422 U.S. 873, 878 (1975)."

### A.  A Jury Could Determine that Defendants' Mistake was Objectively Unreasonable.

A question of fact exists regarding whether Defendants lacked a reasonable, articulable suspicion that Plaintiffs were driving a car with a stolen plate and therefore violated Plaintiffs' rights under the Fourth Amendment.

"The scheme of the Fourth Amendment becomes meaningful only when it is assured that at some point the conduct of those charged with enforcing the laws can be subjected to the more detached, neutral scrutiny of a judge who must evaluate the reasonableness of a particular search or seizure in light of the particular circumstances.  And in making that assessment it is imperative that the facts be judged against an objective standard: would the facts available to the officer at the moment of the seizure or the search "warrant a man of reasonable caution in the belief" that the action taken was appropriate"? *Terry*, 392 U.S. at 21-22. "Anything less would invite intrusions upon constitutionally guaranteed rights based on nothing more substantial than inarticulate hunches, a result this Court has consistently refused to sanction." *Id*. at 22.  Simple "good faith on the part of the arresting officer is not enough.' . . . If subjective good faith alone were the test, the protections of the Fourth Amendment would evaporate, and the people would

be 'secure in their persons, houses, papers, and effects,' only in the discretion of the police. *Id*. (*citing Beck v. Ohio*, 379 U.S. 89 (1964)).

"As a general matter, the decision to stop an automobile is reasonable where the police have probable cause to believe that a traffic violation has occurred." *Id*. Probable cause only exists if, given the totality of the circumstances, the officer "had reasonably *trustworthy* information . . . sufficient to warrant a prudent [person] in believing that the petitioner had committed or was committing an offense." *Beck*, 379 U.S. at 91 (1964) (emphasis added); *see also Porterfield v. Lott*, 156 F.3d 563, 569 (4th Cir. 1998). The burden is on the Government to prove that reasonable suspicion justified a warrantless seizure. *United States v. Kehoe*, 893 F.3d 232, 237 (4th Cir. 2018). The suspicion must be articulable—that is, "[t]he officer must be able to articulate" objective reasons for his suspicion. *Illinois v. Wardlow*, 528 U.S. 119, 123–24 (2000). A mere "'hunch'" or "'inchoate and unparticularized suspicion'" will not do. *Id*. at 124 (quoting *Terry*, 392 U.S. at 27); *see United States v. Gist-Davis*, 41 F.4th 259, 264 (4th Cir. 2022). In making this assessment, the Court considers the totality of the circumstances to determine whether the facts known to the officers at the time of the stop objectively gave rise to reasonable suspicion. See *Kansas v. Glover*, 589 U.S. 376, 380 (2020); *Walker v. Donahoe*, 3 F.4th 676, 682 (4th Cir. 2021). Both the "quantity and quality" of the information possessed by the police must be considered. *See Alabama v. White*, 496 U.S. 325, 330, (1990). When an officer was mistaken about whether the defendant's conduct was ultimately illegal, the stop is only justified at its inception provided the mistake was *objectively reasonable. See Heien v. North Carolina*, 574 U.S. 54, 66 (2014) ("The Fourth Amendment tolerates only reasonable mistakes, and those mistakes— whether of fact or of law—must be *objectively* reasonable.") (emphasis added). Likewise, Zalewski's subjective assertion that he (even mistakenly) believed that the license plate was stolen

does not render his actions constitutional if an objectively reasonable officer could believe otherwise. *See Henry v. Purnell*, 652 F.3d 524, 532 (4th Cir. 2011) (en banc) (finding no protection from civil liability for a case "where an officer committed a constitutionally unreasonable seizure as the result of an unreasonable factual mistake").

In this case, Defendants claim that the mistake was an honest one. However, given that Defendants have been unable to produce the picture from the FLOCK system showing the license plate that allegedly had the same letters and numbers as Plaintiffs' plate, this fact is in dispute and therefore must be determined by a jury. Even if Defendants' mistake may have been an honest one, this does not change this analysis. The law is clear on this point as well—qualified immunity offers no protection to "an officer who makes an honest but objectively unreasonable mistake." *Stewart v. Yulzy*, Civil Action No. ELH-12-1180, 2013 WL 3944473, at * 7 (D. Md. July 30, 2013) (citing *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)). Defendants' subjective belief that the Plaintiffs license plate was stolen and the sincerity of that belief are as irrelevant to the qualified immunity analysis as they were to the underlying constitutional claim. *Henry*, 652 F.3d at 532 ("All actions . . . mistaken or otherwise, are subject to an objective test"). There is no protection for civil liability for a case "where an officer committed a constitutionally unreasonable seizure as the result of an unreasonable factual mistake*." Id.* at 535; *see also Graham v. Gagnon*, 831 F.3d 176, 184 (4th Cir. 2016) ("where the officer's mistake was objectively unreasonable, the officer may be subject to civil liability").

In the present case, a jury could determine that Defendants Zalewski and Wolfe's felony stop of the Plaintiffs was objectively unreasonable and completely unjustified at its inception because it was based on untrustworthy and insufficient evidence. Also, whether the stop was reasonable is based on a credibility determination given that Defendants have failed to produce

the picture of the plate that was allegedly stolen. See *McRay v. Pee Dee Reg'l Transp. Auth.*, 263 Fed. Appx. 301 (4th Cir. 2008) (citing *Gray v. Spillman*, 925 F.2d 90, 95 (4th Cir. 1991)) (The Court must not make credibility determinations and, "where resolution of an issue of fact depends upon such a determination, summary judgment is inappropriate.").   Defendant Zalewski testified that all he had was a blurry picture of a license plate from the FLOCK system.  Zalewski testified that the lettering in the picture was black, and both Officers were fully aware of the fact that they were looking for a stolen plate that was *from South Carolina*.  Although Zalewski claims that the letters and numbers were the same, the plate on Shauna's car was completely different from the one they were looking for – it was from Alaska, it was a Veterans tag, and it had red and blue lettering. (See Ex. E). Because Defendants have been unable to produce the picture of the allegedly stolen plate, a jury must decide if Defendants are credible and determine whether the decision to stop Plaintiffs was reasonable under these circumstances.

Also, it is undisputed that there was no other justification for the stop – it is undisputed that the Plaintiffs were not engaged in any suspicious behavior, their tag wasn't expired, they had not committed any traffic offenses, and they were fully cooperative.  In fact, they were sitting at a light on their way to Bingo when the felony stop was initiated.  Therefore, the decision to initiate a felony stop of Shauna's vehicle was objectively unreasonable.  Even giving Defendants the benefit of the doubt by assuming that some confusion was created by the fact that the plates had the same numbers and letters, because the FLOCK picture was allegedly blurry it was unreliable and further investigation was therefore warranted.  Running the plate through either the FLOCK or NCIC systems would have quickly and easily established that they had the wrong plate. In fact, Zalewski was stopped behind Plaintiff's vehicle at a red light and it would have arguably taken him seconds to verify that it was not stolen by running the plate through NCIC.

(Def. Mot. Summ. J. p.11 (showing that it took 1 minute and 36 seconds for Zalewski to take Shauna's driver's license from Defendant Wolfe, return to his car, and then verify that the car and the tag were not stolen). Instead, Zalewski made the reckless and brash decision to initiate a felony stop of a vehicle that two black women were driving to a Bingo game allegedly based on the mere fact that the license plate had the same letters and numbers as a stolen South Carolina plate. This wasn't even a hunch and it was more than mere negligence. It was a willful failure to pay enough attention to the details of the plate and a willful failure to investigate to confirm suspicion knowing that he had untrustworthy evidence. Defendant Wolfe furthered the recklessness of the stop when he appeared on the scene and failed to simply look at the plate to confirm that it wasn't from South Carolina and was therefore not the plate they were looking for. Neither Defendant has given an objectively reasonable reason why they failed to perform any kind of investigation.

### B. Defendant's Use of a High-Risk Felony Stop was Unreasonable

Furthermore, the Defendants' suspicion that Plaintiffs had stolen the vehicle, having been allegedly based on one blurry license plate picture and mistaken visual confirmation alone, did not justify the intrusive tactics of a felony stop. In determining whether the seizure and search were unreasonable, the Court's inquiry is a dual one -- whether the officer's action was justified at its inception, and whether it was reasonably related in scope to the circumstances which justified the interference in the first place. *Terry,* 392 U.S. at 19-20. "The manner in which the seizure and search were conducted is, of course, as vital a part of the inquiry as whether they were warranted at all." *Terry*, 392 U.S. at 28. As a general rule, officers conducting an investigatory stop are authorized to take such steps as are reasonable necessary to protect their personal safety and to maintain the status quo during the course of the stop. *United States v.*

*Leshuk*, 65 F.3d 1105, 1109 (4th Cir. 1995) (citing *United States v. Hensley*, 469 U.S. 221, 235 (1985)). The Ninth Circuit held a jury could find that the intrusive tactics of a felony stop were not justified when there is simply a reasonable suspicion of vehicle theft. *Chinaryan v. City of Los Angeles*, 113 F. 4th 888, 902 (9th Cir. 2024)  In  *Chinaryan* the court reasoned that the officers were not certain that the vehicle was stolen, and rejected the arguments that a high risk stop was warranted because it approaching nightfall,  the vehicle had darkly tinted windows, and the officers' experience and training led them to believe that stolen vehicles are often linked with armed and dangerous individuals. *Id.* at 900-02.

In this case it is undisputed that there was only suspicion that the license plate was stolen and no other signs that the situation was dangerous.  The stop happened in broad daylight, the Plaintiffs were sitting at a light in the car, and the Plaintiffs had done nothing suspicious. Despite this, Plaintiffs were ordered from the car, placed in handcuffs, and there is a question of fact as to whether Defendant Zalewski drew his gun. Considering the totality of the circumstances and the facts known to the officers at the time of the stop, a jury could determine that there was no reasonable suspicion to conduct a felony stop in this case and that Defendants violated Plaintiffs' rights under the Fourth Amendment.  The officers, relying on untrustworthy evidence and failing to perform a proper investigation, used intrusive tactics that were unwarranted and unreasonable.  Defendants could have initiated a non-felony stop to give them time to investigate.  They could have pulled the car over, asked for Ms. Ashmon's license and registration, and then quickly and easily determined that the car and the plate were not stolen. Because the felony stop was not justified from its inception, the entire stop was unlawful even though it was relatively brief and the officers were relatively polite after they put their firearms back in their holsters.

Accordingly, this Court must determine that a jury, not the Court, should determine whether Defendants violated Plaintiffs Fourth Amendment rights and deny Defendant's Motion for Summary Judgment.

## II.   THE UNLAWFULNESS OF DEFENDANTS' CONDUCT WAS CLEARLY ESTABLISHED AT THE TIME OF THE STOP

In the Fourth Circuit, law enforcement officers are not entitled to qualified immunity when sued in their individual capacities when there is a violation of federal statutory or constitutional rights, and the unlawfulness of their conduct is clearly established at the time of the incident. *Omeish v. Kincaid*, 86 F.4th 546, 555 (4th Cir. 2023). The "clearly established" requirement means that "at the time of the officer's conduct, the law was sufficiently clear that every reasonable official would understand that what he was doing is unlawful." *Id.* Therefore, the law must have placed the constitutionality of the officer's conduct "beyond debate," such that "all but the plainly incompetent or those who knowingly violate the law" are protected. *Id.* (citing *Columbia v. Wesby,* 583 U.S. 48, 62-63 (2018). A case directly on point is not required, but existing authority must only have placed the constitutional questions beyond debate. *Atkinson v. Godrey,* 100 F.4ht 498, 505-06 (4th Cir. 2024 (*citing Kisela v. Hughes*, 584 U.S. 100, 104 (2018). Defendant deputies bear the burden of showing that they are entitled to qualified immunity. *Mays v. Sprinkle*, 992 F.3d 295, 302 n. 5 (4th Cir. 2021).

The unlawfulness of Defendants' conduct was clearly established at the time of the detainment at issue in this case. In the Order Granting Defendants' Motion for Summary Judgment. the Court distinguished the Nonth Circuit authority cited by the Plaintiffs to support their argument that the rights at issue were clearly established and rejected the authority as "out-of-circuit" authority. (Order p. 9)). However, as set forth above, there is binding authority from the U.S. Supreme Court and in this jurisdiction that clearly establishes that qualified immunity

offers no protection to "an officer who makes an honest but objectively unreasonable mistake." *Stewart v. Yulzy*, Civil Action No. ELH-12-1180, 2013 WL 3944473, at * 7 (D. Md. July 30, 2013) (citing *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)). It is clearly established in the Fourth Circuit that Defendants' subjective belief that the Plaintiffs license plate was stolen and the sincerity of that belief are as irrelevant to the qualified immunity analysis as they were to the underlying constitutional claim. *Henry*, 652 F.3d at 532 ("All actions . . . mistaken or otherwise, are subject to an objective test"). It is also clearly established that here is no protection for civil liability for a case "where an officer committed a constitutionally unreasonable seizure as the result of an unreasonable factual mistake*." Id.* at 535; *see also Graham v. Gagnon*, 831 F.3d 176, 184 (4th Cir. 2016) ("where the officer's mistake was objectively unreasonable, the officer may be subject to civil liability"). In this case, because Defendants have failed to produce the alleged picture from the FLOCK system that purportedly had the same letters and numbers as Plaintiffs' plate, it is unclear whether Defendants were "plainly incompetent" or whether they "knowingly violated the law," *see e.g. Belton v. Loveridge*, 129 F.4h 271, 279 (4th Cir. 2025), and there is ample evidence that the mistake was objectively unreasonable. Viewing the evidence in a light most favorable the Plaintiffs, this Court must find that every reasonable officer would understand the clearly established right of a person to be free from search and seizure based on an objectively unreasonable mistake and accordingly deny Defendants Motion for Summary Judgment.

## CONCLUSION

Plaintiff respectfully requests that the Court reconsider its Order Granting Defendants' Motion for Summary Judgment.

[signature page to follow]

<u>*s/ Elizabeth Dalzell*</u>
Elizabeth Dalzell
Fed I.D. No.  #68797
Shealey Law Firm
924 Gervais Street
Columbia, SC 29201
(803) 929-0008

*Attorney for the Plaintiff*

Columbia, South Carolina

September 16, 2025